# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE NORTHERN DISTRICT OF TEXAS
# FORT WORTH DIVISION

| | | |
|---|---|---|
| *In re:* § | | |
| § | | |
| **DUAL D HEALTH CARE** § | | |
| **OPERATIONS, INC. d/b/a KEMP** § | **CASE NO. 17-41320-elm** | |
| **CARE CENTER, LLC.** § | | |
| § | | |
| *Debtor.* § | | |

| | | |
|---|---|---|
| **SHAWN K. BROWN, Chapter 7** § | | |
| **Trustee for Dual D Health Care Operations,** § | | |
| **Inc. d/b/a Kemp Care Center, LLC,** § | | |
| § | | |
| Plaintiff, § | | |
| v. § | **ADVERSARY NO. 20-04059** | |
| § | | |
| **LLOYD DOUGLAS, Individually,** *et al.,* § | | |
| § | | |
| Defendants. § | | |

| | | |
|---|---|---|
| *In re:* § | | |
| § | | |
| **SPECIALTY SELECT CARE CENTER** § | | |
| **OF SAN ANTONIO, LLC** § | **CASE NO. 17-44248-elm-7** | |
| § | | |
| *Debtor,* § | | |

| | | |
|---|---|---|
| **SHAWN K. BROWN, Chapter 7** § | | |
| **Trustee for Specialty Select Care Center** § | | |
| **of San Antonio, LLC,** § | | |
| § | | |
| **Plaintiff,** § | | |
| v. § | **ADVERSARY NO. 20-04060** | |
| § | | |
| **LLOYD DOUGLAS, Individually, et al.,** § | | |
| § | | |
| Defendants. § | | |

**TRUSTEE'S MOTION TO STRIKE MICHAEL CRAIG KELLY
AS A "NON-COMPENSATED, NON-RETAINED" EXPERT**

## **TABLE OF CONTENTS**

I. DESIGNATION OF MR. KELLY ................................................................................... 1

II. *DAUBERT* CONSIDERATIONS SHOULD BE WEIGHED FOR LAY
 "EXPERTS" ..................................................................................................................... 1

III. MR. KELLY DOES NOT HAVE THE GENERAL OR SPECIFIC
 KNOWLEDGE TO OPINE ABOUT THE VALUE OF DEBTORS OR
 THEIR ASSETS ............................................................................................................... 2

## TABLE OF AUTHORITIES

**Page**

**CASES**

*Guile v. U.S.*, 422 F.3d 221, 227 (5th Cir. 2005) ................................................................. 2

*Hodges v. Mack Trucks, Inc.*, 474 F.3d 188, 193 (5th Cir. 2006) ........................................... 2

*McCune v. Graco Children's Prods., Inc.*, 495 F.3d 535, 539 (5th Cir. 2012) (quoting
   Fed. R. Evid. 702(b)-(d)) ................................................................................................. 1

*Viterbo v. Dow. Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987) ............................................. 2

*Wackman v. Rubsamen*, 602 F.3d 391, 400 (5th Cir. 2010) ................................................... 2

COMES NOW Plaintiff, Shawn K. Brown ("*Plaintiff*" or "*Trustee*"), Chapter 7 Trustee of the Dual D. Healthcare Operations, Inc. d/b/a Kemp Care Center, LLC and Specialty Select Care Center of San Antonio, LLC Bankruptcy Estates ("*Debtors*"),[1] and files this Motion to Strike Michael Craig Kelly as a "Non-Compensated, Non-Retained" Expert, and respectfully would show the Court the following:

## I.
## DESIGNATION OF MR. KELLY

1.  Michael Craig Kelly has been identified in the Initial Disclosures of the Defendants under Rule 26(a)(1)(A)(i) as follows:

> Mr. Kelly was the broker representing the sellers and is expected to be a non-compensated, non-retained expert regarding the *bona fides* of the sale and the lack of value of the debtor and its assets. …

See **Exhibit A**, *Initial Disclosures of the Defendants*, dated June 27, 2022, p. 2.

2.  Michael Craig Kelly should not be allowed to give any expert opinions regarding the "lack of value of the Debtor and its assets" since he does not have sufficient knowledge of the transaction in question nor a sufficient general knowledge base to render any such opinion.[2]

## II.
## *DAUBERT* CONSIDERATIONS SHOULD BE WEIGHED FOR LAY "EXPERTS"

3.  The subject of *Daubert* motions is not usually lay witness opinions, but the following statements from the applicable law in the area are useful in assessing Mr. Kelly's ability to give an opinion about the lack of value of the Debtors and the assets of the Debtors.

---

[1] While there are two separate estates, the Adversaries filed by the Trustee in behalf of each Estate are virtually identical and will be tried in a joint trial (but the Estates are not substantively consolidated). Consequently, the Trustee will only file this Motion once in behalf of both Debtors, and will require only one Response.

[2] The Trustee is not sure what is meant by Mr. Kelly would be an expert regarding the "*bona fides* of the sale." He was the broker on the sale, and if that testimony involved nothing more than there was a sale of nine assisted nursing operations for $130 million, there would be no objection to that.

4.      "The testimony is reliable if the expert bases the testimony on 'sufficient facts or data,' uses 'reliable principles and methods to the facts of the case." *McCune v. Graco Children's Prods., Inc.*, 495 F.3d 535, 539 (5th Cir. 2012) (quoting Fed. R. Evid. 702(b)-(d)). Unreliable expert testimony is not legally sufficient evidence. *Hodges v. Mack Trucks, Inc.*, 474 F.3d 188, 193 (5th Cir. 2006).

5.      To constitute "substantial evidence," the expert's opinion must be supported. *Wackman v. Rubsamen*, 602 F.3d 391, 400 (5th Cir. 2010); *Guile v. U.S.*, 422 F.3d 221, 227 (5th Cir. 2005). When an opinion is unsupported, it offers no assistance to a jury. *Viterbo v. Dow. Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987).

## III.
## MR. KELLY DOES NOT HAVE THE GENERAL OR SPECIFIC KNOWLEDGE TO OPINE ABOUT THE VALUE OF DEBTORS OR THEIR ASSETS

6.      Mr. Kelly gave his deposition on February 28, 2024, and in his testimony reproduced here, established absolutely and "unequivocally" that he did not have any – much less "sufficient facts or data" – to give any opinion as to the value of the Debtors, their assets or the value attributed to the assets of the Debtors.

```
 8          Did you appraise the real estate
 9    separately, or did someone appraise the real estate
10    separately?

11          A.   I mean, I have nothing to do with
12    appraising.  We will give names of people to do
13    that.  Marc Lussier was brought in to -- and I
14    forgot now -- put the numbers together and I guess
15    do the appraisal.
```

…

```
19        Q.   You don't know if he appraised the real
20   estate separately?
21        A.   No.  If he did, I didn't look at it or
22   remember looking at it.
```

...

```
16        Q.   So you -- you sell the property.  Now,
17   do you have anything to do with what goes on first
18   at the sale, the closing statement on how much
19   value is attributed to each different business or
20   facility?
21        A.   No.
22        Q.   You say this one was worth this much,
23   this one was worth this much?
24        A.   No.
25        Q.   After the sale, do you have anything to
 1   do with it?  And by -- by that, I mean input or
 2   talking or anything about what gets reported on a
 3   tax return?
 4        A.   No, never.  35 years of doing this,
 5   you'd be talking to the wrong person.
 6        Q.   Okay.
 7        A.   I'm not -- no.
 8        Q.   Okay.  So you don't -- you didn't do
 9   that in this sale, and --
10        A.   No.
11        Q.   -- you just don't do it generally.
12        A.   Never.
```

...

```
20           So in this -- in this sale, either
21   before or after, you had nothing to do with how the
22   sales proceeds were allocated between any of the
23   entities involved.
24       A.   No.
25       Q.   Okay.  And that would go for how much
 1   went to a real estate company, how much went to an
 2   operating company, or how much went to Casa Rio, or
 3   how much went to Kemp, or how much went to
 4   St. Mary's, or what have you.  You just didn't do
 5   that?
 6       A.   That's not what I do.
```

...

```
18       Q.   Most times.  I'm just going to show you
19   an agreement.  It's called an Operations Transfer
20   Agreement, and this one is for Kemp.  I'll ask you
21   if you think you've ever seen that before?
22       A.   I try not to get near these.
23       Q.   You don't -- so you don't review those?
24       A.   Huh-uh.  No, sir.
```

...

```
24       Q.   Yes, sir.
25       A.   "Assumed operating contracts."
```

```
 1        Q.    For the Kemp Care Center?
 2        A.    Yes.
 3        Q.    And how many of them are there?
 4        A.    41 -- 44.
 5        Q.    44.  And are these the -- are these the
 6   kinds of contracts that an operating company has to
 7   have to operate a skilled nursing center?
 8        A.    I would assume.  I've never taken the
 9   time to consider it.
```

...

```
11        A.    It's not...
12        Q.    Do you have any appreciation for how
13   long it would take to get these contracts or get
14   them in place?
15        A.    (Witness shakes head.)
16        Q.    You have to say it out loud.
17        A.    Oh, no.  Never.  Ever.      ...
```

...

```
14        Q.    All right.  Before the break, we -- we
15   looked at Exhibit 11, "Operations Transfer
16   Agreement."  You said that you didn't -- you hadn't
17   seen that before.  This is not part of what you
18   did, right?
19        A.    No.  I know they exist.  We call them
20   OTAs.
21        Q.    OTA.  But you don't --
22        A.    Honestly, I don't -- typically, I don't
23   even look at the contract.
```

```
24        Q.    Do you think you looked at -- didn't
25   look at the contracts in this transaction?
 1        A.    Probably not.
 2        Q.    And would the same be true for the
 3   lease?
 4        A.    Yes.  I don't --
 5        Q.    The lease agreement between the real
 6   estate company, operating company, you wouldn't
 7   review those?
 8        A.    It doesn't involve me.
 9        Q.    Okay.  And then here's a whole bunch of
10   tax returns, but you -- your testimony is for --
11   for Kemp and for Specialty Select Casa Rio, and
12   your testimony is you had nothing to do with any
13   valuations on any tax return.
14        A.    Correct.  Wow.
15        Q.    Whether it -- whether it was for --
16   whether it was for the operating company or the
17   real estate company or how the money was divided
18   between them?
19        A.    Correct.

20        Q.    Nothing to do with that.  And you had
21   nothing to do with those valuations in the sale.
22        A.    No, not a thing.
```

See **Exhibit B**, *Deposition of Craig Kelly*, p. 23, ll. 8-15, 19-22; p. 26, ll. 16-25; p. 27, ll. 1-12, 20-25; p. 28, 1-6, 18-24; p. 29, ll. 24-25; p. 30, ll. 1-9; 11-17; p. 33, ll. 14-25; p. 34, ll. 1-22.

7. Mr. Kelly, who has been designated as a "non-compensated, non-retained expert" regarding the lack of value of the Debtor and its assets:

    a. Generally does not have anything to do with any value attributed to each different business or facility on a Closing Statement;

    b. Does not participate in saying how much one was worth;

    c. Has never, in 35 years, helped anyone decide what should go on a tax return about value;

    d. In this particular sale, he had nothing to do with how the sales proceeds were allocated between the Real Estate Company or the Operating Company, or how much went to Casa Rio or Kemp (stating, "That's not what I do.").

    e. When asked about various agreements in this transaction, he responded, "I try no to get near these" and did not review them;

    f. He has no appreciation for the length of time that would be involved to assimilate the operating contracts. ("Oh, no. Never. Ever.")

    g. He probably did not even look at the contracts in the transactions involved here.

    h. Does not review the lease agreements between the Real Estate Companies and the Operating Companies. ("It doesn't involve me.")

    i. He had nothing to do with how the proceeds of the sale were divided between the various entities, including any division between the Operating Company or the Real Estate Company. (Nothing to do that? "No, not a thing.")

8. Mr. Kelly has shown that he not only does not have sufficient knowledge about the transactions and sales in question pursuant to which these Debtors' assets were given away, but that

is not an exercise he **ever** gets involved in in his business as a broker. He has testified that he simply does not have the knowledge or back ground of how those allocations are made, either generally or specifically.

9. He has not shown that he has even the lay basis of sufficient facts or data in order to give an opinion on the "lack of value of the Debtor and its assets."

## CONCLUSION AND RELIEF REQUESTED

The Trustee hereby requests that his Motion be granted and that Mr. Kelly not be permitted to testify about the value or "lack of value of the Debtor and its assets," and that he not be permitted to give any opinion of any kind about the matters he has testified to that he does not participate in and has no knowledge of.

WHEREFORE, premises considered, Plaintiff respectfully prays the Court grant Plaintiff's Motion, exclude Mr. Kelly from testifying at trial, and grant Plaintiff such other and further relief to which he may be justly entitled.

Respectfully submitted,

By: */s/ Jerry C. Alexander*                               */s/ Joseph F. Postnikoff*
    Jerry C. Alexander                                         Joseph F. Postnikoff
    Texas Bar No. 00993500                                Texas Bar No. 16168320
    **PASSMAN & JONES, P.C.**                            **ROCHELLE MCCULLOUGH, LLP**
    1201 Elm Street, Suite 2500                            300 Throckmorton Street, Suite 520
    Dallas, Texas 75270-2599                                Fort Worth, Texas 76102
    Tel: (214) 742-2121                                           Tel: (817) 347-5260
    alexanderj@passmanjones.com                       jpostnikoff@romclaw.com
  *Special Litigation Counsel for Shawn K. Brown, Chapter 7 Trustee*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 8th day of March 2024, a true and correct copy of the foregoing was served on counsel of record via e-mail.

> */s/ Jerry C. Alexander*
> Jerry C. Alexander