Davor Rukavina, Esq.
Texas Bar No. 24030781
Julian P. Vasek, Esq.
Texas Bar No. 24070790
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 4000
Dallas, Texas 75201
Telephone: (214) 855-7500

ATTORNEYS FOR THE DEFENDANTS

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| DUAL D HEALTH CARE OPERATIONS, | § | Case No. 17-41320-elm-7 |
| INC. d/b/a KEMP CARE CENTER LLC, | § | |
| | § | |
| Debtor. | § | |

| | | |
|---|---|---|
| SHAWN K. BROWN, Chapter 7 | § | |
| Trustee, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | ADVERSARY NO.  20-04059-elm |
| | § | |
| LLOYD DOUGLAS, Individually, *et al.*, | § | |
| | § | |
| Defendants. | § | |

## <u>DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>

TO THE HONORABLE EDWARD L. MORRIS, U.S. BANKRUPTCY JUDGE:

COME NOW Lloyd Douglas, Lloyd Douglas Enterprises, L.C., Brownwood Care Center

I, Ltd., D-5 Development, LLC, Sunflower Park Holdings, LP, Whispering Pines Healthcare, L.C.,

Mt. Pleasant Operators, LLC, Specialty Select Care Center, LLC, Graham Investors Group, LLC,

Kemp Investor Holdings, LLC, Kerens Care Center, Inc., and River City Life Care, Inc.

(collectively, the "Defendants"),[1] the defendants in the above-styled and numbered adversary proceeding (the "Adversary Proceeding"), and file this their *Proposed Findings of Fact and Conclusions of Law* as follows:

## I.      FINDINGS OF FACT

### A.      THE DEBTOR AND THE ESTATE

1.      On March 31, 2017 (the "Petition Date"), Dual D Health Care Operations, Inc. (the "Debtor") filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code, thereby initiating Bankruptcy Case No. 17-41320-elm-7 pending before this Court (the "Bankruptcy Case").

2.      The filing of the petition created the Debtor's bankruptcy estate (the "Estate").

3.      Shawn K. Brown (the "Trustee") is the duly appointed Chapter 7 trustee of the Estate.

### B.      THE DEBTOR'S FORMER BUSINESS AND STRUCTURE

4.      At all times material hereto, the Debtor was indirectly owned and controlled by Lloyd Douglas ("Douglas"), one of the Defendants herein.[2]

5.      Prior to July 30, 2015, the Debtor operated a 124 bed skilled nursing home known as Kemp Center and located at 1351 S. Elm Street, Kemp Texas (the "Facility").

6.      The Debtor did not own the real property or the improvements at the Facility. Rather, pursuant to that certain lease commencing on November 1, 2010 between the Debtor, as tenant, and Kemp Investor Holdings, LLC (the "Landlord"), as landlord, the Landlord owned the

---

[1]      Various of the Defendants have been dissolved, terminated, or cancelled. They appear herein in a limited matter and to a limited extent under protest, and only to the extent that they have any existence left for the purpose of defending against claims. In no way are they reconstituting themselves or waiving any issue or right by defending the Complaint. They reserve all rights regarding the same.

[2]      A very small percentage of such ownership was owned by the Debtor's former spouse, a point that is not relevant to any of the Court's analysis. The spouse did not control the Debtor or any of the other Defendants.

real property and improvements at the Facility, with the Debtor's interest limited to a leasehold interest.

7.      At all times material hereto, the Landlord was owned and controlled by Douglas. The Landlord and the Debtor were insiders.

8.      Furthermore, the furniture, fixtures, and equipment at the Facility—including the beds and medical equipment devices—were owned by the Landlord pursuant to the express terms of the Lease and because the Landlord purchased the same, using its capital and its secured loan from a third party.

9.      At all times material hereto, the Debtor was managed by Lloyd Douglas Enterprises, L.C. (the "Douglas Management"), a defendant herein.  At all times material hereto, Douglas Management was owned and controlled by Douglas.  Douglas Management and the Debtor were insiders.

10.      Douglas Management provided management services to the Debtor in exchange for monthly fees and payments.  These services included corporate overhead and staff, including officers, accounting services, regulatory services, legal services, insurance services, and the collection of receivables generated by the Debtor.  Douglas Management was also entitled to the reimbursement of expenses.

11.      The foregoing structure is standard and ordinary in the Texas nursing home market: one entity owns the real property, improvements, and FFE; one entity operates the nursing home; and one entity manages the nursing home for a fee.  That the three entities are insiders under common ownership and control is not only normal, it is standard.

12.      Thus, prior to July 30, 2015, the Debtor operated the Facility and had, as its principal assets, the receivables generated by said operations, payable by private insurance, cash, and, for the vast majority, government programs (Medicaid and Medicare).  The Debtor had other

assets with a much lower value in the nature of supplies.  In addition, the Debtor had intangible assets including goodwill, provider contracts (*e.g.* third parties providing goods and services to the Debtor for which the Debtor paid), and the use of a government provider number that enabled it to collect on governmental receivables.

13.     The Debtor also purchased liability insurance from Brae Insurance Company Limited ("Brae"), which was a captive insurance company of Douglas that serviced its claims processing and adjustment to a third-party company.

14.     The Brae policies provided for a limit of $250,000.00 per claim, with an overall limit of $750,000.00 in claims per year.  This was reasonable and appropriate.  Among other things, Texas law did not require that the Debtor have any liability insurance; Texas law generally caps damages at a nursing home at $250,000.00 and it would be highly unusual and unexpected to have more than three (3) claims asserted in any given year, the industry average being approximately one such claim per nursing home per year.

## C.    THE TORT CLAIMS

15.     On January 9, 2015 and March 7, 2016, two lawsuits were filed against the Debtor in Texas state court, alleging personal injury and wrongful death claims (the "Tort Claims").

16.     The Debtor disputed each of the Tort Claims and defended against each of the Tort Claims, including through to the Petition Date.  Furthermore, Brae denied the claims.

17.     The Debtor's denial of, and defense against, the Tort Claims was made in good faith, and the Debtor had every right and ability to contest the Tort Claims.  The Debtor was under no legal obligation to admit to any of the Tort Claims or to settle any of them, especially when the Debtor believed in good faith that none of the claims had any value but that instead the Debtor was set up by the San Antonio law firm.

18.     As of the Petition Date, both of the Tort Claims remained pending, disputed, contingent, and unliquidated.  No judgment was entered by any court with respect to any of the Tort Claims as of the Petition Date or after the Petition Date.  Nor did any of the Tort Claims claimants seek relief from the automatic stay to obtain judgments.

19.     In the Bankruptcy Case, and pursuant to Court order, the Trustee compromised and settled the Tort Claims by allowing each as a subordinated, unsecured claim in the amount of $190,000.00.  Such settlement and allowance is not binding on the Defendants.

20.     The Debtor's rights against Brae for denial of coverage, reimbursement of legal expenses, and liability insurance became property of the Estate.  At no time has the Trustee initiated any action against Brae to collect any of such claims.

**D.      THE SALE AND TRANSFER**

21.     As of July 30, 2015, Douglas had been in the nursing home business for approximately twenty (20) years.  Through tireless work, struggle, and sacrifice, Douglas was able to purchase, build, open, and indirectly own ten (10) nursing homes as of that date, of which the Debtor was one.  Douglas was a hands-on manager through Douglas Enterprises, travelling to the ten various locations frequently, personally handling management and staff, personally handling tort claims, and personally handling all aspects of the Debtor's and the other nursing homes' business, which included a professional team of officers and employees at Douglas Enterprises.

22.     By early 2015, various persons, and the premiere nursing home broker for the country, had been soliciting Douglas to sell his nursing homes for years.  By that time, the nursing home market was a seller's market, with various REITs having collectively raised billions of dollars to purchase nursing homes.  Douglas, after decades of hard work and approaching fifty (50) years of age, and seeing that it was indeed a seller's market, finally relented and agreed to put his nursing homes on the market.

23.    Contrary to the Trustee's allegation that Douglas wanted to exit the business because of the Tort Claims, what Douglas wanted was to monetize his hard work and investments, to retire, and to start the next stage of his life.  Avoiding the Tort Claims was not part of Douglas' motivation.

24.    As of July 30, 2015, only two of the nursing homes were facing tort lawsuits: the two against the Debtor, and ten against another of Douglas' nursing homes, Specialty Select Care Center of San Antonio, LLC ("Specialty Select").  Specialty Select filed a separate bankruptcy case, also under the administration of the Trustee, who has asserted very similar claims against the Defendants on behalf of the Specialty Select estate as he has asserted in this Adversary Proceeding.

25.    Thus, Douglas retained the broker to market the nursing homes.  By May 1, 2015, a contract had been secured to sell all ten properties to GruenePointe Acquisition I, LLC (the "Buyer") for the gross purchase price of $130,000,000.00 (the "Sale").

26.    The Buyer is not an insider of or affiliated with Douglas or any of the Defendants.

27.    The Sale was an arm's length transaction, between sophisticated entities employing professionals, and represented a fair, ordinary, and customary market transaction.  Nothing about the Sale was unusual or done with the aim of preventing the Tort Claims claimants from having any recovery.

28.    The Sale can best be characterized as a real estate transaction.  The Buyer, or its designee, was interested in purchasing the real property, the improvements, and the FF&E, and then having its operator operate its own nursing home at the various facilities or leasing them to an operator.  The Buyer was not buying any operations of the nursing homes, including those of the Debtor.  Nor was the Buyer, or any similar reasonably prudent buyer, willing to purchase the real estate and improvements subject to long term encumbrances such as the Lease.

29.     Thus, under the May 1, 2015 *Purchase and Sale Agreement*, all sellers, including the Debtor and the Landlord: (i) were required to terminate the Lease as a condition precedent; (ii) were required to terminate the management contract with Douglas Enterprises, as a condition of the Sale; and (iii) transferred certain property to the Buyer or its designee, including permitting the Buyer or its designee to use each provider number for a period of time while it obtained its own provider number.

30.     However, the receivables and cash of each of the sellers—including the Debtor— were not sold or transferred and were instead retained.

31.     Thus, on July 29, 2015, prior to the closing of the Sale, the Landlord and the Debtor, by agreement, terminated the Lease, and Douglas Enterprises and the Debtor terminated the management agreement.  At that moment, the Debtor could no longer operate as a nursing home as it no longer had a facility or FF&E, lost whatever going concern value it had, lost whatever enterprise value it had, and was left with only limited assets, consisting of its receivables, its cash, the provider contracts, limited supplies, goodwill, and its provider number.

32.     The Sale closed on July 30, 2015.  As part of the same, the Debtor transferred to the Buyer or its designee certain limited assets that it had (the "Transfer"), including the supplies, the vendor contracts, the goodwill, and the temporary use of the provider number.  The Buyer did not pay the Debtor any return consideration for the Transfer.

33.     However, the transferred assets had little to no value to the Debtor or to anyone else.  The vendor contracts, under which the Debtor made payments but did not receive money, had no value and were merely a convenience, saving the Buyer the time it would take to negotiate its own contracts.  The supplies had no value because it would cost more to destroy or remove them from the premises.  The goodwill had no value because of the public nature of the Tort Claims.

34.    The provider number had some value, at least to the Buyer.  This is because it would take any buyer approximately six months to secure its own provider number (as it needed a facility before it could even apply for the same), during which period of time, even if it generated governmental receivables, it could not be paid, instead being paid the accrued receivables only once it secured its own number.  Thus, it is standard and ordinary when a nursing home is transferred for the buyer to be permitted to use the seller's provider number for a period of time, in order that it may immediately commence receiving the receivables that it generates, which is of value for cash flow purposes.  Thus, after the Sale, the Debtor would collect all receivables, whether generated prior to or after the Sale, and would remit to the Buyer the Buyer's portion thereof, until the Buyer secured its own provider number, which is what occurred here.

35.    Even though the temporary use by the Buyer of the Debtor's provider number had some value to the Buyer, the Debtor did not lose the use of its provided number and continued to use it to collect its receivables.  In other words, the value of the Debtor's assets was not reduced by the Buyer's use of the provider number.

36.    As a result of the Sale, and after payment of all secured debt against the various sold properties, Douglas netted approximately $66 million.

37.    Immediately after the Sale, the Debtor had cash on hand of $259,767.  Adjusted for their fair value, the Debtor also had receivables worth $1,050,985, the vast majority of which it subsequently collected.  Further adjusted for undisputed liabilities, including trade vendors, but excluding the Tort Claims, the Debtor's assets exceeded its liabilities at and immediately after the Sale by $584,178.

38.    The Debtor was solvent prior to the Transfer, was not rendered insolvent by the Transfer, and was not insolvent after the Transfer.  Among other things, the Trustee failed to

present any evidence of the value of the Tort Claims from which the Debtor could be found to be insolvent under the balance sheet test.

39.     At the time of the Transfer, the Debtor was not engaged in business or in a transaction, and was not about to engage in business or a transaction, for which any remaining property of the Debtor was an unreasonably small capital.  On the contrary, the Debtor began to wind down its operations and had sufficient property to pay its undisputed debts in full, which it did.

40.     At the time of the Transfer, the Debtor did not intend to incur, or believe that it would incur, debts that were beyond its ability to repay as the same matured, and in fact the Debtor incurred no such debts.  The only obligations of the Debtor after the Transfer related to winding down its affairs and defending the Tort Claims, which it did.

41.     The Debtor, through the intent of Douglas, which intent is imputed to the Debtor, did not cause the Transfer or transfer any property to the Buyer, with the intent to hinder, delay, or defraud any creditor.

42.     On the contrary, Douglas left sufficient assets with the Debtor to enable the Debtor to pay all undisputed debt, which it did as it collected its receivables.  Moreover, the transaction concerning the Sale was identical with respect to the Debtor as with the other nine nursing homes, which transaction was customary and ordinary, further evidencing that no part of Douglas' intention with respect to the same were designed to hinder, delay, or defraud the Tort Claims creditors.

43.     The Trustee has failed to provide a value for the assets the subject of the Transfer. Such value, if anything, was nominal when viewed from the perspective of the Debtor and its creditors.

44.     The Debtor received reasonably equivalent value for any asset the subject of the Transfer because, while the Debtor did not receive any monetary consideration for the same, such assets were of no or nominal value.  The Trustee failed to present any evidence otherwise.

45.     At the time of the Transfer, and within a reasonable period of time thereafter, the Debtor did not have a creditor or incur a debt to a new creditor that was not paid.  The Tort Claims, while not paid, are not the types of claims that suffice for this test.

E.     **REMAINING TRANSFERS AND ISSUES**

46.     The Debtor made the following transfers to Douglas Enterprises (the "Douglas Enterprises Transfers):

| Date of Transfer | Method of Transfer | Amount of Transfer |
|---|---|---|
| 03/26/14 | Wire Transfer | $ 150,000.00 |
| 05/22/14 | Wire Transfer | 250,000.00 |
| 07/09/14 | Wire Transfer | 300,000.00 |
| 10/15/14 | Wire Transfer | 400,000.00 |
| 12/11/14 | Wire Transfer | 300,000.00 |
| 12/23/14 | Wire Transfer | 200,000.00 |
| 02/03/15 | Wire Transfer | 100,000.00 |
| 03/12/15 | Wire Transfer | 100,000.00 |
| 05/04/15 | Wire Transfer | 250,000.00 |
| 06/22/15 | Wire Transfer | 200,000.00 |
| 09/24/15 | Wire Transfer | 100,000.00 |
| 09/25/15 | Wire Transfer | 150,000.00 |
| 11/12/15 | Wire Transfer | $75,000.00 |

47.     Each of the Douglas Enterprises Transfers was a payment by the Debtor on legitimate debt owed by the Debtor to Douglas Enterprises, including for management services and fees and expense reimbursements.

48.     The Debtor was not insolvent when it made the Douglas Enterprises Transfers, and was not rendered insolvent by them.

49.     The Debtor received reasonably equivalent value for each of the Douglas Enterprises Transfers, including a dollar-for-dollar reduction of debt and for management services provided by Douglas Enterprises.

50.     The Debtor did not make the Douglas Enterprises Transfers in order to hinder, delay, or defraud any creditor.  These were payments on legitimate debt pursuant to a long-standing agreement that predated the Tort Claims by years.

51.     The Trustee has failed to present any evidence of any damages to the Debtor resulting from Douglas' alleged breaches of fiduciary duty to the Debtor.

52.     The Trustee has failed to present any evidence on causation to the effect that any action or inaction of Douglas alleged to constitute a breach of fiduciary duty caused any damage or injury to the Debtor.

53.     Douglas did not breach any fiduciary duty with respect to causing the Debtor to purchase insurance from Brae.  On the contrary, the Debtor was not required to purchase any such insurance, and purchasing insurance with the per claim limit and overall limit involved with Brae was reasonable and prudent and in the proper interest of the Debtor.

54.     Additionally, the business judgment rule protects Douglas' decision with respect to Brae.

55.     Douglas did not breach the fiduciary duty of care to the Debtor in causing the Debtor to engage in the Sale or the Transfer.  Douglas ensured that the Debtor had sufficient assets to pay its undisputed debt, Douglas ensured that he and Douglas Enterprises monetized the Debtor's receivables in order to pay such debt, and paid such debt, and the assets that Douglas caused the Debtor to transfer for no monetary consideration had no value to the Debtor or to its creditors.

56.     Additionally, Douglas' decision is protected by the business judgment rule.

57.    Texas law does not impose on Douglas any duty to cause the Debtor to pay a disputed, contingent, and unliquidated tort claim, and Douglas had every right to contest such claims and to cause the Debtor to contest such claims.

58.    With respect to the duty of loyalty regarding the Sale and the Transfer, Douglas did not put his interests above the interests of the Debtor.  There were no proceeds properly payable for the assets the subject of the Transfer, thus there were no hidden proceeds which Douglas diverted to himself.  Furthermore, Douglas ensured that the Debtor paid its undisputed debts before causing the Debtor to pay any insider debt to himself or his other companies.

59.    If any decision of Douglas could be challenged, it was to cease the Debtor's operations.  However, the Trustee has not sought any relief related to this, Douglas was entitled to cease the Debtor's operations, and there is no support in the law that ceasing an entity's operations is a breach of fiduciary duty.  Douglas' fiduciary duties extended to the Debtor and not to its creditors; thus, ceasing business operations, even if it arguably harmed a creditor, could not be a breach of fiduciary duty, and Texas law imposes no duty to continue a business in operation in order to pay creditors.

60.    After the Sale, Douglas and Douglas Enterprises continued to collect the Debtor's receivables, and to use the proceeds of the same to pay all undisputed debt and to fund the defense of the Tort Claims.  As part of the same, due to cash flow issues during the Debtor's wind down, Douglas advanced certain funds to the Debtor both directly by way of contribution and indirectly by way of paying certain of the Debtor's litigation expenses in defending against the Tort Claims.

61.    Such advances were debt and not equity, on which Douglas was entitled to repayment.

62.    After the Transfer, the Debtor paid Douglas various amounts in repayment of such debt and advances.  Paying such debt, even if insider debt, was not a breach of fiduciary duty.

63.     On January 5, 2017, the Debtor paid $78,560.66 to Douglas by check for the repayment of loans and advances made by him to the Debtor (the "<u>Douglas Transfer</u>").  This was a repayment by the Debtor to Douglas of advances Douglas had made to and for the Debtor's benefit, including by advancing the costs of defending the Tort Claims.

**F.     <u>DEBTOR'S TAX RETURNS</u>**

64.     The Trustee presented into evidence the Debtor's original 2015 tax return that listed a sale of the Debtor's assets worth millions of dollars.  The Trustee urges that this is key evidence that the Debtor transferred assets worth millions of dollars and that Douglas diverted these proceeds to himself.

65.     However, this was a mistake caused by the Debtor's tax accountant, as he admits.  Once Douglas caught the mistake, he had the Debtor file an amended return for 2015 that omitted reference to any such sale.

66.     The Court finds the accountant's and Douglas' explanation for this to be credible.  Most obviously, as a result of the amendment, Douglas incurred personal taxes of several hundred thousand dollars, which he paid.  Prior tax returns of the Debtor did not list the assets which the original return stated were sold.  Moreover, it is clear from the Sale documents that no portion of the purchase price was allocated to the Debtor and that no assets of the Debtor worth anywhere close to the amount listed in the original return were involved.  And, the Debtor carried no such assets and no such values on its books and records.  Finally, while the tax returns may be some evidence of assets and values, they are not conclusive and cannot change the actual, factual substance of what transpired and what values were.

## II.     <u>CONCLUSIONS OF LAW</u>

**A.     <u>JURISDICTION AND VENUE</u>**

67.     The Court has jurisdiction over this Adversary Proceeding under 28 U.S.C. § 1334.

68.     Said jurisdiction is core under 28 U.S.C. § 157(b)(2).  To the extent any matter herein is not core, all parties have consented to this Court's entry of final orders and judgment.

69.     Venue of this Adversary Proceeding before this Court is proper under 28 U.S.C. §§ 1408 and 1409.

**B.     FRAUDULENT TRANSFER CLAIMS FOR THE TRANSFER**

**1.     Insolvency**

70.     The Trustee bears the burden of proof on the Debtor's insolvency related to the Transfer.  *See, e.g., In re WCC Holding Corp.*, 171 B.R. 972, 984 (Bankr. N.D. Tex. 1994).

71.     Without taking into account the Tort Claims, the Debtor was solvent both before and after the Transfer.  Among other things, the Debtor retained its receivables and cash after the Sale, which was sufficient to pay all undisputed debt, which the Debtor in fact paid.  Rather, the Trustee attempts to satisfy his burden of proving insolvency by including the Tort Claims in his insolvency arguments.

72.     The Bankruptcy Code defines "insolvent" as the "financial condition such that the sum of such entity's debts is greater than all of such entity's property, *at a fair valuation*."  11 U.S.C. § 101(32)(A) (emphasis added).  The qualification of "fair valuation," importantly, applies to both "debts" and "property," as confirmed by the Fifth Circuit.  *See Orix Credit Alliance, Inc. v. Harvey (In the Matter of Lamar Haddox Contractor Inc.)*, 40 F.3d 118, 121 (5th Cir. 1994); *accord Waller v. Pidgeon*, 2008 WL 2338217 at *4 (N.D. Tex. 2008).  This is also the case under TUFTA.  *See* TEX. BUS. & COMM. CODE § 24.003.

73.     In this respect, the case law is unanimous that unliquidated personal injury and wrongful death claims are not included at their asserted or face amounts for an insolvency analysis.  *See F.D.I.C. v. Bell*, 106 F.3d 258, 264 (8th Cir. 1997); *In re Oakes*, 7 F.3d 234, 1993 WL 339725 at *3 (6th Cir. 1993); *Covey v. Commercial Nat. Bank of Peoria*, 960 F.2d 657, 659-660 (7th Cir.

1992); *In re Chase & Sanborn Corp.*, 904 F.2d 588, 594 (11th Cir. 1990); *Sierra Steel, Inc. v.
Totten Tubes, Inc. (In re Sierra Steel Inc.)*, 96 B.R. 275, 279 (B.A.P. 9th Cir. 1989); *In the Matter
of Xonics Photochemical Inc.*, 841 F.2d 198, 199-200 (7th Cir. 1988); *Waller v. Pidgeon*, 2008
WL 2338217 at *1 (N.D. Tex. 2008); *In re Heritage Organization LLC*, 375 B.R. 230 (N.D. Tex.
2007).

74.      Therefore, the Trustee cannot meet his burden of proof on insolvency without
appropriately discounting the Tort Claims for the likelihood that they will succeed and the
likelihood of at what amount they may be allowed.

75.      In this respect, the Trustee offered no expert opinion or analysis on what the fair
valuation of the Tort Claims may be.

76.      Likewise, the Tort Claims, by way of proof of claim or underlying state court
petitions, cannot be admitted into evidence for the truth of the matters asserted therein, since they
contain hearsay and double hearsay.  *See, e. g., In re DePugh*, 409 B.R. 125, 139-140 (Bankr. S.D.
Tex. 2009); *In re Alpha Protective Svcs., Inc.*, 531 B.R. 889 (Bankr. M.D. Ga. 2015); *In re
Harmony Holdings, LLC*, 393 B.R. 409, 413 (Bankr. D.S.C. 2008).

77.      Nor does the Bankruptcy Code change this analysis.  While proofs of claim may be
deemed allowed unless objected to under section 502(a) of the Bankruptcy Code, that applies only
against the Estate and not third-party defendants.  This is required by due process, fundamental
fairness, and the underlying law of fraudulent transfer, where a consent judgment (the equivalent
of a deemed allowed proof of claim) is insufficient to constitute evidence of the amount of debt.
*See Colonial Leasing Co. of New England v. Logistics Control Group International*, 762 F.2d 454
(5th Cir. 1985); *Parks v. Worthington*, 109 S.W. 909, 911 (Tex. 1908).

78.      Therefore, the Trustee has failed to admit any evidence that the Debtor was
insolvent prior to the Transfer or was rendered insolvent by the Transfer.  Importantly, even if the

Court were to infer some value to the Tort Claims, even of a nuisance amount, more than $1 million of assets, even on an adjusted basis, remained with the Debtor after the Transfer. There is no evidence or logical deduction from which the Court can conclude that the Tort Claims, even if they had some value, had a value in excess of the assets that remained with the Debtor.

     **2.**    **What was Transferred**

79.    The Trustee asserts that what was transferred as a result of the Sale was the Debtor's going concern value, and that, therefore, any avoidance of the Transfer should result in a judgment for the amount of the Debtor's going concern value. This is wrong for two reasons.

80.    First, the operative documents clearly demonstrate that the Debtor's going concern was not transferred. The Transfer expressly consisted of certain vendor contracts, certain intangible rights, certain supplies on hand, and the temporary use by the Buyer of the Debtor's provided number. These, and not the going concern, were transferred, as further evidenced by the fact that the Debtor's receivables and cash stayed with the Debtor.

81.    Second, immediately prior to the Sale, the Landlord terminated the Lease. At that point in time, the Debtor lost all going concern, or enterprise, value. In order to have an operational nursing home, the Debtor would need, among other things, a facility and equipment (including beds and medical machines) in the facility. The Landlord, and not the Debtor, owned this real property and personalty, which was not transferred. Thus, at the moment of the Sale and the Transfer, the Debtor had no business and no going concern value to transfer, and it did not transfer the same.

82.    Both the Bankruptcy Code and TUFTA apply to a "transfer" of an interest in "property" or in an "asset." There is no such "property" or "asset" that is a going concern; rather, a collection of other property or assets creates a going concern. Separately, the termination of the Lease may have been a "transfer," but the Trustee has not asserted any cause of action related to

such termination. Nor is the termination of the Debtor's business, a "transfer" in the first place, as it is not a "mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property." 11 U.S.C. § 101(54)(D). Douglas may, for example, have incinerated a valuable painting that he owned and, whether or not that may give rise to some other cause of action, it does not give rise to a fraudulent transfer because the incineration of that painting is not a "transfer." For the same reason, his decision to terminate the Debtor's business as a going concern is not actionable as a fraudulent transfer.

83.    Thus, the only property or assets that are properly at issue for fraudulent transfer are the minor assets that were actually transferred to the Buyer. The Trustee has failed to offer any evidence as to the value of these assets, aside from his expert's opinion of a going concern or enterprise value which, as concluded above, is no evidence of the value of the actual assets that were transferred.

### 3.    Value of Transferred Assets

84.    For a constructively fraudulent transfer, and with respect to one of the badges of fraud for an actually fraudulent transfer, the Trustee bears the burden of proving that the Debtor received less than reasonably equivalent value for the Transfer. *See In re Hannover Corp.*, 310 F.3d 796, 802 (5th Cir. 2002); *In re Furniture 4 Less Inc.*, 2005 WL 6441378 at *5 (Bankr. N.D. Tex. 2005). Value must be determined at the time of the transfer. *See Furniture 4 Less*, 2005 WL 6441378 at *5.

85.    In the context of fraudulent transfer, the value of a transferred asset is to be determined from the Debtor's perspective. *See Hannover Corp.*, 310 F.3d at 802. Under a balance sheet analysis, the reasonable equivalence standard is satisfied if the Debtor's balance sheet is the same pre-transfer and post-transfer. *See In re Dunbar*, 313 B.R. 430, 437 (Bankr. C.D. Ill. 2004). *See also In re The Heritage Organization LLC*, 375 B.R. 230, 284 (Bankr. N.D. Tex. 2007).

86.     Here, the Trustee has demonstrated that the Debtor did not receive any cash consideration for the assets the subject of the Transfer, but he has failed to present any evidence as to what the value of those assets was.  For this reason, his claim that the Debtor received less than reasonably equivalent value fails.

87.     In a different case, the Court could perhaps infer that the transferred assets had some value, and that zero is not reasonably equivalent as a matter of law.  Here, the Court cannot make that inference.  When the Debtor lost its Lease and its business operations, none of the assets that were transferred had any value from the Debtor's perspective.  The vendor contracts had no implied value, the goodwill had no implied value, the supplies had no value and likely a negative value as it would take money to destroy or remove them, and, while the Buyer had some value for the use of the provider number, whatever value the use of that number had to the Debtor was not lost because the Debtor continued using that number to collect its receivables.

88.     The only evidence as to the value of the transferred assets is that they had no value.  Thus, being transferred for no cash consideration is not less than reasonably equivalent value, especially when considered from the perspective of the Debtor and its creditors.  Or, stated differently, the Debtor could not have monetized those assets to pay creditors and, if they attached or foreclosed against those assets, they would have received nothing for them and would have been out their litigation and other fees and expenses.

### 4.     Actual Fraudulent Transfer Claims Under the Bankruptcy Code

89.     The Trustee bears the burden of proof on each element of a fraudulent transfer under the Bankruptcy Code.  *See, e.g., In re WCC Holding Corp.*, 171 B.R. 972, 984 (Bankr. N.D. Tex. 1994).

90.     Under the Bankruptcy Code, the Trustee may avoid a transfer as an actual fraudulent transfer if the debtor "made such transfer . . . with actual intent to hinder, delay, or

defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted." 11 U.S.C. § 548(a)(1)(A).

91.     Because a debtor will rarely admit to such fraudulent intent, courts apply various "badges of fraud," which include the following:

(1) the transfer or obligation was to an insider;

(2) the debtor retained possession or control of the property transferred after the transfer;

(3) the transfer or obligation was concealed;

(4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(5) the transfer was of substantially all of the debtor's assets;

(6) the debtor absconded;

(7) the debtor removed or concealed assets;

(8) the value of consideration received by the debtor was [less than] reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

*In re Texas O&P Operating Inc.*, 2022 WL 2719472 at *8 (Bankr. N.D. Tex. 2022).

92.     Here: (i) the Transfer was not to an insider; (ii) the Debtor did not retain possession or control over the transferred property; (iii) the Transfer was not of substantially all of the Debtor's assets, as the vast majority of those assets were retained; (iv) the Debtor did not abscond, but instead remained in existence to liquidate its assets and pay legitimate debts; (v) the Debtor did not remove or conceal assets; (vi) the Debtor was not insolvent before or after the Transfer;

Case 20-04059-elm   Doc 96   Filed 03/15/24   Entered 03/15/24 13:17:55   Desc Main
Document      Page 20 of 29

(vii) the Transfer did not occur shortly before or after a substantial debt was incurred; and (viii) the Debtor did not transfer the assets to a lienor who then transferred the assets to an insider.

93.     The Trustee argues that the Transfer was concealed.  However, there is no evidence of this.  In fact, the Sale, and therefore the Transfer, was public and involved the filing of public records, such as transfer deeds.

94.     With respect to reasonably equivalent value, the Trustee has failed to present evidence demonstrating the presence of this factor, for the reasons discussed above.

95.     The only factor that is present is that, prior to the Transfer, the Debtor was threatened with suit.

96.     The presence of this one factor is insufficient to conclude that the Trustee has sustained his burden of demonstrating an actual fraudulent transfer.  Furthermore, the badges of fraud are merely a guide to demonstrate the required intent.  Here, the Transfer was not undertaken to hinder, delay, or defraud a creditor because:

(i)     Douglas decided to sell all of his nursing homes because the broker had been pushing him for years to do so and the market in 2015 was a seller's market, not because he wanted to avoid paying the Debtor's debts;

(ii)    Douglas decided to retire and enjoy the fruits of his decades of hard work and investment, not because he wanted to avoid paying the Debtor's debts;

(iii)   the transaction for the Debtor was the same as with respect to the other nine (9) nursing homes: nothing was done differently with respect to the Debtor to suggest an intent to prevent the Tort Claims creditors from being paid;

(iv)    Douglas caused the Debtor to retain most of its assets, including receivables and cash, and to continue operations to liquidate its receivables, which receivables and cash were used to pay undisputed trade and other debts, and which he would not have done were he trying to avoid having the Debtor pay its debts;

(v)     the Sale and the Transfer were structured in the manner that they were at the demand of the Buyer, and not at the demand of Douglas, in what was an ordinary and customary market transaction; and

(vi)    the broker, a neutral third party, confirmed that the Sale and the Transfer were above-board, arm's length, and market-standard and reasonable.

DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW—Page 20

97.     In the end, the Buyer required that the Landlord terminate the Lease, which the Landlord did as a condition to closing the Sale. Thus, at the time of the Sale, the Debtor no longer had a lease, facilities, beds, or anything else that it would need to continue as a going concern. The only thing that one might have complained about is the termination of the Debtor as a going concern prior to the Sale. However, that is not a fraudulent transfer because it is not a "transfer," and the Trustee has not sued the Landlord to avoid the termination of the Lease or otherwise to assert any cause of action against any of the Defendants for the termination of the Lease.

98.     Accordingly, the Debtor did not transfer any assets under the Sale or the Transfer with the intent of hindering, delaying, or defrauding any creditor.

**5.     Constructive Fraudulent Transfer Claims Under the Bankruptcy Code**

99.     Under the Bankruptcy Code, the Trustee may avoid a transfer if the Debtor "received less than a reasonably equivalent value in exchange for such transfer" and the Debtor "(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation; [or] (II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; [or] (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured." 11 U.S.C. § 548(a)(1)(B).

100.    The Debtor was not insolvent at the time of the Transfer and the Transfer did not render the Debtor insolvent. Among other things, the Debtor retained all of its receivables and cash after the Transfer, which was sufficient to pay all outstanding obligations, and the Trustee has failed to value the Tort Claims so as to conclude otherwise. For the same reasons, the Debtor's capital was not unreasonably small to effectuate its remaining business, which was to wind down.

And, the Debtor did not intend or believe that it would incur debts beyond its ability to repay them when they matured and, in fact, the Debtor did not incur any such debts.

101.    Additionally, for the reasons concluded above, the Trustee has failed to demonstrate that the Debtor received less than reasonably equivalent value for the Transfer.

102.    Accordingly, the Debtor did not transfer any assets in the Transfer for less than reasonably equivalent value when it was insolvent, and the Transfer did not render the Debtor insolvent.

### 6.    __TUFTA__[3]

103.    For substantially the same reasons as stated above with respect to the Trustee's actual fraudulent transfer claims under the Bankruptcy Code with respect to the Transfer, the Debtor did not transfer any assets in the Transfer with the intent to hinder, delay, or defraud any creditor within the meaning and operation of TUFTA.

104.    For substantially the same reasons as stated above with respect to the Trustee's constructively fraudulent transfer claims under the Bankruptcy Code with respect to the Transfer, the Debtor did not transfer its assets for less than reasonably equivalent value while insolvent, and the Transfer did not render the Debtor insolvent, all within the meaning and operation of TUTFA.

105.    The Court further denies the Trustee's TUFTA claims for an additional reason. The Trustee may assert these claims on behalf of creditors pursuant to section 544 of the Bankruptcy Code. This, in turn, requires the Trustee to prove the existence of a "golden creditor," *i.e.* "an actual unsecured creditor holding an allowable unsecured claim as of the date of the petition that could avoid the challenged transfer." *In re Essential Fin. Educ. Inc.*, 629 B.R. 401, 420 (Bankr.

---

[3] The Defendants do not concede that the Trustee has pled or preserved a cause of action to avoid the Douglas Transfer and the Douglas Enterprises Transfers as a constructively fraudulent transfer under TUFTA, Count 2 of this complaint being limited to the Transfer. The Defendants include this discussion because it overlaps with claims at the Specialty Select case, because it relates to other actual fraudulent transfer claims in this case, and in the event that the Court disagrees with the Defendants' position.

N.D. Tex. 2021). Because the underlying law is TUFTA, this requires the Trustee to prove the existence of a creditor who could avoid the Transfer under TUFTA, which requires a creditor whose "claim arose before or within a reasonable time after the transfer was made." TEX. BUS. & COMM. CODE §§ 24.005 & 24.006.

106.    The only creditors that the Trustee attempted to identify prior to or at the time of the Transfer are the holders of the Tort Claims. In this respect, however, Texas law provides that, while such a creditor would have standing to file an action under TUFTA, the creditor's claim must actually be reduced to judgment in order to recover under TUFTA. *See Colonial Leasing Co. of New England v. Logistics Control Group International*, 762 F.2d 454, 458 (5th Cir. 1985).

107.    Therefore, insofar as the Trustee has failed to identify the required "golden creditor," the Trustee's claims under section 544 of the Bankruptcy Code and under TUFTA are denied.

**7.  <u>Section 550 of the Bankruptcy Code</u>**

108.    The Trustee seeks to recover, by money judgment, any transfer of assets by the Debtor in the Transfer that is avoided, pursuant to section 550 of the Bankruptcy Code. Because no such transfer is avoided, there is nothing to recover. However, the Trustee's claims under section 550 fail for an additional reason. Under that section, the Trustee may recover "the property transferred, or, if the court so orders, the value of such property." 11 U.S.C. § 550(a). The Trustee does not seek a recovery of the transferred property and has not sued the Buyer as the initial transferee to so obtain. Thus, he is limited to a recovery of the value of the property. This is his burden of proof on which, as concluded above, he has failed to present any evidence. Thus, even if there was a transfer to avoid, the Trustee has failed to evidence what the value of that transfer, and therefore of any money judgment, should be. At best, the Trustee would be entitled to a nominal damages amount of $1.00.

## C.    FRAUDULENT TRANSFER CLAIMS FOR OTHER TRANSFERS

109.    The Trustee seeks to avoid and recover, as actual and constructively fraudulent transfers, $2,575,000.00 in management fees to Douglas Enterprises.

110.    With respect to actual fraudulent transfer, these fees were not paid with the intent to hinder, delay, or defraud a creditor.  Among other things, these fees had been paid for years before the Tort Claims in exchange for valuable services provided by Douglas Enterprises to the Debtor on account of legitimate and lawful obligations, whether above market or not.

111.    Only one badge of fraud with respect to the same exists, in that they were paid to an insider.  This lone badge of fraud is insufficient to make a *prima facie* case of actual fraudulent transfer.  Furthermore, various of the other important badges of fraud are not present, including lack of reasonably equivalent value, insolvency, and concealment.

112.    With respect to constructively fraudulent transfer, these payments cannot be avoided unless the Trustee avoids the underlying agreement pursuant to which they were made, which he has not sought to do and has not done.

113.    Furthermore, the Debtor was not insolvent when these transfers were made and they did not render the Debtor insolvent.  And, the Debtor received reasonably equivalent value for the transfers.  While the Trustee argues that these management fees were above market, the evidence demonstrated the contrary and, even if so, they could only be avoided as above-market as constructively fraudulent transfers which, because the Debtor was solvent, they cannot be.

114.    Additionally, the Debtor receives value when it repays a debt, even to an insider.  *See* 11 U.S.C. § 548(d)(2)(A); TEX. BUS. & COMM. CODE § 24.004.  Thus, when the Debtor repaid its obligations to Douglas Enterprises through these transfers, the Debtor received reasonably equivalent value as a matter of law.

115.    With respect to TUFTA (to the extent that the Trustee seeks relief on these payments under TUFA), as otherwise concluded above, the Trustee has failed to identify a "golden creditor" as required under section 544 of the Bankruptcy Code and under TUFTA.  For that additional reason, the Trustee's claims to avoid and recover these transfers fail.

**D.**    **PREFERENCE CLAIMS**

116.    The Trustee asserts an insider preference against Douglas to avoid and recover a payment to Douglas from the Debtor in the amount of $78,560.66 on January 5, 2017, to reimburse Douglas for advances he had made to the Debtor or on the Debtor's behalf.

117.    In order to recover this payment as an insider preference, the Trustee must prove, among other things, that the Debtor was insolvent when it made the payment.  *See* 11 U.S.C. § 547(b)(3).  The Trustee is entitled to a presumption of insolvency within ninety (90) days of the petition Date.  *See* 11 U.S.C. § 547(f).

118.    Here, that presumption is overcome by the evidence.  Excluding the Tort Claims, on which the Trustee failed to present evidence of value, the only undisputed, non-insider claim against the Debtor arose in March, 2017 and is in the amount of $14,327.06, asserted by Sullivan & Cook, LLC, which Douglas paid anyway.  In any event, this claim arose after the date of the payment and there is no evidence otherwise of any undisputed debt of the Debtor on the date of payment.  Thus, the Debtor was not insolvent when it made the payment.

119.    Accordingly, the Trustee's claim to avoid and recover the payment as an insider preference is denied.

**E.**    **BREACH OF FIDUCIARY DUTY CLAIMS**

120.    As held by the Supreme Court of Texas, the elements of a breach of fiduciary duty claim are: "(1) the existence of a fiduciary duty, (2) breach of the duty, (3) causation, and (4)

damages." *First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 220 (Tex. 2017).

121.    The Defendants served the following interrogatory question on the Trustee: "[w]ith respect to Count V of your Complaint and with respect to each action or inaction (negligence or gross negligence) you assert as the basis for each breach of fiduciary duty claim, identify the damages resulting from each such breach and explain how you arrived at such number."  On January 25, 2023, the Trustee answered this interrogatory as follows: "Undetermined. Facts will be developed through discovery."

122.    The Trustee never supplemented this interrogatory response, or provided any expert opinion or other information as to what his breach of fiduciary duty damages and damages model may be.  It is fundamentally unfair for Douglas to defend a claim that the Trustee has not explained in discovery.   And, without knowing what the Trustee's alleged damages may be, it is not reasonably possible for Douglas to fairly defend against any causality argument or evidence.

123.    The Trustee had a duty to supplement his interrogatory answer if and when he formed his damages model.  *See* Fed. R. Civ. P. 26(e)(1).  The basic purpose of this rule is to prevent prejudice or surprise at trial.  *See, e.g., Brower v. Staley Inc.*, 2008 WL 5352019 at *2 (5th Cir. 2008).  Either the Trustee has failed with respect to that duty or he has been unable to identify any breach of fiduciary duty damages—which is his burden of proof.  Excluding evidence the subject of an interrogatory where the party failed to properly supplement it is proper.  *See, e.g., Murphy v. Magnolia Elec. Power Ass'n*, 639 F.2d 232, 234 (5th Cir. 1981).  In determining whether to exclude evidence when one breaches the duty to supplement an interrogatory, courts should consider: 1) the explanation, if any, for the failure, 2) the importance of the evidence, 3) potential prejudice in allowing the evidence, and 4) possibility of continuance to cure such prejudice.  *See, e.g., Geiger v. Monroe County Miss.*, 2021 WL 5933129 at *2 (N.D. Miss. 2021).

124.   Here, the consideration of these factors is only marginally helpful because, even at the time of trial, the Trustee has not provided *any* evidence or allegation to Douglas as to what his alleged breach of fiduciary duty damages are, which as pointed out above also goes to causation.

125.   Therefore, the Court will not permit the Trustee to present any evidence or argument on any alleged damages or causation with respect to his breach of fiduciary duty claims against Douglas.  As such, the Trustee has failed to offer evidence on two elements of his cause of action, and that cause of action is denied.

126.   Alternatively, the Court will review the alleged breaches of fiduciary duty as answered by the Trustee in response to interrogatory no. 10, asking the Trustee to state the date on which each alleged breach occurred.

127.   One such alleged breach is: "On or about December 21, 2010, Douglas formed Brae Insurance Company Limited as a captive insurance company and personally, or through Douglas Enterprises contracted with Brae Insurance Company Limited to provide liability insurance coverage to the Debtor and renewed the insurance coverage periodically."  This is well outside the statute of limitations and is denied.  Even so, Douglas caused the Debtor to purchase insurance for up to three claims per year at up to $250,000 per claim, which was proper because no such insurance was even required, there is a Texas cap generally of $250,000 per claim, and it was highly and unreasonably unlikely that more than three such claims would be asserted in any year.

128.   Another such allegation, to the extent made and preserved, is that Douglas caused the Debtor to pay excessive management fees to Douglas Enterprises.  For the reasons found and concluded above, however, these fees were not excessive and the Trustee has not sought to avoid the underlying agreement.  Douglas did not breach the duty of care and was entitled to the business judgment rule.  Nothing about paying legitimate debt breaches the duty of care or the duty of loyalty, as Douglas was permitted to prefer one creditor over another under fiduciary duty

principles, and Douglas and the Debtor in good faith and reasonably did not believe that any of the Tort Claims were meritorious such that there was any preferential payment.

129.    Finally, the Trustee complains that Douglas breached his fiduciary duties with respect to the Sale and the Transfer.  This was not a breach of the duty of care, because, at most, Douglas caused the Debtor to transfer worthless assets for nothing, which is not gross negligence and is protected by the business judgment rule.  And, this was not a breach of the duty of loyalty, because there was no hidden value or hidden proceeds that Douglas channeled to himself as opposed to the Debtor.

130.    Finally, even if there were any such hidden proceeds, the Debtor was solvent and, characterizing any such hidden proceeds as a distribution on equity, there is no breach of fiduciary duty when a solvent entity makes a distribution to equity.  That is the whole point of equity ownership.

RESPECTFULLY SUBMITTED this 15th day of March, 2024.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/ Davor Rukavina
    Davor Rukavina, Esq.
    Texas Bar No. 24030781
    500 N. Akard Street, Suite 3800
    Dallas, Texas 75202-2790
    Telephone: (214) 855-7500
    Facsimile: (214) 978-4375
    drukavina@munsch.com

**ATTORNEYS FOR THE DEFENDANTS**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on this the 15th day of March, 2024, true and correct copies of this document were electronically served by the Court's ECF system on all parties to this Adversary Proceeding through their counsel of record, including on counsel for the Trustee.

By: /s/ Davor Rukavina
    Davor Rukavina, Esq.