IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORTH WORTH DIVISION

| | | |
|---|---|---|
| In re<br><br>DUAL D HEALTH CARE OPERATIONS,<br>INC. d/b/a KEMP CARE CENTER, LLC,<br><br>Debtor. | § §<br>§<br>§<br>§<br>§<br>§ | Case No. 17-41320-elm-7 |
| In re<br><br>SPECIALTY SELECT CARE CENTER<br>OF SAN ANTONIO, LLC,<br><br>Debtor. | § §<br>§<br>§<br>§<br>§<br>§ | Case No. 17-44248-elm-7 |
| SHAWN K. BROWN, TRUSTEE,<br><br>    Plaintiff,<br><br>v.<br><br>LLOYD DOUGLAS, *et. al.*,<br><br>Defendants. | § §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Adv. No. 20-04059-elm |
| SHAWN K. BROWN, TRUSTEE,<br><br>    Plaintiff,<br><br>v.<br><br>LLOYD DOUGLAS, *et. al.*,<br><br>Defendants. | § §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Adv. No. 20-04060-elm |

## **DEFENDANTS' TRIAL BRIEF**

## TABLE OF CONTENTS

I.    SUMMARY ...........................................................................................................1

II.   FRAUDULENT TRANSFERS RELATED TO THE SALE..............................................4

    A.    VALUING UNLIQUIDATED TORT CLAIMS ................................................4
    B.    "GOLDEN CREDITOR" REQUIREMENT ...................................................15
    C.    INADMISSABILITY OF PROOFS OF CLAIM...............................................16
    D.    DEEMED ALLOWANCE OF PROOFS OF CLAIM........................................17
    E.    VALUE OF TRANSFERRED ASSETS.........................................................18
    F.    ACTUAL FRAUDULENT TRANSFER .........................................................21
    G.    CONSTRUCTIVELY FRAUDULENT TRANSFER...........................................24

III.  REMAINING TRANSFERS ...................................................................................26

    A.    DUAL D MANAGEMENT FEES ...............................................................26
    B.    SPECIALTY SELECT DOUGLAS TRANSFERS ............................................28
    C.    SPECIALTY SELECT DOUGLAS ENTERPRISES TRANSFER ........................28
    D.    INSIDER PREFERENCES.........................................................................29

IV.   BREACH OF FIDUCIARY DUTY ..........................................................................29

    A.    GENERAL OBJECTION TO EVIDENCE .....................................................29
    B.    SUBSTANTIVE ANALYSIS .....................................................................32
    C.    MR. CHANG CANNOT OPINE ON INSOLVENCY .......................................26

V.    CONCLUSION.....................................................................................................36

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*Ahmed v. Mbogo*, 2018 WL 3616887 at *11 (Tex. App. – Dallas 2018) ......................................32

*Brower v. Staley Inc.*, 2008 WL 5352019 at *2 (5th Cir. 2008)............................................13, 32

*Burk Royalty Co. v. Walls*, 616 S.W.2d 911, 920 (Tex. 1981) ......................................................33

*Burton v. Exxon Corp.*, 583 F. Supp. 405, 421 (S.D.N.Y. 1984) ..................................................35

*Colonial Leasing Co. of New England v. Logistics Control Group Intern.*,
762 F.2d 454 (5th Cir. 1985) ...........................................................................................7, 8, 15, 18

*Covey v. Commercial Nat. Bank of Peoria*, 960 F.2d 657, 659-660 (7th Cir. 1992)................6, 10

*DeLeonardis v. Credit Agricole Indosuez*, 2000 WL 1718543 at *8 (S.D.N.Y. 2000).................34

*F.D.I.C. v. Bell*, 106 F.3d 258, 264 (8th Cir. 1997).........................................................................6

*F.D.I.C. v. Harrington*, 844 F. Supp. 300, 305 (N.D. Tex. 1994) .................................................33

*First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 220 (Tex. 2017)......31

*Gearhart Indus. Inc. v. Smith Intern. Inc.*, 741 F.2d 707, 719-20 (5th Cir. 1984) .......................34

*Geiger v. Monroe County Miss.*, 2021 WL 5933129 at *2 (N.D. Miss. 2021).............................32

*Hardy v. Johns-Manville Corp.*, 681 F.2d 334, 347 (5th Cir. 1982) .............................................16

*Huff Energy Fund L.P. v. Gershen*, 2016 WL 5462958 at *11 (Del. Ch. 2016) ...........................34

*Indiana Bell Telephone Co. Inc. v. Lovelady*, 2008 WL 11408781 (Bankr. W.D. Tex. 2008) .....11

*In re Alpha Protective Svcs., Inc.*, 531 B.R. 889 (Bankr. M.D. Ga. 2015)....................................16

*In re Babcock & Wilcox Co.*, 274 B.R. 230 (Bankr. E.D. La. 2002)..............................................12

*In re Chase & Sanborn Corp.*, 904 F.2d 588, 594 (11th Cir. 1990)................................................6

*In re DePugh*, 409 B.R. 125, 139-140 (Bankr. S.D. Tex. 2009) ...................................................16

*In re Dill*, 30 B.R. 546 (B.A.P. 9th Cir. 1983)...............................................................................11

*In re Doctors Hosp. of Hyde Park Inc.*, 507 B.R. 558, 631 (Bankr. N.D. Ill. 2013)....................20

*In re Dunbar*, 313 B.R. 430, 437 (Bankr. C.D. Ill. 2004)...............................................19

*In re Essential Fin. Educ. Inc.*, 629 B.R. 401, 420 (Bankr. N.D. Tex. 2021)...............................15

*In re Furniture 4 Less Inc.*, 2005 WL 6441378 at *5 (Bankr. N.D. Tex. 2005).....................19, 24

*In re Hannover Corp.*, 310 F.3d 796, 802 (5th Cir. 2002)......................................................19, 24

*In re Harmony Holdings, LLC*, 393 B.R. 409, 413 (Bankr. D.S.C. 2008) ..................................16

*In re Heritage Organization LLC*, 375 B.R. 230 (N.D. Tex. 2007) ....................................8, 9, 19

*In re Scarpinito*, 196 B.R. 257, 267 (Bankr. E.D.N.Y. 1996) ................................................16, 17

*In re Sierra Steel Inc.*, 96 B.R. 275, 279 (B.A.P. 9th Cir. 1989)................................................6

*In re SMTC Mfg. of Tex.*, 421 B.R. 251 (Bankr. W.D. Tex. 2009)..............................................9

*In re Texas O&P Operating Inc.*, 2022 WL 2719472 at *8 (Bankr. N.D. Tex. 2022)..................23

*In re Trans World Airlines*, 134 F.3d 188 (3d Cir. 1998)...............................................................7

*In re W.R. Grace & Co.*, 281 B.R. 852 (Bankr. D. Del. 2002)....................................................12

*In re Wyly*, 607 B.R. 862, 876 (Bankr. N.D. Tex. 2018) ..........................................................9, 11

*In the Matter of Lamar Haddox Contractor Inc.*, 40 F.3d 118, 121 (5th Cir. 1994).......4, 6, 13, 14

*In the Matter of Musurlian*, 97 B.R. 985, 987 (Bankr. W.D. Wis. 1989)....................................20

*In the Matter of Xonics Photochemical Inc.*, 841 F.2d 198, 199-200 (7th Cir. 1988).................4, 5

*In re Oakes*, 7 F.3d 234, 1993 WL 339725 at *3 (6th Cir. 1993).....................................................6

*Murphy v. Magnolia Elec. Power Ass'n*, 639 F.2d 232, 234 (5th Cir. 1981) .........................13, 32

*Parks v. Worthington*, 109 S.W. 909, 911 (Tex. 1908) ..........................................................8, 18

*Van Bavel v. Oasis Design Inc.*, 1998 WL 546342 at *6 (Tex. App. – Fort Worth 1998)............32

*Waller v. Pidgeon*, 2008 WL 2338217 at *4 (N.D. Tex. 2008)................................................4, 9

## Statutes and Rules

11 U.S.C. § 101(32)(A)...............................................................................................................4

11 U.S.C. § 101(54) ...................................................................................................18

11 U.S.C. § 502(a) ....................................................................................................17

11 U.S.C. § 544(b)(1) ...............................................................................................15

11 U.S.C. § 547(f) .....................................................................................................29

11 U.S.C. § 548(a)(1)...............................................................18, 21, 24, 25, 27

11 U.S.C. § 548(d)(2)(A)...........................................................................................27

11 U.S.C. § 550(a) ....................................................................................................19

FED. R. CIV. P. 26(e)(1) ......................................................................................13, 32

TEX. BUS. & COMM. CODE § 24.002(12) ..................................................................18

TEX. BUS. & COMM. CODE § 24.004 ........................................................................27

TEX. BUS. & COMM. CODE §§ 24.005 ...............................................15, 18, 21, 24, 25

TEX. BUS. & COMM. CODE §§ 24.006 ......................................................................15

**DEFENDANTS' TRIAL BRIEF**

TO THE HONORABLE EDWARD L. MORRIS, U.S. BANKRUPTCY JUDGE:

COME NOW Lloyd Douglas ("Douglas"), Lloyd Douglas Enterprises, L.C., Brownwood Care Center I, Ltd., D-5 Development, LLC, Sunflower Park Holdings, LP, Whispering Pines Healthcare, L.C., Mt. Pleasant Operators, LLC, Specialty Select Care Center, LLC, Graham Investors Group, LLC, Kemp Investor Holdings, LLC, Kerens Care Center, Inc., and River City Life Care, Inc. (collectively, the "Defendants"),[1] the defendants in the two (2) Adversary Proceedings styled and numbered above in relation to the bankruptcy cases of Dual D Health Care Operations, Inc. ("Dual D") and Specialty Select Care Center of San Antonio, LLC ("Specialty Select," with Dual D, the "Debtors"), and file this their *Trial Brief*, respectfully stating as follows:

## I.    SUMMARY

1.      The law of fraudulent transfer is a technical one; fraudulent transfer is not some roving commission to do what one may think is "right." Technicalities, facts, and evidence matter. In this respect, the Trustee's case rests on three false premises. First, he argues that the Debtors transferred, for no value, their going concern or enterprise value. This is not correct, as evidenced both by the underlying transaction documents and by the simple fact that, prior to the Sale, the Debtors lost their leases and their FF&E and had no going concern. Second, he argues that the Sale was of substantially all assets of the Debtors. This is incorrect: the Debtors retained their cash and receivables, in each case worth more than $1 million, and transferred worthless, minor assets. Third, the Trustee argues that the Sale rendered the Debtors insolvent. This, too, is not correct, as the Debtors' assets after the Sale exceeded their liabilities, were sufficient to pay all

---

[1]      Various of the Defendants have been dissolved, terminated, or cancelled. They appear herein in a limited matter and to a limited extent under protest, and only to the extent that they have any existence left for the purpose of defending against claims. In no way are they reconstituting themselves or waiving any issue or right by defending the Complaint. They reserve all rights regarding the same.

undisputed creditors, and in fact did pay all undisputed creditors.  The Trustee will have no evidence that the then-pending Tort Claims were sufficient to alter this conclusion.

2.      Likewise, the Trustee's overall theory of his case will fail based on the evidence that will be presented.  Namely, the Trustee alleges that Douglas orchestrated a transfer of substantially all assets of the Debtors in order to avoid paying the Tort Claims.  Why, then, did Douglas leave the cash and receivables with the Debtors?  If he was harming creditors, he would have taken those for himself.  Why, then, did Douglas work after the Sale to pay all legitimate, undisputed creditors of the Debtors?  If he was harming creditors, he would have stiffed them. Why, then, was the transaction for the Debtors the same as for the ten (10) nursing homes involved in the Sale, eight (8) of which had no Tort Claims?  Surely something about these two Debtors would have been different if the intent was to scam the Tort Claims.  Perhaps the more appropriate question to ask is how it is mathematically possible for there to be ten wrongful death claims at the same nursing home, in the span of a few months, when no criminality was involved.  It is not.

3.      The truth is far different from what the Trustee alleges.  After decades of hard work, tireless efforts, familial sacrifice, and blood, sweat, and tears, Douglas was persuaded by a hot seller's market to sell his nursing homes.  He made a fortune, vindicating the American Dream of hard work.  None of this had to do with the Tort Claims.  But, the Sale was a real estate transaction. The buyer was not buying operations: it was buying the land and the facilities.  The buyer, not Douglas, insisted that the Debtors' leases be terminated as a condition of closing, for the simple reason that the buyer was not buying encumbered land and intended to put its own operator in place, or lease the nursing homes to third parties.  That—the termination of the leases—was the end of the Debtors.  At that point, they lost all going concern value and, other than their cash and receivables, their remaining assets were worthless.  The buyer did not pay anything for those assets because they had no value; there were no hidden proceeds which Douglas diverted into his pocket.

4.      In truth, if any of Douglas' actions could be challenged, it was the agreement to terminate the Debtors' leases and wind down their businesses.  But the Trustee has not sued for that action.  Limitations expired long ago.  Deciding to end a business is not a fraudulent transfer because there is no "transfer," and it cannot be a breach of fiduciary duty without invoking principles of involuntary servitude.  But again, none of that had anything to do with the Tort Claims or avoiding paying them: it was a man intending to retire by monetizing his life's worth of hard work, and a buyer who decided it wanted the land, and not the operations, in an ordinary, customary, and reasonable market transaction.  If the Trustee really believed that valuable assets were fraudulently transferred, why not sue the buyer, as the initial transfee?

5.      The Defendants explain below why the Trustee's causes of action have no merit, based on the law and on the facts.  But they also suggest that this case has certain philosophical implications that the Court may consider.   For one, should a businessman pay a disputed, unliquidated tort claim that the businessman sincerely believes to be bogus and worthless?  Might that not be a breach of fiduciary duty?  Or, should a business carry as debt on its books and records these unproven and disputed tort claims, when the business in good faith believes they have no value and will not be paid?  What would that do to loan covenants, taxes, and basic accounting?  And, should a man be forced by the law to keep in existence a business that otherwise has sufficient assets to pay all undisputed debt, at personal financial, emotional, and familial burdens, on the possibility that at some point in the future a disputed tort claimant may obtain a judgment?  What if the business fails in the interim and then no creditor gets paid?

6.      These are the real world implications and realities of the Trustee's case. Respectfully, the Defendants request that the Court rule against the Trustee and in favor of the Defendants and find that Douglas did everything right, professionally, and ethicaly here.

## II.    FRAUDULENT TRANSFERS RELATED TO THE SALE

### A.    VALUING UNLIQUIDATED TORT CLAIMS

7.    A key element of the Trustee's claims concerns the Debtors' alleged insolvency caused by the Sale.  This, in turn, raises the question of how to value the unliquidated Tort Claims—that is what makes this case unique, in that the sole claims are disputed, unliquidated tort claims never reduced to judgment.  The Trustee seems to argue that these claims are taken at face value.  This is not correct under the unanimous case law.

8.    First, and most persuasively, is the Bankruptcy Code itself.  It defines "insolvent" as the "financial condition such that the sum of such entity's debts is greater than all of such entity's property, *at a fair valuation*."  11 U.S.C. § 101(32)(A) (emphasis added).  The qualification of "fair valuation," importantly, applies to both "debts" and "property," as confirmed by the Fifth Circuit.  *See In the Matter of Lamar Haddox Contractor Inc.*, 40 F.3d 118, 121 (5th Cir. 1994) (quoting section 101(32)(A) and noting that courts "engage in the 'fair valuation' of the debts and property shown on the balance sheet, as required by the statute").  *Accord Waller v. Pidgeon*, 2008 WL 2338217 at *4 (N.D. Tex. 2008) ("the Fifth Circuit has articulated a test of insolvency in which both debts and property are determined under the 'fair valuation' standard").

9.    Judge Posner, of the Seventh Circuit, whom the Defendants are sure the Court recognizes as a judicial expert on economic realities, considered an appeal where the issue was whether contingent (and presumably disputed) obligations were to be valued at their face amounts for bankruptcy avoidance solvency purposes.  *See In the Matter of Xonics Photochemical Inc.*, 841 F.2d 198, 199-200 (7th Cir. 1988).  Judge Posner said it best:

> The startling feature of the case is the parties' apparent assent to the proposition that if the loan guarantee and the note that Xonics Photochemical had co-signed were valid obligations, Xonics Photochemical was insolvent as of the date the obligations were assumed, on the theory that they created liabilities greater than the company's net assets (much greater: $28 million in liabilities versus less than $2

million in net assets). The proposition is absurd; it would mean that every individual or firm that had contingent liabilities greater than his or its net assets was insolvent—something no one believes. Every firm that is being sued or that may be sued, every individual who has signed an accommodation note, every bank that has issued a letter of credit, has a contingent liability. Such liabilities are occasionally listed on the firm's balance sheet, for example by earmarking a portion of surplus for contingent liabilities. (They are supposed to be listed "if the future event is *likely to occur* and if its amount can be *reasonably estimated*." More often they are listed in a footnote, thus leaving the firm's stated net worth undisturbed. Often they are not listed at all, when they are remote or when they are too small to affect net worth substantially.

There is a compelling reason not to value contingent liabilities on the balance sheet at their face amounts, even if that would be possible to do because the liability, despite being contingent, is for a specified amount (that is, even if there is no uncertainty about what the firm will owe *if* the contingency materializes). By definition, a contingent liability is not certain—and often is highly unlikely—ever to become an actual liability. To value the contingent liability it is necessary to discount it by the probability that the contingency will occur and the liability become real.

*   *   *

The principle just outlined has long been recognized in cases dealing with the question whether a firm is insolvent within the meaning of the Bankruptcy Code (and this is such a case). It makes no difference whether the firm has a contingent asset or a contingent liability; the asset or liability must be reduced to its present, or expected, value before a determination can be made whether the firm's assets exceed its liabilities.

*Id*. at 199-200 (emphasis in original) (collecting cases).

10.     Another equally esteemed jurist of the Seventh Circuit, Judge Easterbrook, reaffirmed the foregoing holdings in a subsequent opinion:

*Xonics* shows that to find the value of a contingent liability a court must determine the likelihood that the contingency will occur. To disregard the probability that the firm will not be called on to pay is to regard all firms as insolvent all of the time, for all firms face some (remote) contingencies exceeding the value of their assets. A firm's product might prove dangerous, maiming hundreds of customers; all of an air carrier's planes might fall out of the sky, or one of an electric utility's nuclear stations melt down, creating stupendous liabilities; all of an insurer's policyholders might die in the same year, generating obligations that exceed its assets. The probability of such occurrences is low, however, and it therefore makes sense to treat the firms as solvent.

\*      \*      \*

> Discounting a contingent liability by the probability of its occurrence is good economics and therefore good law, for solvency, the key to § 548(a)(2), is an economic term.

*Covey v. Commercial Nat. Bank of Peoria*, 960 F.2d 657, 659-660 (7th Cir. 1992) (internal citation omitted)

11.    The *Eleventh* Circuit agrees: "[i]t is well established, however, that a contingent liability cannot be valued at its potential face amount; rather, it is necessary to discount it by the probability that the contingency will occur and the liability become real." *In re Chase & Sanborn Corp.*, 904 F.2d 588, 594 (11th Cir. 1990) (internal quotation omitted).  As does the *Eighth* Circuit: "[t]o correctly value the contingent liability it is necessary to discount it by the probability that the contingency will occur and the liability become real." *F.D.I.C. v. Bell*, 106 F.3d 258, 264 (8th Cir. 1997) (internal quotation omitted).  As does the *Sixth*: "[d]ebtors continue to have the burden of proof concerning insolvency.  Although contingent liabilities are included in determining whether a debtor is insolvent for preference purposes, they cannot be included at face value. . .  To determine a contingent liability, one must discount it by the probability that the contingency will occur and the liability will become real." *In re Oakes*, 7 F.3d 234, 1993 WL 339725 at \*3 (6th Cir. 1993) (internal citation and quotation omitted).  As does the *Ninth* Circuit BAP: "[a] contingent liability must be reduced, however, to its present or expected amount before a determination on insolvency can be made.  To determine a contingent liability, one must discount it by the probability that the contingency will occur and the liability will become real." *In re Sierra Steel Inc.*, 96 B.R. 275, 279 (B.A.P. 9th Cir. 1989) (internal citation omitted).

12.    The Defendants have not located a Fifth Circuit opinion that is on point, although the Fifth Circuit's opinion in *In the Matter of Lamar Haddox Contractor Inc.*, discussed at length below, comes close.  40 F.3d 118 (5th Cir. 1994).  Nevertheless, the Defendants respectfully

submit that the Fifth Circuit would follow the holdings of five (5) of its sister circuits, especially when no circuit opinion holds otherwise.[2]

13.     The Fifth Circuit's opinion in *Colonial Leasing Co. of New England v. Logistics Control Group Intern.* is instructive because it discusses the role of a judgment in a disputed debt. 762 F.2d 454 (5th Cir. 1985). There, the question was one of both standing and validity of a claim: whether a claimant who had filed a lawsuit but had not secured a judgment was a creditor under TUFTA. *See id.* at 456-57. The Fifth Circuit concluded that the filing of a lawsuit gave the creditor standing as such, but did not prove that the creditor had a claim for ultimate relief under TUFTA:

> Under Texas law, one may bring an action under the Fraudulent Transfer Act as a creditor of the transferor merely by virtue of a legal action, pending and unliquidated at the time of transfer, against the transferor. . . Thus, to withstand summary judgment on this issue a claimant need only show it has asserted against the transferor a cause of action that accrued prior to the transfer. To be entitled to relief under the Act, however, the claimant must introduce evidence that judgment was rendered in its favor.

*Id.* at 458 (internal citations omitted). In particular, while the creditor introduced evidence that it has sued the debtor (*i.e.* the transferor), it failed to admit into evidence at trial evidence of the validity of its claim.[3] *See id.* Thus, the Fifth Circuit stated that "a claimant under the Fraudulent Transfer Act whose claim against the transferor was unliquidated at the time of the transfer is only entitled to relief if it introduces evidence that the claim has matured to judgment." *Id.* at 460. Even if there is an actual judgment:

> if the validity of the debt claimed by the judgment creditor is challenged by the transferee, the judgment is conclusive only against the transferor; against the

---

[2] The Third Circuit's opinion in *In re Trans World Airlines*, 134 F.3d 188 (3d Cir. 1998), does not hold otherwise. There, the circuit held that the debtor's debt was to be valued at face value, as opposed to market value (the debt being publicly traded). That, however, was a fact-specific decision, including on the basis that the debt was contract debt not subject to contingencies. As Judge Fitzwater explained, the Third Circuit's opinion does not change the established law: "[t]he court did not adopt a per se rule rejecting the application of a fair valuation standard to debts, but instead simply eschewed the specific valuation that the appellants proposed." *Waller* at 2008 WL 2338217 at *6.

[3]       Remarkably, the creditor had obtained a judgment by that time, but failed to introduce it into evidence.

transferee, it is merely prima facie evidence of the underlying debt. The court in Stolte held that the transferee could meet the introduction in evidence of the judgment with evidence that there was, in fact, no valid debt on which to premise the judgment or that any such debt did not preexist the transfer.

*Id.*

14.     Similar to *res judicata*, while a judgement of liability against the Debtors may be binding on them, it would not be as to the Defendants, who are the alleged transferees here. And that is where there is even a judgement in the first place, which of course there is none here. Thus, the general rule for an unliquidated claimant remains that, even if it has standing to sue under TUFTA (and the Trustee therefore under section 544 of the Bankruptcy Code), the creditor and therefore the Trustee is entitled to a judgment of avoidance "only" if it "introduces evidence that the claim has matured to judgment."

15.     This is in line with, if not mandated by, the general Texas law that "where the judgment is based upon the confession of the defendant after the execution by him of the deed attacked, it affords no evidence of the fact of indebtedness," and that "there should be some further proof of the fact that the debt had real existence than a judgment which registers only the admission of the defendant made after he had conveyed the property sought to be subjected" without which the creditor cannot recover a fraudulent transfer. *Parks v. Worthington*, 109 S.W. 909, 911 (Tex. 1908).

16.     Importantly, this Court, through former Chief Judge Houser, agrees with the foregoing legal principles and conclusions. *See In re Heritage Organization LLC*, 375 B.R. 230 (N.D. Tex. 2007). The opinion considered the confirmation of a trustee chapter 11 plan and the objections filed thereto. *See id*. at 237. Addressing certain objections to confirmation (and to the settlements embodied in the plan), and with respect to a pending avoidance action adversary proceeding, the court noted as follows:

> The case law is clear that in determining the value of contingent assets *or liabilities* for purposes of a solvency analysis, a bankruptcy court should not use their face value. Rather, the court should multiply the face amount of the asset or liability times the probability that the contingency will occur. In other words, the court must determine the 'likelihood that the contingency will occur and the liability will become real.'

*Id*. at 283-84 (internal citations omitted) (emphasis added). Whether this was *dicta* or a holding is unclear, but the point is the same: this Court recognized the broad consensus in the case law that contingent liabilities are not to be accepted at face value for insolvency purposes.

17.     Our District Court agrees with the foregoing law and principles by direct holding, albeit by unpublished opinion: "the dispositive question presented is one of law: whether the definition of insolvency under § 24.003 of the Texas Business and Commerce Code . . . requires that a debtor's debts be valued at book value. Concluding that it does not, the court enters judgment for defendant." *Waller v. Pidgeon*, 2008 WL 2338217 at *1 (N.D. Tex. 2008) (Fitzwater, J.). The Western District of Texas likewise relied on the foregoing body of law in denying a trustee's fraudulent transfer claims, because the trustee had not actually or fairly valued contingent liabilities. *See In re SMTC Mfg. of Tex.*, 421 B.R. 251 (Bankr. W.D. Tex. 2009).

18.     That being said, there is a potential issue under the caselaw that the Defendants will address head-on; namely, whether a disputed and unliquidated tort claim is a "contingent" claim such that its value should be adjusted. In this respect, certain opinions hold that an unliquidated tort claim is not contingent, even though no judgment has been entered, because the debtor's liability arises at the time of the tort. Even Judge Houser seems to have held that a disputed and unadjudicated tort claim is not "contingent" for purposes of discounting the value of the claim, even though the claim is unliquidated, reasoning that a claim is not contingent when all events giving rise to liability occurred before the transfer. *See In re Wyly*, 607 B.R. 862, 876 (Bankr. N.D. Tex. 2018).

---

19.     To the extent that these cases stand for the proposition that an unliquidated tort claim should be valued at its face amount for a fraudulent transfer insolvency analysis, these cases are simply wrong.   First, there is the Bankruptcy Court's definition of "insolvent" which, as demonstrated above, requires that liabilities be fairly valued; *i.e.* that they are not accepted at face amount.   Second, whether an unliquidated tort claim is contingent for purposes of section 101(5)(A), or 303, or 727 of the Bankruptcy Code, or for state law accrual and limitations purposes, is a separate matter from how an unliquidated tort claim, contingent or not, is valued for insolvency purposes.   Third, there is the wisdom and spirit of the circuit caselaw, which addresses such hypotheticals (only to make a point) as airplanes falling out of the sky, or a nuclear meltdown, which are unliquidated possible claims, in pointing out that claims (and these would be tort claims) are not taken at face amounts.  *See Covey v. Commercial Nat. Bank of Peoria*, 960 F.2d 657, 659-660 (7th Cir. 1992).   The Debtors were no different, albeit much smaller in scope.   Yes, sick and elderly people die in nursing homes, especially advanced ones treating specialized patients here.[4] That a grieving relative, or an unethical lawyer, or a local television channel looking for scandal, might allege a claim, no more proves the validity or amount of the claim than the fact that someone died means that a tort was committed in the process.

20.     Continuing the discussion, there is no indication that the established circuit caselaw discussed above intended to use the term "contingent" in any technical sense, much less as the Bankruptcy Code's definition of "claim" would use the term.   Rather, the letter and spirit of the opinions is simply that, when dealing with a disputed and unliquidated claim that requires an adjudication before it can be enforced or collected, the claim must be discounted to some fair value by taking into account the probability of validity and the probability of amount.   That should not

---

[4]     The Defendants are not being flippant or insensitive to their former patients or their relatives.  They merely state an unfortunate fact of life.

be a controversial proposition, and anything to the contrary would elevate words over substance and be hyper-technical, not to mention an injustice; what is the point of filing and proving a lawsuit if one may speak a claim into existence and reality merely by alleging it?  Or, to multiply absurdity by absurdity, can the Defendants defeat any claim of insolvency by alleging that they held unliquidated claims for tens of millions of dollars against third parties (such as against medical payors for nonpayment) and, merely by alleging the same, have their claims valued at face amount? Of course not.  Like it or not, contingent or not, there are certain claims in our system that must be proven through judicial process and judgment and, unless and until that happens, the value of the claim is speculative and must be proven with evidence, not mere assertion.

21.     One of the main cases on this, to which others cite,[5] is *In re Dill*.  30 B.R. 546 (B.A.P. 9th Cir. 1983).  That opinion did indeed hold that "[a] tort claim ordinarily is not contingent as to liability; the events that give rise to the tort claim usually have occurred and liability is not dependent on some future event that may never happen. It is immaterial that the tort claim is not adjudicated or liquidated." *Id*. at 549.  That opinion, however, considered the definition of "claim" under the Bankruptcy Code and creditor status to file an involuntary petition; not any fraudulent transfer of other avoidance claim.  Judge Houser considered the question of whether tax liabilities, while perhaps unliquidated, were contingent—an obviously different situation.  *See In re Wyly*, 607 B.R. at 876.  In *Indiana Bell Telephone Co. Inc. v. Lovelady*—an opinion on which Judge Houser relies—the court did hold that the creditor could recover under TUFTA on an unliquidated fraud (tort) claim even though it had not filed suit by the time of the transfer, but that creditor actually did subsequently obtain a judgment on the fraud prior to trial on the fraudulent transfer suit.  2008 WL 11408781 (Bankr. W.D. Tex. 2008).  This is consistent with *Colonial Leasing Co.*

---

[5]        In support of her conclusion, for example, Judge Houser relied on *Indiana Bell Telephone Co. v. Lovelady*, 2008 WL 11408781 (Bankr. W.D. Tex. 2008), which in turn relied on *In re Dill*.

discussed above that noted that a tort creditor needed to obtain a judgment prior to actually avoiding a fraudulent transfer (even if not prior to filing suit).

22.    Second, even those opinions that hold that an unliquidated personal injury or wrongful death claim is not contingent once the tort has occurred still value the claim, prior to judgment, for purposes of insolvency.  Judge Houser considered the opinion in *In re W.R. Grace & Co.* which, as Judge Houser noted, held that an unliquidated asbestos tort claim was not a "contingent" claim for purposes of an insolvency reduction.  281 B.R. 852 (Bankr. D. Del. 2002).  But that opinion also contained the following critical qualifier:

> no-one suggests that each claim, be it prepost–1998, must be counted at face value without further analysis. As counsel are well aware, large numbers of asbestos tort claims are routinely analyzed and their value estimated by experts on the basis of epidemiology and statistics. The behavioral variables raised by counsel are typically taken into account in this process. That the Court must place a value on the post–1998 claims does not mean that they are not claims nor does it mean that they were merely contingent claims on the transfer date.

*Id*. at 864.  The same conclusion was reached in *In re Babcock & Wilcox Co.*, another asbestos case.  274 B.R. 230 (Bankr. E.D. La. 2002).  Even if the asbestos claims were not contingent, that court, relying on *Xonics*, agreed that "contingent liabilities must be discounted."  *Id*. at 261.

23.    Perhaps the precise discussion then is academic, or circular.  The point is a simple one: whether the body of caselaw intended to use "contingent" technically or loosely, and whether or not the claims here were not contingent on the dates of the transfers, the end result is the same: they must be discounted to a value that is less than their face, asserted, amounts, based on both the probabilities of the contingency (the judgment) occuring and based on the probabilities that any such judgment will be in the amounts claimed.

24.    The rule that the Court should therefore follow—as the one both mandated by the Bankruptcy Code and adopted by multiple circuit courts, the District Court, and this Court, and most consistent with Fifth Circuit authority—is simply that the Tort Claims asserted against the

Debtors here, if they are even admissible under the Federal Rules of Evidence (they are not, as discussed below), must be analyzed and discounted to an actual, or "fair" value for a fraudulent transfer insolvency analysis, regardless of whether they are "contingent" claims or not.

25.    The Trustee will have no admissible evidence of the value of the Tort Claims. Indeed, the Defendants will seek to exclude any such evidence based on the Trustee's interrogatory response as follows:

> What were the liabilities of the Debtor immediately prior to the closing referenced in paragraph 29 of the Complaint? If you include contingent personal injury/wrongful death claims as of that date, state the value you place on each such claim and the methodology employed to arrive at that value.

ANSWER:

Undetermined. Facts will be developed through discovery

26.    The Trustee never supplemented this Interrogatory.  The Trustee had a duty to supplement his interrogatory answer if and when he formed his damages model.  *See* FED. R. CIV. P. 26(e)(1).  The basic purpose of this rule is to prevent prejudice or surprise at trial.  *See, e.g., Brower v. Staley Inc.*, 2008 WL 5352019 at *2 (5th Cir. 2008).  Either the Trustee has failed to uphold that duty or he has been unable to identify any value of the Tort Claims—which is his burden of proof.  Excluding evidence the subject of an interrogatory where the party failed to properly supplement it is proper.  *See, e.g., Murphy v. Magnolia Elec. Power Ass'n*, 639 F.2d 232, 234 (5th Cir. 1981).

27.    A Fifth Circuit opinion aptly demonstrates the foregoing, if not compels the conclusion urged by the Defendants.  *See In the Matter of Lamar Haddox Contractor Inc.*, 40 F.3d 118 (5th Cir. 1994).  There, the Fifth Circuit reversed a bankruptcy court judgment avoiding certain preferential transfers because the plaintiff failed to prove insolvency.  *See id*. at 119.  This was

despite the deferential "clearly erroneous" standard of review applied to review the trial court's

finding of fact on insolvency. *See id*. at 120.

28.     The Fifth Circuit began by noting that the plaintiff bore the burden of proof on

insolvency, as the transfers were outside the ninety (90) day presumption period. *See id*. at 121.

This analysis continued by holding that section 101(32)(A) required a fair valuation of both assets

*and* debts. *See id*.  The circuit noted: "[n]eedless to say, a fair valuation may not be equivalent to

the values assigned on a balance sheet." *Id*.  Continuing, it then addressed the sole evidence of

insolvency, that being the plaintiff's accountant-expert who based his opinion of insolvency on the

debtor's books and records, which showed an excess of liabilities over assets. *See id*.  The Fifth

Circuit found that this testimony did not rise to the level of credible evidence because the

accountant-expert had failed to provide any fair valuation of those books and records:

> The estate representative presented no evidence whatsoever of the fair value of the
> Debtor's property. The accountant testified that he had no information as to the fair
> value of the equipment . . .  He could not determine whether the fair value was
> greater than the book value because there are 'so many factors: how long, you
> know, how well it's maintained, what the market is for it.'  There is evidence that
> the book value of the assets probably was not reflective of the property's fair value.
> . .  There was neither testimony nor a financial record from which a court could
> determine what either the book value or the fair value of the equipment was.
>
> While the Debtor's insolvency does not have to be established through
> documentary evidence, such evidence would have helped the court to determine the
> fair market value of the assets. . .  As a result, the court was left with only conclusory
> opinion testimony as to insolvency, without any evidence necessary to support the
> conclusions.
>
> The opinion testimony was not sufficient to establish the debtor's insolvency,
> because substantial questions remain as to the fair value of the Debtor's property.
> No witness had any information as to the fair value of the property, only its book
> value. . .  Therefore, we must conclude that the courts below were clearly erroneous
> in finding that the estate representative had carried the burden of proof that the
> Debtor was insolvent on and after September 27, 1988, an essential element of his
> claim that the payments to appellant were preferential transfers.

*Id*. at 121-22 (internal citations and quotations omitted).

29.     Although the issue concerned the fair valuation of assets, the principle is the same with respect to a fair valuation of debts: taking something at face value without independent evidence of actual (or "fair") value simply does not cut it for one's burden of proof on insolvency. Yet that is all that the Trustee and his proffered expert will do here, resulting in nothing but a conclusory statement that is "not sufficient to establish the debtor's insolvency."

**B.      "GOLDEN CREDITOR" REQUIREMENT**

30.     Various of the Trustee's causes of action are asserted under the Texas Uniform Fraudulent Transfer Act ("TUFTA").  The Trustee has standing under TUFTA only through section 544 of the Bankruptcy Code as, otherwise, the Trustee is not a creditor at the time of the transfer and only a creditor may commence an action under TUFTA (as opposed to the debtor). In this respect, section 544 requires that a transfer be avoidable "under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title." 11 U.S.C. § 544(b)(1). This is referred to as the "golden creditor," "an actual unsecured creditor holding an allowable unsecured claim as of the date of the petition that could avoid the challenged transfer."  *In re Essential Fin. Educ. Inc.*, 629 B.R. 401, 420 (Bankr. N.D. Tex. 2021).  Because the underlying law is TUFTA, this requires the Trustee to prove the existence of a creditor who could avoid the Transfer under TUFTA: a creditor whose "claim arose before or within a reasonable time after the transfer was made."  TEX. BUS. & COMM. CODE §§ 24.005 & 24.006.

31.     Importantly, as noted above, while a tort creditor has standing to sue under TUFTA even before he obtains a judgment, he cannot *recover* under TUFTA unless and until he first obtains a judgment.  *See Colonial Leasing Co. of New England v. Logistics Control Group International*, 762 F.2d 454, 458 (5th Cir. 1985) ("[t]o be entitled to relief under the Act, however, the claimant must introduce evidence that judgment was rendered in its favor").

32.     In this respect, the evidence will demonstrate that, at the time of the Sale and within a reasonable period of time thereafter, there were no unpaid creditors who could bring a claim under TUFTA, except the Tort Claims creditors.  However, as held by the Fifth Circuit, because none of their petitions has been reduced to a judgment, they cannot recover under TUFTA and, therefore, neither can the Trustee, because section 544(b)(1) requires that the creditor be able to avoid the transfer, not merely file suit seeking to have it avoided.  In sum, the Trustee will be unable to identity a "golden creditor" entitling him to any relief under TUFTA.

**C.    <u>INADMISSIBILITY OF PROOFS OF CLAIM</u>**

33.     The proofs of claim filed by the Tort Claimants are inadmissible as hearsay, especially because they also contain hearsay within hearsay.  *See, e. g., In re DePugh*, 409 B.R. 125, 139-140 (Bankr. S.D. Tex. 2009) ([d]ocuments attached to proof of claim were insufficient, were hearsay, and no foundation was laid under the business records exception to permit entry of the documents into evidence); *In re Alpha Protective Svcs., Inc.*, 531 B.R. 889 (Bankr. M.D. Ga. 2015); *In re Harmony Holdings, LLC*, 393 B.R. 409, 413 (Bankr. D.S.C. 2008); *In re Scarpinito*, 196 B.R. 257, 267 (Bankr. E.D.N.Y. 1996) ("we may not infer the truth of facts contained in documents, unfettered by rules of evidence or logic, simply because such documents were filed with the court").

34.     While the Court may take judicial notice that the Tort Claims were filed with the Court, that power does not extend to taking judicial notice that any allegation therein contains any evidentiary value.  "[J]udicial notice applies to self-evident truths that no reasonable person could question, truisms that approach platitudes or banalities." *Hardy v. Johns-Manville Corp.*, 681 F.2d 334, 347 (5th Cir. 1982).  Thus, even if the Court takes judicial notice that the claims were filed, that notice provides no evidentiary value to the actual facts in dispute.  *See, e.g., In re Alpha Protective Svcs., Inc.*, 531 B.R. at 907 ("[t]he Court may take judicial notice that the IRS has filed

a proof of claim, but it cannot take judicial notice of the contents of that claim because such facts must be evaluated using ordinary evidentiary rules, such as hearsay and its exceptions"); *In re Scarpinito*, 196 B.R. at 267.

D.   **Deemed Allowance of Proofs of Claim**

35.    The Defendants recognize that, under the Bankruptcy Code, the Tort Claimants' proofs of claim are deemed allowed unless objected to.  *See* 11 U.S.C. § 502(a).  The Defendants have reviewed the case law for whether such deemed allowance can possibly be applicable to a defendant in an adversary proceeding, and have found no case on point either way.  However, the Defendants argue that it must be the case that this deemed allowance cannot be binding on the Defendants, consistent with principles of due process.  The point of a proof of claim is to assert a claim against an *estate*, not third parties, and it would be absurd to argue that anyone filing any claim, however bogus it may be, could prejudice the Defendants' due process rights to be presented with evidence that they can test in open court.

36.    Although the Defendants have not located case law on point—which is surprising, as one would expect the case law to have addressed the effect of section 502(a) *vis a vis* an adversary proceeding defendant, unless the conclusion is so self-evident as to not merit analysis— the Defendants have located highly analogous case law supporting their argument.  Namely, can a fraudulent judgment case be maintained by a creditor whose claim is based on an agreed judgment to prove creditor status, which is closely analogous to the Bankruptcy Code's deemed allowance provision because there is no actual judicial determination of the claim.

37.    Under Texas law, "where the judgment is based upon the confession of the defendant after the execution by him of the deed attacked, it affords no evidence of the fact of indebtedness," and that "there should be some further proof of the fact that the debt had real existence than a judgment which registers only the admission of the defendant made after he had

conveyed the property sought to be subjected" without which the creditor cannot recover a fraudulent transfer. *Parks v. Worthington*, 109 S.W. 909, 911 (Tex. 1908). And, even if there is an actual judgment, "the judgment is conclusive only against the transferor; against the transferee, it is merely prima facie evidence of the underlying debt." *Colonial Leasing Co. of New England v. Logistics Control Group Intern.*, 762 F.2d 454, 460 (5th Cir. 1985). Here, of course, there is not even any judgment with respect to any of the Tort Claims. The issue is akin to *res judicata*, where the judgment (here, the deemed allowance) may be binding on the parties and their privies, but the Defendants are not such parties and they certainty are not in privity with the Trustee.

### E.    VALUE OF TRANSFERRED ASSETS

38.     Under the Bankruptcy Code, the Trustee "may avoid any transfer . . . of an interest of the debtor in property." 11 U.S.C. § 548(a)(1). "Transfer," in turn, requires that there be a parting with or disposing of "property." 11 U.S.C. § 101(54). Likewise, under TUFTA, a creditor may avoid a "transfer." TEX. BUS. & COMM. CODE § 24.005. Here, too, the predicate is a parting with or disposing of "an interest in an asset." *Id*. § 24.002(12).

39.     Thus, it is necessary first to identify which "property" or "asset" was transferred by the Debtors. In this respect, the Trustee argues that it was substantially all of their assets, or their businesses, or their going concern values. As the evidence will conclusively demonstrate, this was not the case. Rather, what was transferred were minor assets of no value: vendor contracts, supplies, intangibles and goodwill, and the buyer's temporary use of the Debtors' provider numbers (while the Debtors still retained the use of the same to collect their receivables). It is only these minor assets whose transfer may be avoided, and any monetary recovery therefor be based on.

40.     Next, it is necessary to determine the value of these transferred assets. The Trustee will simply present the Court with what his expert believes to be the enterprise value of the Debtors

prior to the Sale, ignoring that there was no such value after the leases were terminated and that no going concern was transferred. As a matter of law, the Trustee's evidence will miss the mark. Importantly, however, this is an issue for which the Trustee bears the burden of proof, under both the actual fraudulent transfer and constructive fraudulent transfer provisions of the Bankruptcy Code and TUFTA. *See In re Hannover Corp.*, 310 F.3d 796, 802 (5th Cir. 2002); *In re Furniture 4 Less Inc.*, 2005 WL 6441378 at *5 (Bankr. N.D. Tex. 2005). In particular, concerning a constructively fraudulent transfer, the Trustee must prove that the Debtors received less than reasonably equivalent value for the transfers, which necessitates that the value of the transferred assets be proven. *See id.* That value is determined as of the date of the transfer—not before, and not after. *See In re Furniture 4 Less Inc.*, 2005 WL 6441378 at *5.

41. Also of significance, the value of the transferred asset is determined from the Debtors' perspective. *See In re Hannover Corp.*, 310 F.3d at 802. Under a balance sheet analysis, the reasonable equivalence standard is satisfied if a debtor's balance sheet is the same pre-transfer and post-transfer. *See In re Dunbar*, 313 B.R. 430, 437 (Bankr. C.D. Ill. 2004); *see also In re The Heritage Organization LLC*, 375 B.R. 230, 284 (Bankr. N.D. Tex. 2007). Thus, whatever value the buyer may have derived from the transferred assets is not the test. Rather, whatever value these assets had to the Debtors and to their creditors is the test, for the simple and logical reason that if the creditors derived no value from the transferred assets, then they were not harmed.

42. Likewise, the Trustee seeks a money judgment under section 550(a) of the Bankruptcy Code. Under that section, the Trustee may recover "the property transferred, or, if the court so orders, the value of such property." 11 U.S.C. § 550(a). The Trustee does not seek a recovery of the transferred property and has not sued the buyer as the initial transferee to obtain any such recovery. Thus, he is limited to a recovery of the value of the property. This is his burden

of proof.[6]  *See In re Doctors Hosp. of Hyde Park Inc.*, 507 B.R. 558, 631 (Bankr. N.D. Ill. 2013)

("Trustee has the burden of proof on all elements of a fraudulent transfer and of the grounds for

recovery"); *In the Matter of Musurlian*, 97 B.R. 985, 987 (Bankr. W.D. Wis. 1989) ("the trustee

has the burden of proving each element for recovery").   While in the context of cash or a check

this proof is easy, here, because the transferred property was not cash, the Trustee bears the burden

of proving the value of the transferred property as a predicate for obtaining a money judgment.

43.     In this respect, the Trustee will have no credible evidence of that value.   The

Trustee's expert opined as to enterprise value, but undertook no analysis of the value of the actual

assets at issue.   Perhaps the Trustee will seek to obtain such value from Mr. Douglas, who will

testify that the assets at issue had no value (and may have even had negative value, since otherwise

the Debtors would have had to expend funds to dispose of supplies), except with respect to the

provider number, which value the Debtor did not transfer and retained throughout.   Even if the

Court discounts Mr. Douglas' testimony, that will still leave the Trustee with no credible evidence

of value, even though this is his burden of proof.

44.     As the sole evidence of value, the Trustee will present his "smoking gun" evidence.

Namely, the Debtors filed their original 2015 tax returns purporting to list a sale of millions of

dollars of their assets.   This, however, was a mistake caused by the tax accountant.   When this

error was caught, the Debtors filed amended 2015 tax returns correcting the mistake and listing no

sale of assets.   That this was a mistake and that this will not be evidence of anything other than a

mistake will be demonstrated by the clear facts:

> (i)     the accountant prepared the original returns with no input from Douglas and no
> reference to the Debtors' books and records;

> (ii)    the accountant acknowledged his mistake, and that it was a mistake;

---

[6]      The Defendants concede that they bear the burden of proof on value under section 550(b).

(iii)   the accountant had no personal knowledge of the Debtors' assets, or their values, or of any allocation of the $130 million overall sales price;

(iv)    the accountant has no expertise in appraisals or valuation;

(v)     the closing documents and actual agreements prove that there was no sale of anything of value;

(vi)    the Debtors' other tax returns carried no assets of value; and

(vii)   as a result of the amendments, Douglas incurred, and paid, hundreds of thousands of dollars in additional taxes.

45.     It will stretch the imagination that Douglas personally paid hundreds of thousands of additional income taxes only to obtain some advantage in this litigation, which he always believed to be baseless.  That, and the accountant's honest acknowledgement that he made a mistake, will be the best evidence that this was in fact a mistake.

46.     In the end, the Trustee will ask this Court to convert that mistake into fact.  The Defendants are confident that, once the Court considers the evidence, it will agree that this was a mistake that bears no probative value on the actual issue of the value of the transferred assets. Bankruptcy courts are courts of equity that do not put form over substance, and they do not convert mistakes into facts.

**F.    ACTUAL FRAUDULENT TRANSFER**

47.     Actual fraudulent transfer requires that the Debtors transferred their assets "with actual intent to hinder, delay, or defraud."  11 U.S.C. § 548(a)(1)(A); TEX. BUS. & COMM. CODE § 24.005(1).  Here, the evidence will demonstrate that there was no intention to hinder, delay, or defraud the Tort Claimants.  Among other things:

(i)     Douglas, whose intent is imputed to the Debtors, left more than $1 million with each Debtor to pay debts;

(ii)    Douglas did not, in good faith, believe any of the Tort Claims to have merit or any value;

(iii)   Douglas was persuaded by the broker, after years of trying to persuade him to sell, to sell all of his nursing homes, not just the "troubled" ones, because it was a seller's market and Douglas wished to retire;

(iv)   the buyer, not Douglas, structured the Sale as executed; and

(v)   the exact same structure was employed at all ten (10) nursing homes, as opposed to just the Debtors with the Tort Claims.

48.   All of the evidence, including from the broker, will confirm that no portion of the equation, discussions, or negotiations had anything to do with not paying the Tort Claims. Everything about the transaction was ordinary and customary according to market standards and expectations. This is not some case where Douglas transferred a Ferrari to his son, had a judgment around his neck that he was trying to avoid, or made a transfer to an insider while retaining control and the benefits of the business. Everything was above-board, involved arm's length transactions, was done employing professionals, and there is no indication, much less evidence, of any red flags.

49.   That being said, because a defendant will rarely admit to any intent to hinder, delay, or defraud a creditor, case law has developed the "badges of fraud" to assist the Court with finding the truth. But these are factors designed to assist the Court; they are not talismanic and they do not replace the overall inquiry. In other words, if the Court believes that there was no intent to hinder, delay, or defraud a creditor, then the "badges of fraud" become irrelevant. Well-developed "badges of fraud" include the following:

(1) the transfer or obligation was to an insider;

(2) the debtor retained possession or control of the property transferred after the transfer;

(3) the transfer or obligation was concealed;

(4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(5) the transfer was of substantially all of the debtor's assets;

(6) the debtor absconded;

(7) the debtor removed or concealed assets;

(8) the value of consideration received by the debtor was [less than] reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

*In re Texas O&P Operating Inc.*, 2022 WL 2719472 at *8 (Bankr. N.D. Tex. 2022).

50.     Here: (i) the transfer was not to an insider; (ii) the Debtors did not retain possession or control over the transferred property; (iii) the transfer was not of substantially all of the Debtors' assets, as the vast majority of those assets were retained; (iv) the Debtors did not abscond, but instead remained in existence to liquidate their assets and pay legitimate debts; (v) the Debtors did not remove or conceal assets; (vi) the Debtors were not insolvent before or after the transfer; (vii) the transfer did not occur shortly before or after a substantial debt was incurred; and (viii) the Debtors did not transfer the assets to a lienor who then transferred the assets to an insider.

51.     The Trustee argues that the Transfer was concealed.  However, there is no evidence of this.  In fact, the Sale, and therefore the transfer, was public and involved the filing of public records, such as transfer deeds.  And, with respect to reasonably equivalent value, the Trustee has failed to present evidence demonstrating the presence of this factor, for the reasons discussed above.

52.     The only factor that is present is that, prior to the Transfer, the Debtor was threatened with suit.  The presence of this one factor is insufficient to conclude that the Trustee has sustained his burden of demonstrating an actual fraudulent transfer, especially when the Court hears from Douglas and the broker and considers the actual facts and governing documents of the

Sale.  To reiterate, if Douglas, and therefore the Debtors, wanted to stiff any creditor, then Douglas would have swept the Debtors' cash and receivables.  He did not.  Instead, he ensured that every undisputed creditor was paid in full.  And, his decision to cease the Debtors' operations is not even a "transfer" in the first place.  Finally, as pointed out above, there is no "golden creditor" under TUFTA, which is an additional reason for denying a recovery under the Trustee's TUFTA claims.

## G.  CONSTRUCTIVELY FRAUDULENT TRANSFER

53.    For a constructively fraudulent transfer, both the Bankruptcy Code and TUFTA require that the Debtors transferred an asset for less than reasonably equivalent value, while insolvent or which transfer rendered them insolvent.  *See* 11 U.S.C. § 548(a)(1)(B); TEX. BUS. & COMM. CODE § 24.005(2).  The Trustee bears the burden of proof on all of these elements.  *See In re Hannover Corp.*, 310 F.3d 796, 802 (5th Cir. 2002); *In re Furniture 4 Less Inc.*, 2005 WL 6441378 at *5 (Bankr. N.D. Tex. 2005).

54.    Here, the Trustee's case will fail, first, because he will have no evidence that the Debtors were insolvent or were rendered insolvent by the transfer, because he will have no evidence of the value of the Tort Claims from which to present a conclusion of insolvency.  Instead, the evidence will demonstrate that the Debtors were solvent both before and after the transfer in that they had more than enough assets to pay their debts, which they in fact did.  In fact, each Debtor had more than $1 million of assets, far more than necessary to pay all undisputed debt.

55.    Second, the Trustee's case will fail because, as demonstrated above, he will have no evidence as to the value of the transferred assets from which the Court could conclude that there was less than reasonably equivalent value.  In a different case, perhaps the Court could infer some value, and therefore less than reasonably equivalent value, so as to at least present a *prima facie* case because no cash was paid for the transferred assets.  But not here.  Once the Debtors lost their leases and their operations, whatever minimal and junk assets they had lost all value and became

just that, junk.  An obvious example concerns the bedding: who is going to pay anything to purchase used nursing home sheets and pillow cases.  No one.  Thus, what the evidence will demonstrate is that assets worth zero were transferred for zero.  That is not a transfer for less than reasonably equivalent value and it is not one by which creditors were harmed, because nothing was taken from them or their potential recoveries.

56.     Aside from insolvency, a constructively fraudulent transfer may be proven if a debtor "was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital," or if a debtor "intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured."  11 U.S.C. § 548(a)(1)(B)(ii)(II)-(III); Tex. Bus. & Comm. Code § 24.005(2)(A) & (B).

57.     There will be no evidence of either of the above, and the evidence will directly demonstrate the opposite.  Even after the Sale, the Debtors had sufficient assets to pay all undisputed debts, which they did.  And, the Debtors did not intend to, or believe that they would, incur new debts beyond their abilities to repay.  All of the Tort Claims were already pending, and the only debts the Debtors incurred were related to liquidating their receivables and defending against the Tort Claims, which they did and which they paid.

58.     Indeed, the evidence will be conclusive with respect to Dual D, where the Trustee entered into two Rule 9019 orders allowing the two Tort Claims there as subordinated unsecured claims in the amount of $190,000.00 each.  The Defendants do not concede that these settlements are binding on them at all, for the reasons discussed above.  But, even if the Court uses these numbers, and the one other miniscule claim against Dual D (for attorneys fees, filed against the wrong entity because Dual D was not obligated to pay the same and Douglas paid the same anyway), the debt of Dual D will be less than $400,000.  Yet after the Sale, Dual D had assets in

excess of $1.3 million dollars, which included liquid and virtually certain assets in the form of

cash in the bank of $645,329.55 as of August 1, 2025 and highly collectible Medicare, Medicaid,

and private pay receivables of more than $1 million, more than $250,000 of which was collected

in just August of 2015.  After accounts payable at that time of $411,096 are taken into account,

Dual D was solvent, by a lot, even if these Tort Claims are considered at the amounts settled by

the Trustee (or even at their face values).

### III.    REMAINING TRANSFERS

#### A.    DUAL D MANAGEMENT FEES

59.    The Trustee seeks to avoid, as fraudulent transfers (albeit it unclear under which

statute) transfers of $2,575,000.00 in management fees to Douglas Enterprises, which he states

were $150,000.00 per month and which he alleges were well in excess of a 5% market rate.

60.    With respect to actual fraudulent transfer, in addition to the reasons discussed above

for the Sale, the evidence will demonstrate that these transfers began years before any of the Tort

Claims surfaced.  It cannot be that Dual D started making these payments to hide its assets from

the Tort Claimants—and only two against Dual D at that—when Dual D had been making these

payments for years.  And, as the evidence will demonstrate, these were not disguised equity

distributions.  In addition to management fees, Dual D paid Douglas Enterprises a flat amount for

cost reimbursement in order to avoid repeated Medicare and Medicaid denial of the same and in

light of the greatly increased workload at Dual D, given that it was added to, rebuilt, and  required

specialized nursing and other staffing because it had medical procedures and equipment that other

nursing homes did not.

61.    Even if the Court applies the badges of fraud to these transfers, the only badge that

will be present is that these payments were transfers to an insider.  The critical ones of insolvency,

less than reasonably equivalent value, being threatened with suit, and concealment will not exist.

Indeed, on the badge of concealment, the Defendants asked the Trustee by interrogatory "each basis and fact" for his allegation that the payments were concealed, to which he answered "Management fees were paid by wire transfers from the Debtor to Douglas Enterprises under the guise of business-related payments." This is simply incredible, that something paid by wire would be "concealed" any more than something paid by check, especially when Dual D and Douglas Management carried the payments on their books and records and reported the same on their tax returns.

62.    With respect to constructively fraudulent transfer, where the Trustee's arguments most resonate in light of his allegation that the management fees were above market, the Trustee's claim must fail as a matter of law because he has not sought to, and cannot, avoid the underlying agreement pursuant to which the fees were paid. Dual D received value when it repaid its debts, even to an insider. *See* 11 U.S.C. § 548(d)(2)(A); TEX. BUS. & COMM. CODE § 24.004. Thus, when Dual D repaid its obligations to Douglas Enterprises through these transfers, Dual D received reasonably equivalent value as a matter of law. And, this is aside from the Trustee's failure of proof on insolvency—even worse than with respect to the Sale—because, while the Trustee thinks he may offer evidence of insolvency on July 30, 2015, most of these transfers occurred in 2014 and before.

63.    Finally, with respect to many of these transfers—all of them that were before May 4, 2015—the Trustee cannot resort to section 548 of the Bankruptcy Code as either an actual or a constructive fraudulent transfer because this is outside the two-year lookback. *See* 11 U.S.C. § 548(a)(1). While the Trustee may seek relief against the same under TUFTA's four-year lookback, the problem (in addition to all others) is again that he cannot identify a "golden creditor" when these transfers occurred, not even with respect to the Tort Claims, which were not filed until January 9, 2015 at the earliest.

B.    SPECIALTY SELECT DOUGLAS TRANSFERS

64.    Against Specialty Select, the Trustee seeks to avoid transfers of $301,643.75 to Douglas as alleged actual and constructive fraudulent transfers, although again it is unclear under which statute the Trustee seeks this relief.  These were repayments to Douglas for advances he made to Specialty Select after the collection of receivables became insufficient to pay continuing legal defense costs, and defending against ten (10) tort claims is not cheap.  Nothing about these payments was to hinder, delay, or defraud a creditor: they were payments of legitimate advances that Douglas actually made.  Here again the only badge of fraud is that these payments were to an insider.  But, there can be no question that Specialty Seclect was entitled to defend itself against the Tort Claims, that this cost money, and that Douglas actually advanced these costs and others.  Even the amount of each transfer, save one, made to the penny, proves that these payments were repayment of advances bundled up and submitted for reimbursement.  And, with respect to reasoanbly equivalent value, issues of insolvency aside (which again, the Trustee will not be able to prove), Douglas gave value and Specialty Select received dollar-for-dollar value with each payment because its legitimate debt obligations were paid.

C.    SPECIALTY SELECT DOUGLAS ENTERPRISES TRANSFER

65.    The Trustee seeks to avoid a transfer by Specialty Select of $225,000.00 to Douglas Enterprises on December 23, 2015.  The Trustee does not appear to challenge the Douglas Enterprises Transfer at Specialty Select as a constructive fraudulent transfer.  To the extent that he does (over the Defendants' objection), the analysis is the same as above: this was the payment of legitimate debt, even if insider debt, and Specialty Select received reasonably equivalent value for a reduction of its debt as a matter of law.  Rather, he challenges this transfer as an actually fraudulent transfer.  Here again, there was no intent to hinder, delay, or defraud a creditor.  This was simply the repayment of insider debt, advanced years before and carried on Specialty Select's

books as debt.  Douglas simply chose to pay all non-insider debt before paying insider debt, exactly as he should have.  That may have been an insider preference for which the Trustee has not sued (because he can't), but it is not a fraudulent transfer.

**D.      INSIDER PREFERENCES**

66.     Against Specialty Select, the Trustee seeks to avoid and recover an insider preference to Douglas on January 4, 2017 in the amount of $19,860.39.  This is outside the ninety (90) day presumption of insolvency.  *See* 11 U.S.C. § 547(f).  The Trustee will therefore have to present affirmative evidence of insolvency which, as argued throughout this Brief, he will have no evidence of—especially because even his own expert was not asked to review Specialty Select's solvency or insolvency in 2017.

67.     Against Dual D, the Trustee seeks to avoid and recover an insider preference to Douglas on January 5, 2017 in the amount of $78,560.66.  Here, Dual D was presumed to be insolvent on that date.  However, the evidence will demonstrate that Dual D had no creditors on that date, other than Douglas, when the Tort Claims are excluded.  Douglas will therefore rebut the presumption of insolvency, and the Trustee will not be able to demonstrate insolvency for the same reasons as argued above.

## IV.      BREACH OF FIDUCIARY DUTY

**A.      GENERAL OBJECTION TO EVIDENCE**

68.     The Trustee's complaints regarding his breach of fiduciary duty claims are, to put it bluntly, a mess.  They are a shotgun approach.  This is why Douglas served various interrogatories on the Trustee, as opposed to engaging in more motion practice, to have the Trustee identify his claims.

69.     For Dual D:

INTERROGATORY NO. 14:

With respect to Count V of your Complaint, state the date on which Douglas committed each action or inaction (negligence or gross negligence) you assert as the basis for each breach of fiduciary claim.

ANSWER:

Douglas negotiated a management agreement providing for payment of management fees well in excess of the industry standard.

Management fees were paid to Douglas well in excess of the industry standard and included the following payments on the dates indicated:

*     *     *

On or about December 21, 2010, Douglas formed Brae Insurance Company Limited as a captive insurance company and personally, or through Douglas Enterprises contracted with Brae Insurance Company Limited to provide liability insurance coverage to the Debtor and renewed the insurance coverage periodically.

70.     Thus, with respect to Dual D, the alleged breaches of fiduciary duty were: (i) the allegedly excessive management fees, and (ii) the Brae insurance policies.

71.     For Specialty Select:

INTERROGATORY NO. 10:

With respect to Count V of your Complaint, state the date on which Douglas committed each action or inaction (negligence or gross negligence) you assert as the basis for each breach of fiduciary claim.

ANSWER:

On or about July 29, 2015 ~ sale of assets closed without consideration being received by the Debtor.

Douglas directed transfers to himself of no less than $301,643.75 following closing of the sale of the skilled nursing home chain on July 29, 2015 as follows:

*     *     *

Douglas directed transfers to Douglas Enterprises of no less than $225,000 on December 23, 2015.

On or about December 21, 2010, Douglas formed Brae Insurance Company Limited as a captive insurance company and personally, or through Douglas Enterprises contracted with Brae Insurance Company Limited to provide liability insurance coverage to the Debtor and renewed the insurance coverage periodically.

72.     Thus, with respect to Specialty Select, the Trustee's breaches of fiduciary duty were: (i) the Sale; (ii) transfer to Douglas of the Douglas Transfers; (iii) transfer to Douglas Enterprises of the $225,000; and (iv) the Brae insurance policy.

73.     However, Douglas also served the following Interrogatory with respect to alleged damages, because the Trustee failed to allege the same in his complaints:

INTERROGATORY NO. 12:

With respect to Count V of your Complaint and with respect to each action or inaction (negligence or gross negligence) you assert as the basis for each breach of fiduciary duty claim, identify the damages resulting from each such breach and explain how you arrived at such number.

ANSWER:

Undetermined. Facts will be developed through discovery.

74.     The above Interrogatory was served in Specialty Select, but an identical one was also served in Dual D (Interrogatory 16).

75.     As held by the Supreme Court of Texas, the elements of a breach of fiduciary duty claim are: "(1) the existence of a fiduciary duty, (2) breach of the duty, (3) causation, and (4) damages." *First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 220 (Tex. 2017).  Not only, therefore, are damages an element of the cause of action but, without damages, the element of causation also cannot be addressed.  Yet, as the Trustee answered, his damages are "Undetermined. Facts will be developed through discovery." Discovery is over and it is time for trial.

76.     The Trustee never supplemented this interrogatory response, or provided any expert opinion or other information as to what his breach of fiduciary duty damages and damages model

may be.  The Trustee had a duty to supplement his interrogatory answer if and when he formed his damages model.  *See* Fed. R. Civ. P. 26(e)(1).  The basic purpose of this rule is to prevent prejudice or surprise at trial.  *See, e.g., Brower v. Staley Inc.*, 2008 WL 5352019 at *2 (5th Cir. 2008).  Either the Trustee has failed with respect to that duty or he has been unable to identify any breach of fiduciary duty damages—which is his burden of proof.

77.     Excluding evidence the subject of an interrogatory where the party failed to properly supplement it is proper.  *See, e.g., Murphy v. Magnolia Elec. Power Ass'n*, 639 F.2d 232, 234 (5th Cir. 1981).  In determining whether to exclude evidence when one breaches the duty to supplement an interrogatory, courts should consider: 1) the explanation, if any, for the failure, 2) the importance of the evidence, 3) potential prejudice in allowing the evidence, and 4) possibility of continuance to cure such prejudice.  *See, e.g., Geiger v. Monroe County Miss.*, 2021 WL 5933129 at *2 (N.D. Miss. 2021).  Here, the evidence is critical; there will be irreparable injury if the Trustee is permitted to offer any evidence, because Douglas still—on the eve of trial—does not know what allegations to defend against; and there should be no continuance on this basis in a lawsuit that is nearly four (4) years old.

78.     Douglas therefore submits that it would be improper for the Court to permit the Trustee to present any evidence of alleged breaches of fiduciary duty because he has failed to provide any evidence on damages, and therefore on causation.

**B.      S**UBSTANTIVE **A**NALYSIS

79.     The first question that must be asked is who Douglas' fiduciary duties extended to. Those duties were owed to the Debtors but, because the Debtors were solvent, those duties meant that Douglas was entitled to manage the Debtors for the benefit of equity, which in this case was indirectly himself.  *See Ahmed v. Mbogo*, 2018 WL 3616887 at *11 (Tex. App. – Dallas 2018); *Van Bavel v. Oasis Design Inc.*, 1998 WL 546342 at *6 (Tex. App. – Fort Worth 1998) ("directors

and officers of a corporation owe a fiduciary duty to the corporation for the benefit of the shareholders"). Douglas owed no fiduciary duty to creditors, much less the Tort Claimants. If he ran the Debtors to benefit equity, which he did not, there was nothing wrong with that, since that is the whole point of owning a business in our capitalistic society. Or, did Douglas breach a duty to himselg?

80.     On the duty of care, Texas law is clear that this duty is subject to the business judgment rule, meaning that only gross negligence gives rise to a breach of the duty of care (and even then not always). *See, e.g., F.D.I.C. v. Harrington*, 844 F. Supp. 300, 305 (N.D. Tex. 1994) ("the Court concludes that Texas law imposes liability only for grossly negligent acts"). Gross negligence is defined as "that entire want of care which would raise the belief that the act or omission complained of was the result of a conscious indifference to the right or welfare of the person or persons to be affected by it." *Burk Royalty Co. v. Walls*, 616 S.W.2d 911, 920 (Tex. 1981). In no event was Douglas consciouly indifferent to the interests of the Debtors with respect to the Sale or anything else: he left more than enough assets with each to pay all undisputed debts, which they paid. That he transferred worthless assets for no monetary consideration is neither negligence or gross negligence, it was good business.

81.     The duty of loyalty under Texas law is more nuanced, but has been summarized by the Fifth Circuit as follows:

> The duty of loyalty dictates that a director must act in good faith and must not allow his personal interests to prevail over the interests of the corporation. Whether a director is 'interested' is a question of fact. A director is considered 'interested' if he or she (1) makes a personal profit from a transaction by dealing with the corporation or usurps a corporate opportunity, (2) buys or sells assets of the corporation, (3) transacts business in his director's capacity with a second corporation of which he is also a director or significantly financially associated, or (4) transacts business in his director's capacity with a family member.
>
> Transactions involving an interested director are subject to strict judicial scrutiny but are not voidable unless they are shown to be unfair to the corporation. If the

> director is found to have committed fraud, over-reaching, or waste of corporate
> assets, the transaction will be set aside.  In all other circumstances, the burden of
> proof is on the interested director to show that the action under fire is fair to the
> corporation.  A challenged transaction found to be unfair to the corporate enterprise
> may nonetheless be upheld if ratified by a majority of disinterested directors or the
> majority of the stockholders.

*Gearhart Indus. Inc. v. Smith Intern. Inc*., 741 F.2d 707, 719-20 (5th Cir. 1984) (internal citations

omitted).

82.     Taking a step back, what really happened was that Douglas decided to cease the

Debtors' operations and wind down their affairs, for the benefits of the Sale, because that is what

the buyer required having nothing to do with the Tort Claimants.  Yet, in the process, he ensured

that the Debtors had sufficient assets to pay their undisputed debts, which they did.  The question,

then, is whether any of Douglas' fiduciary duties required him to keep the Debtors going or, more

particularly, prevented him from deciding to cease operations.  Again, his decision to terminate

the leases *could* reasonably be questioned, but the Trustee has not sued for that and limitations

expired long ago.

83.     The Defendants have found no reported opinion discussing whether the owner of a

business can possibly breach his fiduciary duties by ceasing business operations, even if they are

profitable, although the available case law strongly suggests not.  *See, generally, Huff Energy Fund

L.P. v. Gershen*, 2016 WL 5462958 at *11 (Del. Ch. 2016) (holding that directors of corporation

did not breach fiduciary duties by approving a plan of dissolution for the corporation);

*DeLeonardis v. Credit Agricole Indosuez*, 2000 WL 1718543 at *8 (S.D.N.Y. 2000) ("Lieberman's

decision to dissolve SEI L.P. . . . cannot constitute a breach of fiduciary duty to the other members

of SEI Capital, since Lieberman had the unqualified right to unilaterally dissolve SEI L.P. . . [the

agreement] cannot be read to impose upon Lieberman a fiduciary duty to continue as fund manager

of the SEI Fund in perpetuity in order that each member of the Indosuez Capital Group might

remain eligible to reap a share of the profits"); *Burton v. Exxon Corp.*, 583 F. Supp. 405, 421 (S.D.N.Y. 1984) (concluding no breach of fiduciary duty in deciding to dissolve corporation).

84.    Douglas does not argue that a fiduciary can never breach a fiduciary duty related to a decision to cease a business' operations, at least when there are other stockholders to consider and ulterior motives, anticompetitive motives, outright hostility, or fraud against other stockholders which may motivate a decision to dissolve—because the interests of others are involved.  None of that is present here, only Douglas.  Since the owner of a solvent business is the one who benefits from a profitable business, the Defendants cannot imagine that the law would impose upon him a duty to keep the business going for his own benefit.

85.    With respect to any allegation of breach of fiduciary duty for causing the Debtors to purchase insurance from Brae, first, this appears to be outside of the four (4) year statute of limitations applicable to breaches of fiduciary duty.  Second, Texas law did not even require the Debtors to have liability insurance.  Third, the Debtors purchased insurance where each claim is capped at $250,000.00, as indeed it is under Texas law, and where each year's policy would pay up to three (3) such claims.  Very rarely is there ever more than one, and in unusual circumstances two, personal injury or wrongful death claims against a nursing home in any given year.  Nothing to do with Brae breached any duty of loyalty, much less of care—which is also subject to the gross negligence standard and the business judgment rule.

86.    With respect to any allegation of breach of fiduciary duty in causing the Debtors to pay the "Douglas Transfers" and the "Management Fees," there was no possible breach of the duty of care because this was the repayment of legitimate debt.  Even if the management fees were allegedly excessive, that is not gross negligence.  As for the duty of loyalty, paying insider debt does not breach that duty at least where, as here, non-insider undisputed debt was first paid.  For the allegedly excessive management fees, this may be subject to stricter srutiny because of the

insider nature of the transaction.  However, the evidence will demonstrate that this was still fair to the debtor and that Dual D obtained full value for these fees, given the extra demands and subsmued cost reimbursements at Dual D.  And, Dual D certainly ratified this decision and obtained its benefits, thus precluding any liability for breach of the duty of loyalty.

## V.    <u>CONCLUSION</u>

87.    Had the Debtors had legitimate, undisputed debt that was not paid, perhaps the conclusion would be different.  Had the Tort Claimants secured judgments, even after the petition dates, perhaps the result would be different.  As the Defendants point out above, however, what makes this case truly unique is that the only debts that were not paid were the disputed, contingent, and unliquidated tort claims, none of which have even been proven.  It would be odd indeed, and unjust, for Douglas to have to pay the Trustee his requested millions of dollars against this unproven debt, or for any of that money to flow to tort claimants who have not proven their cases.  That is turning our legal system upside down on its head.  When Douglas decided to sell and to retire, he could have taken all assets for himself, were he trying to stiff the Debtors' creditor.  He did not.  He left enough in to pay every legitimate debt in full, worked to collect receivables, and even advanced the Debtors the funds needed to defend themselves.  That should not be critisized, much less punished.  That should be applauded.  That the Tort Claimants may receive nothing is a reality, but then so is the fact that none of them received a judgment, without which, of course, none of them had any right to payment to begin with.  This case should begin and end with that fact.

WHEREFORE, PREMISES CONSIDERED, the Defendants respectfully request that the Court deny the Trustee all relief on his complaints and that the Court grant them such other and further relief to which they may be justly entitled.

RESPECTFULLY SUBMITTED this 15th day of March, 2024.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/ Davor Rukavina
     Davor Rukavina, Esq.
     Texas Bar No. 24030781
     500 N. Akard Street, Suite 3800
     Dallas, Texas 75202-2790
     Telephone: (214) 855-7500
     Facsimile: (214) 978-4375
     drukavina@munsch.com

**ATTORNEYS FOR THE DEFENDANTS**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that, on this the 15th day of March, 2024, true and correct copies of this document were electronically served by the Court's ECF system on all parties to this Adversary Proceeding through their counsel of record, including on counsel for the Trustee.

By: /s/ Davor Rukavina
     Davor Rukavina, Esq.