IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| *In re:* | § | |
| | § | |
| **DUAL D HEALTH CARE** | § | |
| **OPERATIONS, INC. d/b/a KEMP** | § | **CASE NO. 17-41320-elm** |
| **CARE CENTER, LLC.** | § | |
| | § | |
| *Debtor.* | § | |

| | | |
|---|---|---|
| **SHAWN K. BROWN, Chapter 7** | § | |
| **Trustee for Dual D Health Care Operations,** | § | |
| **Inc. d/b/a Kemp Care Center, LLC,** | § | |
| | § | |
| **Plaintiff,** | § | |
| **v.** | § | **ADVERSARY NO. 20-04059** |
| | § | |
| **LLOYD DOUGLAS, Individually,** *et al.,* | § | |
| | § | |
| **Defendants.** | § | |

**PLAINTIFF TRUSTEE'S PROPOSED FINDINGS
OF FACT AND CONCLUSIONS OF LAW**

COMES NOW Plaintiff Shawn K. Brown, Trustee and Plaintiff herein and submits the
following Proposed Findings of Fact and Conclusions of Law.

**I.
PROPOSED FINDINGS OF FACT**

**A.    Procedural Background and Parties.**

1.    Dual D Health Care Operations, Inc. d/b/a Kemp Care Center, LLC ("***Dual D***" or
"**Debtor**") is a Texas corporation which filed a Voluntary Petition for Relief Under chapter 7 of
the Bankruptcy Code on March 31, 2017 (the "**Petition Date**"), thereby commencing this case.

2.    Plaintiff, Shawn K. Brown, is the duly appointed and qualified Chapter 7 Trustee
("**Trustee**") of the Dual D bankruptcy estate pursuant to 11 U.S.C. § 701(a).

3.      Defendant, Lloyd Douglas ("**Douglas**") is an individual who directly or indirectly owned and controlled all other Defendants in this Adversary Proceeding.

4.      Defendant, Lloyd Douglas Enterprises, L.C. ("**Douglas Enterprises**") is a Texas limited liability company which served as the Management Company for the operating companies in the Douglas Skilled Nursing Home Chain.

5.      Defendant, Brownwood Care Center I. Ltd. ("**Brownwood**") is a Texas limited partnership which held fee simple title to the facility known as Songbird Lodge located in Brownwood, Texas.

6.      Defendant, D-5 Development, LLC ("**D-5**") is a Texas limited liability company which held fee simple title to the facility known as St. Teresa Nursing and Rehabilitation Center located in El Paso, Texas.

7.      Defendant, Sunflower Park Holdings, LP ("**Sunflower**") is a Texas limited partnership which held fee simple title to the facility known as Sunflower Park Health Care located in Kaufman, Texas.

8.      Defendant, Whispering Pines Healthcare, L.C. ("**Whispering Pines**") is a Texas limited liability company which held fee simple title to the facility known as Whispering Pines located in Longview, Texas.

9.      Defendant, Mt. Pleasant Operators, LLC ("**Mt. Pleasant**") is a Texas limited liability company which held fee simple title to the facility known as Greenhill Villas located in Mount Pleasant, Texas.

10.     Defendant, Specialty Select Care Center, LLC ("**Specialty Select**") is a Texas limited liability company which held fee simple title to the facility known as Casa Rio Healthcare and Rehabilitation located in San Antonio, Texas.

In re Dual D Health Care Operations, Inc. d/b/a Kemp Care Center, LLC - Debtor
Findings of Fact and Conclusions of Law                                    Page 2
470422

11.     Defendant, Graham Investors Group, LLC ("**Graham**") is a Texas limited liability company which held fee simple title to the facility known as Graham Oaks located in Graham, Texas

12.     Defendant, Kemp Investor Holdings, LLC ("**Kemp**") is a Texas limited liability company which held fee simple title to the facility known as Kemp Care Center located in Kemp, Texas.

13.     Defendant, Kerens Care Center, Inc. ("**Kerens**") is a Texas corporation which held fee simple title to the facility known as Kerens Care Center located in Kerens, Texas.

14.     Defendant, River City Life Care, Inc. ("**River City**") is a Texas corporation which held fee simple title to the facility known as River City Care Center located in San Antonio, Texas.

15.     Brownwood, D-5, Sunflower, Whispering Pines, Mt. Pleasant, Specialty Select, Graham, Kemp, Kerens and River City are collectively referred to herein as the "**Fee Owners**".

**B.**     <u>**General History of the Debtor.**</u>

16.     Debtor was the operator of a 124 bed skilled nursing home known as Kemp Care Center located at 1351 S. Elm Street, Kemp, Texas 75144 ("**Kemp Care Center**") and was part of a chain of ten (10) skilled nursing homes owned by Lloyd Douglas and managed by Lloyd Douglas Enterprises, L.C. Douglas was the sole shareholder, a director and served as president of the Debtor at all relevant times

17.     For each nursing home in the Douglas skilled nursing home chain, there was a fee owner, the property company, which was owned by Douglas which leased the location to an operator, the operating company, that was also owned by Douglas which in turn contracted the management services of Douglas Enterprises which was owned by Douglas as well. This so called OpCo/ProCo organizational structure was employed as a means of limiting liability, such as to

In re Dual D Health Care Operations, Inc. d/b/a Kemp Care Center, LLC - Debtor
Findings of Fact and Conclusions of Law                                                    Page 3
470422

potential personal injury and wrongful death claimants, while maximizing the income and overall profitability to the equity owner.

18.     At all relevant times, Douglas owned Douglas Enterprises and the Fee Owners and served as manager of Douglas Enterprises and manager or president of the Fee Owners, as the case may be.

19.     Douglas, Douglas Enterprises and the Fee Owners are insiders of the Debtor.

20.     On Debtor's 2013 Form 1120S U.S. Income Tax Return for an S Corporation, the Debtor reflected gross receipts of $5,979,481 and total deductions of $5,949.010, resulting in ordinary business income of $30,471. The value of total assets was reported as $1,616,590.

21.     On Debtor's 2014 Form 1120S U.S. Income Tax Return for an S Corporation, the Debtor reflected gross receipts of $8,338,808 and total deductions of $8,271,564, resulting in ordinary business income of $67,244. The value of total assets was reported as $1,065,996.

22.     On Debtor's 2015 Form 1120S U.S. Income Tax Return for an S Corporation, the Debtor reflected gross receipts of $5,347,418 and total deductions of $5,234,056, resulting in ordinary Business income of $113,362. The Debtor ceased operations after July 30, 2015.

## C.     Douglas Enterprises Management Agreement.

3.     Management of Kemp Care Center was performed by Douglas Enterprises and Debtor paid monthly management fees of $150,000 to Douglas Enterprises until the Kemp Lease was terminated effective as of July 30, 2015. During the period of January 1, 2014 through November 12, 2015 alone, Debtor paid Douglas Enterprises no less than $2,575,000 in management fees (the "**Management Fees**") follows:

| Date of Transfer | Method of Transfer | Amount of Transfer |
|---|---|---|
| 03/26/14 | Wire Transfer | $ 150,000.00 |
| 05/22/14 | Wire Transfer | 250,000.00 |
| 07/09/14 | Wire Transfer | 300,000.00 |

In re Dual D Health Care Operations, Inc. d/b/a Kemp Care Center, LLC - Debtor
Findings of Fact and Conclusions of Law                                           Page 4
470422

| 10/15/14 | Wire Transfer | 400,000.00 |
|---|---|---|
| 12/11/14 | Wire Transfer | 300,000.00 |
| 12/23/14 | Wire Transfer | 200,000.00 |
| 02/03/15 | Wire Transfer | 100,000.00 |
| 03/12/15 | Wire Transfer | 100,000.00 |
| 05/04/15 | Wire Transfer | 250,000.00 |
| 06/22/15 | Wire Transfer | 200,000.00 |
| 09/24/15 | Wire Transfer | 100,000.00 |
| 09/25/15 | Wire Transfer | 150,000.00 |
| 11/12/15 | Wire Transfer | 75,000.00 |
| TOTAL | | $2,575,000.00 |

23.     A total of $325,000 was transferred to Douglas Enterprises after closing of the GruenePointe 1 Kemp sale on or about July 29, 2015. The industry standard for management fees in the skilled nursing home industry is 5% of gross revenues.

24.     Applying the 5% industry standard to the Debtor's gross revenues of $5,979,481 in 2013, $8,338,808 in 2014 and $5,347,418 for the first seven months of 2015, Douglas Enterprises would have been entitled to a management fee in 2013 of $298,974, in 2014 of $416,940 and in 2015 of $267,371.

25.     The $150,000 monthly management fee actually collected by Douglas Enterprises calculates out to be $1,800,000 on an annualized basis and $1,050,000 for seven (7) months.

26.     The management fees paid by the Debtor to Douglas Enterprises were well above the industry standard. The result of the above-market management fees was to minimize cash reserves and limit the overall profitability of the Debtor. Meanwhile, Douglas Enterprises was enriched by the stream of $150,000 monthly management fee payments.

27.     Douglas Enterprises is the General Partner of Lloyd Douglas Enterprises I, Ltd.

28.     The management agreement (the "**Management Agreement**") for Kemp Care Center was executed on or about January 1, 2007, between the Debtor and Lloyd Douglas Enterprises I, Ltd. The Management Agreement is not binding on the Debtor.

In re Dual D Health Care Operations, Inc. d/b/a Kemp Care Center, LLC - Debtor
Findings of Fact and Conclusions of Law                                    Page 5
470422

**D.**     **Sale of Douglas Skilled Nursing Home Chain.**

29.     On or about May 1, 2015, Douglas Enterprises joined by the Fee Owners, Debtor and the other operators of the skilled nursing home chain entered into a Purchase and Sale Agreement ("**Sale Agreement**") with GruenePointe Acquisition I, LLC, a Texas limited liability company, or its permitted assignee ("**GruenePointe**"), pursuant to which GruenePointe agreed to purchase the assets of the skilled nursing home chain for the sum of $130 million. (Plaintiffs' Exhibit 8)

30.     The Sale Agreement was amended by the First Amendment to Purchase and Sale Agreement dated June 29, 2015 (Plaintiffs' Exhibit 9).

31.     The parties to the Sale Agreement also entered into an Escrow Agreement on July 30, 2015 (Plaintiffs' Exhibit 10).

32.     Closing of the sale of the assets of the skilled nursing home chain to GruenePointe occurred on or about July 29, 2015. The sale resulted in the transfer and assignment of substantially all assets of the Debtor, save and except cash and accounts receivable.

33.     In conjunction with the sale of the assets, Debtor executed, among others, the following documents:

   a.     Operations Transfer Agreement (Plaintiffs' Exhibit 11)

   b.     Bill of Sale dated July 29, 2015 (Plaintiffs' Exhibit 13)

   c.     Bill of Sale dated July 30, 2015 (Plaintiffs' Exhibit 15)

   d.     Termination of Management Agreement (Plaintiffs' Exhibit 17)

   e.     Assignment and Assumption Agreement (Plaintiffs' Exhibit 19)

   f.     Lease Termination Agreement (Plaintiffs' Exhibit 22)

   g.     Confirmation of Termination of Leases and Contract (Plaintiffs' Exhibit 23)

In re Dual D Health Care Operations, Inc. d/b/a Kemp Care Center, LLC - Debtor
Findings of Fact and Conclusions of Law                                        Page 6
470422

34.    Net proceeds of sale from the sale of the skilled nursing home chain in the amount of $66,838,802.02 were paid to Douglas Enterprises (Plaintiffs' 29).

35.    Net proceeds of sale from the sale of the skilled nursing home chain in the amount of $66,838,802.02 were wired by the closing agent, Texas American Title Company, to Douglas Enterprises on July 31, 2015.

36.    Debtor received no cash consideration for the sale of the assets in conjunction with the sale of the skilled nursing home chain. Instead, the net purchase money from the sale was diverted to Douglas, Douglas Enterprises, Kemp or other of the Fee Owners.

37.    The 2015 Form 1120S U.S. Income Tax Return for an S Corporation filed by the Debtor reflected at Form 8949, proceeds of sale from the sale of business of $2,462,745 and a net gain of $2,358,411 on the sale (Plaintiffs' Exhibit 33).

38.    After lengthy discussions between the Trustee and Douglas prior to commencement of this adversary proceeding, Douglas caused to be filed by the Debtor, on or about July 17, 2020, without the authorization of the Trustee, an amended 2015 Form 1120S U.S. Income Tax Return for an S Corporation removing all references to the asset sale (Plaintiffs' Exhibit 34).

**E.    <u>Value of the Debtor's Assets Sold.</u>**

39.    The fair market value of the Debtor's business enterprise and equity as of July 29, 2015 is $2,410,000.00 as reflected in the Independent Fair Market Valuation of the Business Enterprise ("BEV") of Dual D Health Care Operations, Inc. d/b/a/ Kemp Care Center, LLC and Solvency Analysis as of July 29, 2015 prepared by the Trustee's appraiser and solvency expert, Jerry M. Chang dated December 8, 2023 (Plaintiffs' Exhibit 103).

In re Dual D Health Care Operations, Inc. d/b/a Kemp Care Center, LLC - Debtor
Findings of Fact and Conclusions of Law                                                    Page 7
470422

**F.**     **Schedules and Statement of Financial Affairs.**

40.     The Debtor commenced its chapter 7 bankruptcy case on March 31, 2017. The Schedules of assets and liabilities filed May 4, 2017 [Docket No. 11] reflected no secured or priority claims and non-priority unsecured claims of $20,730.51. The Statement of Financial Affairs filed May 4, 2017 [Docket No. 12] reflected three personal injury/wrongful death cases pending as of the Petition Date

**G.**     **Proofs of Claim.**

41.     Three proofs of claim have been filed in the Debtor's bankruptcy case, two of which are personal injury/wrongful death cases. Of the two personal injury/wrongful death cases, one was filed prior to the sale of the assets of the Debtor on July 29, 2015. The cases are as follows: (i) Cause No. 048-276330-15 commenced January 9, 2015 in the 48th Judicial District Court in and for Tarrant County, Texas styled *Grace Shepherd, as Wrongful Death Beneficiary of John Shepherd, Deceased, Plaintiff vs. Dual D Healthcare Operations Inc. d/b/a Kemp Care Centers, Dual D Life Care, Inc., and Kemp Care Center Operators, LLC Defendants* (the "**Shepherd Case**") seeking redress for errors and omissions which caused the death of Mr. Shepherd on January 20, 2014; and (ii) Cause No. DC-16-02641 commenced March 7, 2016 in the 160th Judicial District Court in and for Dallas County, Texas styled *Charles Harley on Behalf of the Estate of Nellie Peele and on Behalf of All Wrongful Death Beneficiaries vs. East Texas Medical Center Athens, GruenePointe 1 Kemp, LLC d/b/a Kemp Care Center, Karah L. Coker, M.D. and Warren Cave, R.N. N.P.* (the "**Peele Case**").

42.     Until the Petition Date, Debtor defended the Shepherd Case and Peele Case. Following the Petition Date, estate representatives for both Shepherd and Peele filed proofs of claim with the Bankruptcy Court

In re Dual D Health Care Operations, Inc. d/b/a Kemp Care Center, LLC - Debtor
Findings of Fact and Conclusions of Law                                                         Page 8
470422

43.     This Court has approved compromise and settlement agreements between the Trustee and both estate representatives resulting in allowed tardily filed unsecured claims of $190,000 on account of the Shepherd Case and $190,000 on account of the Peele Case.

44.     A third proof of claim was filed by Sullivan & Cook, LLC ("**Sullivan**") as an unsecured claim in the amount of $15,927.06 representing "Professional fees for unpaid legal services rendered through the petition date".

45.     On the Petition Date, there was the sum of $2,622.84 in the Debtor's bank account available for satisfaction of allowed claims, including the claims the subject of the Shepherd Case and the Peele Case, all other assets of the Debtor having been conveyed to GreunePointe 1 Kemp or expended by the Debtor.

**H.     Insolvency.**

46.     The Debtor was solvent up until the time of the GruenePointe asset sale.

47.     The sale of substantially all of the Debtor's assets rendered the Debtor insolvent.

48.     The Debtor remained insolvent at all times after the closing of the GruenePointe asset sale.

**I.     Captive Insurance Companies.**

49.     On or about December 21, 2010, two captive insurance companies were formed by Douglas pursuant to IRC section 831(B)(2)(A) to insure risks of the Douglas skilled nursing home chain.

50.     Douglas and Douglas Enterprises acting on behalf of the Debtor contracted with one of those captives, Brae Insurance Company Limited, to provide a Long Term Care Facility Liability insurance policy No. NBIC2010-03R15 with a limit of $250,000 per each medical incident and with a general aggregate limit of $750,000 (the "**Brae Insurance Policy**"). The Brae

In re Dual D Health Care Operations, Inc. d/b/a Kemp Care Center, LLC - Debtor
Findings of Fact and Conclusions of Law                                        Page 9
470422

Insurance Policy was purchased in 2010 and was therefore in effect at the time of the incidents which gave rise to the Shepherd Case and Peele Case.

51.    Coverage for both the Shepherd Case and Peele Case was denied instance.

52.    Douglas and Douglas Enterprises understood, at the time the captive insurance companies were formed and at the time the Brae Insurance Policy was secured, that the contracted for insurance coverage was wholly inadequate thereby leaving the Debtor without insurance coverage for potential risks including wrongful death claims, such as those the subject of the Shepherd Case and Peele Case.

**J.    Transfer(s) to Lloyd Douglas.**

53.    On or about January 5, 2017, within the one-year period immediately preceding the Petition Date, Debtor transferred to Douglas the sum of $78,560.66 by Check No. 9680 drawn on Wells Fargo Bank, N.A. account number XXXXX02728 (the "**Douglas Transfer**").

54.    The Douglas Transfer was a reimbursement for Debtor expenses, primarily attorney fees incurred defending the Shepherd Case and the Peele Case, which were satisfied by Douglas.

55.    Individual invoices had been collected over time, bundled for payment, and actually paid on January 5, 2017.

**K.    Avoidance of Fraudulent Transfers Pursuant to 11 U.S.C. §§ 548(a)(1)(A) and 550**

56.    At closing of the GruenePointe 1 Kemp acquisition, which occurred within the two-year period prior to the Petition Date, Debtor received no consideration whatsoever for the valuable assets transferred to GruenePointe 1 Kemp. Instead, Douglas, acting on his own behalf and on behalf of the entities he controls, namely the Debtor, Douglas Enterprises and the Fee Owners, caused the consideration justly due to the Debtor to be transferred to Douglas, Douglas Enterprises

In re Dual D Health Care Operations, Inc. d/b/a Kemp Care Center, LLC - Debtor
Findings of Fact and Conclusions of Law
470422
Page 10

and/or the Fee Owners. The value transferred by the Debtor to the respective defendants is $2,410,000.

57.    Within the two year period prior to the Petition Date, the Debtor made or transferred to (a) Douglas Enterprises, the Management Fees which were well in excess of the 5% industry standard; and (b) Lloyd Douglas, the Douglas Transfer.

58.    The Debtor transferred the: (a) GruenePointe 1 Kemp sale proceeds to Douglas, Douglas Enterprises and/or the Fee Owners; (b) Management Fees to Douglas Enterprises; and (c) Douglas Transfer to Douglas with actual intent to hinder, delay, or defraud creditors. By transferring these assets to or for the benefit the Defendants without disclosing the transfers, the Debtor concealed the fact that money was being transferred to the Defendants. The transfers hindered, delayed, and defrauded creditors because they placed funds not due to the Defendants out of their reach and out of their discovery.

59.    Several "badges of fraud" demonstrating Debtor's actual intent to hinder, delay, or defraud are present. See, e.g., Chastant v. Chastant (In re Chastant), 873 F.2d 89, 91 (5th Cir. 1989)), including the following.

60.    The Transfer Was to an Insider: Douglas owned and controlled the Debtor, Douglas Enterprises and the Fee Owners. Defendants are insiders of the Debtor as that term is defined pursuant to section 101(31)(A) of the Bankruptcy Code.

61.    The Transfer Was Concealed: The diversion of the sale proceeds as well as the transfer of the Management Fees and Douglas Transfer were made in either in whole or in part under the guise of business-related payments. Moreover, the Debtor amended its 2015 Form 1120S U.S. Income Tax Return for an S Corporation to conceal the sale and alter the information originally provided the Internal Revenue Service in the original return.

In re Dual D Health Care Operations, Inc. d/b/a Kemp Care Center, LLC - Debtor
Findings of Fact and Conclusions of Law                                                    Page 11
470422

62.    <u>Existence of Litigation</u>: Mr. Shepherd passed away on January 20, 2014 and the Shephard Case was commenced January 9, 2015, well in advance of the GruenePointe 1 Kemp sale, transfer of sizable Management Fees and the Douglas Transfer.

63.    <u>The Transfer Was of Substantially all of the Debtor's Assets</u>: The transfer of the Debtor's Assets to GruenePointe 1 Kemp was of substantially all of the Debtor's assets. All that remained was the Debtor's bank account and right to receipt of receivables from the final cost report.

64.    <u>Less Than Reasonably Equivalent Value Exchanged</u>: The Debtor received no consideration whatsoever for the transfer of assets to GruenePointe 1 Kemp and grossly insufficient consideration for the Management Fees paid to Douglas Enterprises.

65.    <u>Debtor Was Insolvent or Became Insolvent</u>: The Debtor became insolvent as a direct result of the transfer to GruenePointe 1 Kemp and after closing of the transfer to GruenePointe 1 Kemp on July 29, 2015, each transfer was made at the time the Debtor was insolvent.

66.    <u>Existence or Cumulative Effect of the Pattern of Series of Transactions</u>: Payment of the Management Fees had the effect of reducing the Debtor's income and syphoning off the Debtor's available cash reserves. The Debtor preferred Douglas over the claims of other unsecured creditors in making the Douglas Transfer and the transfer of substantially all of the Debtor's assets to GruenePointe 1 Kemp had the effect of eliminating the Debtor's ability to satisfy the claim of unsecured creditors.

67.    Moreover, using a captive insurance company to satisfy regulator insurance requirements was designed to provide the appearance of liability insurance coverage when, in fact, there was not. The Brea Insurance Policy reflects limits of $250,000 per incident with a general

In re Dual D Health Care Operations, Inc. d/b/a Kemp Care Center, LLC - Debtor
Findings of Fact and Conclusions of Law                                                                    Page 12
470422

aggregate limit of $750,000 (inclusive of defense expenses). The Brea Insurance Policy is a reimbursement policy. In contracting with his captive insurance company for the subject policy, Douglas created a $250,000 fund to defend three covered incidents per year. The defense costs cannibalize the policy limits such that if defense costs run $100,000, there would only be $150,000 of remaining available coverage. Additionally, if there are four or more claims on the Brea Insurance Policy in a single year of coverage, the first three claims may be covered, but after that, claims made on the Brea Insurance Policy would automatically be denied as outside policy limits.

68.    The General Chronology of Events and Transactions: The transactions, the subject of inquiry, were made over a period of time under a scheme to siphon money away from the Debtor and its creditors.

69.    The badges of fraud indicate the Debtor intended to hinder, delay and defraud its creditors. Personal injury/wrongful death claims are to be anticipated in a skilled nursing home; however, the Debtor and Defendants worked in concert to frustrate the ability of such claimants to be compensated for their damages. The Brae Insurance Policy secured from the captive insurance company provided the appearance of coverage, but failed to tender coverage for in the Shepherd Case and the Peele Case. The Debtor engaged counsel to defend the pending personal injury/wrongful death claims; however, because the Debtor was without sufficient resources to fund the litigation to conclusion, the defense continued until available Debtor resources were virtually exhausted. It was only then that Debtor took the final action of commencing the underlying bankruptcy case.

70.    The Debtor employed a scheme of transferring cash resources, which would otherwise have been available to respond to a judgment, to insiders. Douglas Enterprises received the Management Fee, Douglas received the Douglas Transfer in preference to other creditors and

In re Dual D Health Care Operations, Inc. d/b/a Kemp Care Center, LLC - Debtor
Findings of Fact and Conclusions of Law                                          Page 13
470422

Douglas, Douglas Enterprises and/or the Fee Owners received the proceeds of sale of the Debtor's

assets to GruenePointe 1 Kemp. All with the effect of hindering, delaying and defrauding creditors

of the Debtor.

71.    Certain of the Defendants were initial transferees of avoidable transfers within the

meaning of the Bankruptcy Code.

72.    Certain of the Defendants were subsequent transferees of avoidable transfers within

the meaning of the Bankruptcy Code and were not transferees in good faith and had or should have

had ample knowledge and awareness of the avoidability of the initial transfers at the time they

were received.

**L.    Avoidance of Constructive Fraudulent Transfers Pursuant to 11 U.S.C. §§
548(a)(1)(B) and 550)**

73.    The Debtor received less than equivalent value for the transfer of its assets to

GruenePointe 1 Kemp on or about July 29, 2015. In fact, the Debtor received absolutely no

consideration for the assets transferred to GruenePointe 1 Kemp.

74.    The Debtor became insolvent as a result of the transfer to GruenePoint 1 Kemp.

The sale of substantially all of the Debtor's assets to GruenePoint 1 Kemp left the Debtor with

limited assets and ability to satisfy any claims, including the attorney fees for defense of the

personal injury claims.

75.    The Debtor was engaged in business or a transaction, or was about to engage in

business or a transaction, for which any property remaining with the Debtor was an unreasonably

small capital.

76.    The Debtor intended to incur, or believed that the Debtor would incur, debts that

would be beyond the Debtor's ability to pay as such debts matured. With the pending Shepherd

Case and Peele Case, the Debtor employed a strategy of defending the litigation until virtually all

In re Dual D Health Care Operations, Inc. d/b/a Kemp Care Center, LLC - Debtor
Findings of Fact and Conclusions of Law                                                    Page 14
470422

Debtor resources were exhausted. As of the Petition Date, there was a balance on hand in the Debtor's bank account of $2,622.84 while the Proof of Claim filed by Sullivan indicated Debtor's own litigation counsel had a remaining unsatisfied claim as of the Petition Date of nearly $16,000.

77.     Certain of the Defendants were initial transferees of avoidable transfers within the meaning of the Bankruptcy Code.

78.     Certain of the Defendants were subsequent transferees of avoidable transfers within the meaning of the Bankruptcy Code and were not transferees in good faith and had or should have had ample knowledge and awareness of the avoidability of the initial transfers at the time they were received.

## M.    Avoidance of Actual and Constructive Fraudulent Transfers (TUFTA and 11 U.S.C. §§ 544(b) AND 550)

79.     Grace Shepherd, as Wrongful Death Beneficiary of John Shepherd, Deceased, commenced the Shepherd Case on January 9, 2015 against the Debtor for personal injuries that ultimately resulted in the death of John Shepherd on January 20, 2014. Grace Shepherd filed a Proof of Claim in the Debtor's bankruptcy case on January 11, 2018 as an unsecured claim in the amount of $250,000. The proof of claim was docketed as Claim Number 2 on the Claims Register maintained by the Clerk of the Bankruptcy Court (the "Shepherd Claim"). The Shepherd Claim has been allowed as a tardily filed claim in the amount of $190,000 pursuant to Order entered December 7, 2018 [Docket No. 46]. The Shepherd Claim is a triggering creditor.

**Actual Fraud**

80.     The transfers of the Management Fees to Douglas Enterprises, the Douglas Transfer to Douglas and the diversion of the sale proceeds justly due the Debtor from the sale of its assets to GruenePointe 1 Kemp were made with the actual intent to hinder, delay or defraud the legitimate creditors of the estate.

In re Dual D Health Care Operations, Inc. d/b/a Kemp Care Center, LLC - Debtor
Findings of Fact and Conclusions of Law                                              Page 15
470422

81.    The "badges" of fraud (as discussed earlier) indicate the Debtor intended to hinder, delay and defraud its creditors. Personal injury/wrongful death claims are to be anticipated in a skilled nursing home; however, the Debtor and Defendants worked in concert to frustrate the ability of such claimants to be compensated for their damages. The Brae Insurance Policy secured from the captive insurance company provided the appearance of coverage, but failed to tender coverage in the Shepherd Case and the Peele Case. Further, the Debtor engaged counsel to defend the pending personal injury/wrongful death claims; however, because the Debtor was without sufficient resources to defend the litigation to conclusion, the defense continued until available Debtor resources were virtually exhausted. It was only then that Debtor took the final action of commencing the underlying bankruptcy case.

82.    The Debtor employed a scheme of transferring cash resources, which would otherwise have been available to respond to a judgment, to insiders. Douglas Enterprises received the Management Fee, Douglas received the Douglas Transfer in preference to other creditors and Douglas, Douglas Enterprises and/or the Fee Owners received the proceeds of sale of the Debtor's assets to GruenePointe 1 Kemp. All with the effect of hindering, delaying and defrauding creditors of the Debtor.

**Constructive Fraud**

83.    Grace Shepherd, as Wrongful Death Beneficiary of John Shepherd, Deceased serves as the triggering creditor.

84.    The Debtor received less than equivalent value for the transfer of its assets to GruenePointe 1 Kemp on or about July 29, 2015. In fact, the Debtor received absolutely no monetary consideration for the assets transferred to GruenePointe 1 Kemp.

In re Dual D Health Care Operations, Inc. d/b/a Kemp Care Center, LLC - Debtor
Findings of Fact and Conclusions of Law                                    Page 16
470422

85.     The Debtor became insolvent as a result of the GruenePointe 1 Kemp transfer. The sale of substantially all of the Debtor's assets to GrunePointe Kemp left the Debtor with limited assets and ability to satisfy any claims, including the attorney fees for defense of the personal injury claims.

86.     Certain of the Defendants were initial transferees of avoidable transfers within the meaning of the Bankruptcy Code.

87.     Certain of the Defendants were subsequent transferees of avoidable transfers within the meaning of the Bankruptcy Code and were not transferees in good faith and had or should have had ample knowledge and awareness of the avoidability of the initial transfers at the time they were received

## N.     <u>Avoidance of Preferential Transfers Pursuant to 11 U.S.C. 547 AND 550</u>

88.     The Douglas Transfer was made to or for the benefit of Douglas, a creditor of the Debtor.

89.     The Douglas Transfer was for or on account of an antecedent debt owed by the Debtor before such payment was made.

90.     The Douglas Transfer was made while the Debtor was insolvent.

91.     The Douglas Transfer was made within the one-year before the Petition Date.

92.     Douglas is an insider of the Debtor.

93.     The Douglas Transfer enables Douglas to receive more than Douglas would receive (a) in this chapter 7 bankruptcy case, (b) the Douglas Transfer had not been made; and (c) Douglas received payment of such debt to the extent provided by the provisions of title 11 of the United States Code.

In re Dual D Health Care Operations, Inc. d/b/a Kemp Care Center, LLC - Debtor
Findings of Fact and Conclusions of Law                                    Page 17
470422

O.    **Breach of Fiduciary Duty.**

94.    Douglas breached his fiduciary duty to the Debtor by taking or otherwise diverting assets of the Debtor.

95.    Corporate officers have the fiduciary duties of due care, loyalty and obedience.

96.    At all relevant times, Douglas was the sole shareholder and was a director and the president of the Debtor.

97.    In connection with the sale of the skilled nursing home chain to GruenePointe, Douglas negotiated and executed the Purchase and Sale Agreement as well as amendments thereto for Douglas Enterprises, the Fee Owners, the Debtor as well as the other operating companies.

98.    At closing of the sale of the skilled nursing home chain to GruenePointe, Douglas negotiated and executed all closing documents including the Operations Transfer Agreements, Bills of Sale, Assignment and Assumption Agreements, Termination of Management Agreements, Sublease Agreements, Lease Termination Agreements and Closing Statements (the "Sale Documents").

99.    In executing the GruenePointe Sale Documents, Douglas negotiated, approved and closed on a $130 million transaction which transferred substantially all of Debtor's assets to the purchaser, GruenePointe 1 Kemp, without the Debtor receiving any monetary return in exchange. Instead, the net proceeds of sale were distributed to Douglas, Douglas Enterprises and the Fee Owners leaving the Debtor without sufficient cash reserves to satisfy claims of creditors. The entirety of the sale proceeds were diverted in whole with the damages suffered by the Debtor as a result of the breach of fiduciary duty no less than $2,410,000.

100.    After the Trustee discovered the gain on sale reported in the Debtor's 2015 Form 1120S U.S. Income Tax Return for an S Corporation, Douglas attempted to cover up the diversion

In re Dual D Health Care Operations, Inc. d/b/a Kemp Care Center, LLC - Debtor
Findings of Fact and Conclusions of Law                                        Page 18
470422

of funds from the Debtor by filing an amended 2015 Form 1120S U.S. Income Tax Return for an S Corporation removing all references to the asset sale.

101.    Douglas put his own interests above the best interests of the Debtor by negotiating a management agreement between the Debtor and Douglas Enterprises of $150,000 per month which was well above the industry 5% of gross receipts standard. The excessive management fees reduced Debtor's income as well as cash reserves available to respond to creditor claims.

102.    Douglas was well aware of the risk of personal injury and/or wrongful death at the Debtor-operated skilled nursing home and negotiated the Debtor's management agreement on terms which were weighted in favor of Douglas Enterprises so as to shift cash reserves from the Debtor to Douglas Enterprises.

103.    Douglas also caused the Debtor to pay the excessive management fees to Douglas Enterprises and Douglas Enterprises to accept the excessive management fees paid by the Debtor.

104.    Douglas formed Brae Insurance Company Limited as a captive insurance company to provide liability insurance coverage the Debtor. Douglas understood, at the time the captive insurance companies were formed, and at the time the Brae Insurance Policy was secured, that the contracted for insurance coverage was wholly inadequate thereby leaving the Debtor without insurance coverage for potential risks including wrongful death claims, such as those the subject of the Shepherd Case and Peele Case.

105.    The Brea Insurance Policy reflects limits of $250,000 per incident with a general aggregate limit of $750,000 (inclusive of defense expenses). The Brea Insurance Policy is a reimbursement policy.

106.    In contracting with his captive insurance company for the subject policy, Douglas essentially created a $250,000 fund to defend three covered incidents per year. The defense costs

In re Dual D Health Care Operations, Inc. d/b/a Kemp Care Center, LLC - Debtor
Findings of Fact and Conclusions of Law                                    Page 19
470422

cannibalize the policy limits such that if defense costs run $100,000, there would only be $150,000 of remaining available coverage.

107.    If there are four or more claims on the Brea Insurance Policy in a single year of coverage, the first three claims may be covered, but after that, claims made on the Brea Insurance Policy would automatically be denied as outside policy limits.

108.    In each instance, Douglas caused the injury to the Debtor by decisions he made in his fiduciary capacity as president of the Debtor.

109.    Debtor has been injured by diversion of the proceeds of the GruenePointe 1 Kemp asset sale to Douglas, Douglas Enterprises and the Fee Owners. Debtor has been further injured the decision Douglas made to purchase the Brea Insurance Policy with the stated limits which are unreasonably inadequate under the circumstances.

## II.

## PROPOSED CONCLUSIONS OF LAW

### A.    Jurisdiction and Venue.

110.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 157 and 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(A), (E) and (F).  Venue is proper in this District pursuant to 28 U.S.C. §§1409.

111.    To the extent the Court determines that any of the claims asserted herein are not core, the Trustee expressly consented to the entry of final orders and judgments by the Bankruptcy Court. All parties consented to the entry of Final Order.

### B.    The Trustee's Claims.

112.    The Trustee has asserted several alternative theories of relief in this adversary proceeding.

In re Dual D Health Care Operations, Inc. d/b/a Kemp Care Center, LLC - Debtor
Findings of Fact and Conclusions of Law                                                                    Page 20
470422

113.    The fair market value of the Debtor's business enterprise and equity as of July 29, 2015 is $2,410,000.00 as reflected in the Independent Fair Market Valuation of the Business Enterprise ("BEV") of Dual D Health Care Operations, Inc. d/b/a/ Kemp Care Center, LLC and Solvency Analysis as of July 29, 2015 prepared by the Trustee's appraiser and solvency expert, Jerry M. Chang dated December 8, 2023

114.    The Debtor was solvent up until the time of the GruenePointe asset sale.

115.    The sale of substantially all of the Debtor's assets rendered the Debtor insolvent.

116.    The Debtor remained insolvent at all times after closing of the GruenePointe asset sale.

117.    Douglas Enterprises is the General Partner of Lloyd Douglas Enterprises I, Ltd.

118.    The management agreement (the "Management Agreement") for Kemp Care Center was executed on or about January 1, 2007, between the Debtor and Lloyd Douglas Enterprises I, Ltd. The Management Agreement is not binding on the Debtor.

### 1. Avoidance of Actual Fraudulent Transfers Pursuant to 11 U.S.C. §§ 548(a)(1)(A) and 550.

119.    Section 548(a)(1)(A) of the Bankruptcy Code allows the trustee to avoid a transfer of the debtor's interest in property made within two years of the petition date if the transfer was made with the actual intent to hinder, delay, or defraud creditors. Section 550 allows the trustee to recover the asset transferred in violation of section 548. Avoidable transfers may be recovered from the initial transferees pursuant to section 550(a)(1) of the Bankruptcy Code. Avoidable transfers may be recovered from subsequent transferees pursuant to section 550(a)(2) of the Bankruptcy Code.

120.    At closing of the GruenePointe 1 Kemp acquisition, which occurred within the two-year period prior to the Petition Date, Debtor received no consideration whatsoever for the valuable

In re Dual D Health Care Operations, Inc. d/b/a Kemp Care Center, LLC - Debtor
Findings of Fact and Conclusions of Law                                                            Page 21
470422

assets transferred to GruenePointe 1 Kemp. Instead, Douglas, acting on his own behalf and on behalf of the entities he controls, namely the Debtor, Douglas Enterprises and the Fee Owners, caused the consideration justly due to the Debtor to be transferred to Douglas, Douglas Enterprises and/or the Fee Owners. The value transferred by the Debtor to the respective defendants is $2,410,000.

121.    Within the two year period prior to the Petition Date, the Debtor made or transferred to (a) Douglas Enterprises, the Management Fees which were well in excess of the 5% industry standard; and (b) Lloyd Douglas, the Douglas Transfer.

122.    The Debtor transferred the: (a) GruenePointe 1 Kemp sale proceeds to Douglas, Douglas Enterprises and/or the Fee Owners; (b) Management Fees to Douglas Enterprises; and (c) Douglas Transfer to Douglas with actual intent to hinder, delay, or defraud creditors. By transferring these assets to or for the benefit the Defendants without disclosing the transfers, the Debtor concealed the fact that money was being transferred to the Defendants. The transfers hindered, delayed, and defrauded creditors because they placed funds not due to the Defendants out of their reach and out of their discovery.

123.    Several "badges of fraud" demonstrating Debtor's actual intent to hinder, delay, or defraud are present. See, e.g., Chastant v. Chastant (In re Chastant), 873 F.2d 89, 91 (5th Cir. 1989)), including the following.

124.    The Transfer Was to an Insider: Douglas owned and controlled the Debtor, Douglas Enterprises and the Fee Owners. Defendants are insiders of the Debtor as that term is defined pursuant to section 101(31)(A) of the Bankruptcy Code.

125.    The Transfer Was Concealed: The diversion of the sale proceeds as well as the transfer of the Management Fees and Douglas Transfer were made in either in whole or in part

In re Dual D Health Care Operations, Inc. d/b/a Kemp Care Center, LLC - Debtor
Findings of Fact and Conclusions of Law                                    Page 22
470422

under the guise of business-related payments. Moreover, the Debtor amended its 2015 Form 1120S U.S. Income Tax Return for an S Corporation to conceal the sale and alter the information originally provided the Internal Revenue Service in the original return.

126.    <u>Existence of Litigation</u>: Mr. Shepherd passed away on January 20, 2014 and the Shephard Case was commenced January 9, 2015, well in advance of the GruenePointe 1 Kemp sale, transfer of sizable Management Fees and the Douglas Transfer.

127.    <u>The Transfer Was of Substantially all of the Debtor's Assets</u>: The transfer of the Debtor's Assets to GruenePointe 1 Kemp was of substantially all of the Debtor's assets. All that remained was the Debtor's bank account and right to receipt of receivables from the final cost report.

128.    <u>Less Than Reasonably Equivalent Value Exchanged</u>: The Debtor received no consideration whatsoever for the transfer of assets to GruenePointe 1 Kemp and grossly insufficient consideration for the Management Fees paid to Douglas Enterprises.

129.    <u>Debtor Was Insolvent or Became Insolvent</u>: The Debtor became insolvent as a direct result of the transfer to GruenePointe 1 Kemp and after closing of the transfer to GruenePointe 1 Kemp on July 29, 2015, each transfer was made at the time the Debtor was insolvent.

130.    <u>Existence or Cumulative Effect of the Pattern of Series of Transactions</u>: Payment of the Management Fees had the effect of reducing the Debtor's income and syphoning off the Debtor's available cash reserves. The Debtor preferred Douglas over the claims of other unsecured creditors in making the Douglas Transfer and the transfer of substantially all of the Debtor's assets to GruenePointe 1 Kemp had the effect of eliminating the Debtor's ability to satisfy the claim of unsecured creditors.

In re Dual D Health Care Operations, Inc. d/b/a Kemp Care Center, LLC - Debtor
Findings of Fact and Conclusions of Law                                    Page 23
470422

131.    Moreover, using a captive insurance company to satisfy regulator insurance requirements was designed to provide the appearance of liability insurance coverage when, in fact, there was not. The Brea Insurance Policy reflects limits of $250,000 per incident with a general aggregate limit of $750,000 (inclusive of defense expenses). The Brea Insurance Policy is a reimbursement policy. In contracting with his captive insurance company for the subject policy, Douglas created a $250,000 fund to defend three covered incidents per year. The defense costs cannibalize the policy limits such that if defense costs run $100,000, there would only be $150,000 of remaining available coverage. Additionally, if there are four or more claims on the Brea Insurance Policy in a single year of coverage, the first three claims may be covered, but after that, claims made on the Brea Insurance Policy would automatically be denied as outside policy limits.

132.    <u>The General Chronology of Events and Transactions</u>: The transactions, the subject of inquiry, were made over a period of time under a scheme to siphon money away from the Debtor and its creditors.

133.    The Debtor intended to hinder, delay and defraud its creditors. Personal injury/wrongful death claims are to be anticipated in a skilled nursing home; however, the Debtor and Defendants worked in concert to frustrate the ability of such claimants to be compensated for their damages. The Brae Insurance Policy secured from the captive insurance company provided the appearance of coverage, but failed to tender coverage for in the Shepherd Case and the Peele Case. The Debtor engaged counsel to defend the pending personal injury/wrongful death claims; however, because the Debtor was without sufficient resources to fund the litigation to conclusion, the defense continued until available Debtor resources were virtually exhausted. It was only then that Debtor took the final action of commencing the underlying bankruptcy case.

In re Dual D Health Care Operations, Inc. d/b/a Kemp Care Center, LLC - Debtor
Findings of Fact and Conclusions of Law                                                      Page 24
470422

134.    The Debtor employed a scheme of transferring cash resources, which would otherwise have been available to respond to a judgment, to insiders. Douglas Enterprises received the Management Fee, Douglas received the Douglas Transfer in preference to other creditors and Douglas, Douglas Enterprises and/or the Fee Owners received the proceeds of sale of the Debtor's assets to GruenePointe 1 Kemp. All with the effect of hindering, delaying and defrauding creditors of the Debtor.

135.    Certain of the Defendants were initial transferees of avoidable transfers within the meaning of the Bankruptcy Code.

136.    Certain of the Defendants were subsequent transferees of avoidable transfers within the meaning of the Bankruptcy Code and were not transferees in good faith and had or should have had ample knowledge and awareness of the avoidability of the initial transfers at the time they were received.

137.    The conduct of the Defendants resulted in damages to the Debtor in the amount of $_____.

### 2.  Avoidance of Constructive Fraudulent Transfers Pursuant to 11 U.S.C. §§ 548(a)(1)(B) and 550.

138.    Section 548(a)(1)(B) allows the trustee to avoid a transfer of the debtor's interest in property made within two years of the petition date if the debtor received less than reasonably equivalent value for the transfer and the debtor: (i) was insolvent at the time of the transfer or was rendered insolvent by the transfer; or (ii) was engaged in a business for which the debtor's remaining property was un unreasonably small capital. Section 550 allows the trustee to recover the value of the property transferred in violation of section 548. Avoidable transfers may be recovered from initial transferees pursuant to 550(a)(1) of the Bankruptcy Code. Avoidable

In re Dual D Health Care Operations, Inc. d/b/a Kemp Care Center, LLC - Debtor
Findings of Fact and Conclusions of Law                                    Page 25
470422

transfer may be recovered from subsequent transferees pursuant to section 550(a)(2) of the Bankruptcy Code.

139.    The Debtor received less than equivalent value for the transfer of its assets to GruenePointe 1 Kemp on or about July 29, 2015. In fact, the Debtor received absolutely no consideration for the assets transferred to GruenePointe 1 Kemp.

140.    The Debtor became insolvent as a result of the GruenePoint 1 Kemp transfer. The sale of substantially all of the Debtor's assets to GruenePoint 1 Kemp left the Debtor with limited assets and ability to satisfy any claims, including the attorney fees for defense of the personal injury claims.

141.    The Debtor was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the Debtor was an unreasonably small capital.

142.    The Debtor intended to incur, or believed that the Debtor would incur, debts that would be beyond the Debtor's ability to pay as such debts matured. With the pending Shepherd Case and Peele Case, the Debtor employed a strategy of defending the litigation until virtually all Debtor resources were exhausted. As of the Petition Date, there was a balance on hand in the Debtor's bank account of $2,622.84 while the Proof of Claim filed by Sullivan indicated Debtor's own litigation counsel had a remaining unsatisfied claim as of the Petition Date of nearly $16,000.

143.    Certain of the Defendants were initial transferees of avoidable transfers within the meaning of the Bankruptcy Code.

144.    Certain of the Defendants were subsequent transferees of avoidable transfers within the meaning of the Bankruptcy Code and were not transferees in good faith and had or should have

In re Dual D Health Care Operations, Inc. d/b/a Kemp Care Center, LLC - Debtor
Findings of Fact and Conclusions of Law                                            Page 26
470422

had ample knowledge and awareness of the avoidability of the initial transfers at the time they were received.

145.    The conduct of the Defendants resulted in damages to the Debtor in the amount of $_____.

### 3. Avoidance of Actual and Constructive Fraudulent Transfers (TUFTA and 11 U.S.C. §§ 544(b) and 550

146.    The Texas Uniform Fraudulent Transfer Act ("TUFTA"), codified as Chapter 24 of the Texas Business and Commerce Code, permits the recovery of the value of any transfers made "with actual intent to hinder, delay, or defraud any creditor of the debtor" as well as those made "without receiving a reasonably equivalent value in exchange for the transfer or obligation. TUFTA §24.005. Transfer made within four years of the Petition Date may be avoided. TUFTA §24.010.

147.    Section 544(b) of the Bankruptcy Code allows the trustee to avoid a transfer of the debtor's interest in property that is voidable under applicable law – in this case, TUFTA. Section 550 of the Bankruptcy Code allows the trustee to step into the shoes of a creditor who has been harmed by the fraudulent transfer at issue to recover the value of the property transferred in violation of section 548. Avoidable transfers may be recovered from the initial transferees pursuant to section 550(a)(1) of the Bankruptcy Code. Avoidable transfers may be recovered from subsequent transferees pursuant to section 550(a)(2) of the Bankruptcy Code.

148.    Grace Shepherd, as Wrongful Death Beneficiary of John Shepherd, Deceased, commenced the Shepherd Case on January 9, 2015 against the Debtor for personal injuries that ultimately resulted in the death of John Shepherd on January 20, 2014. Grace Shepherd filed a Proof of Claim in the Debtor's bankruptcy case on January 11, 2018 as an unsecured claim in the amount of $250,000. The proof of claim was docketed as Claim Number 2 on the Claims Register

In re Dual D Health Care Operations, Inc. d/b/a Kemp Care Center, LLC - Debtor
Findings of Fact and Conclusions of Law                                                                Page 27
470422

maintained by the Clerk of the Bankruptcy Court (the "Shepherd Claim"). The Shepherd Claim

has been allowed as a tardily filed claim in the amount of $190,000 pursuant to Order entered

December 7, 2018 [Docket No. 46]. The Shepherd Claim is a triggering creditor.

**Actual Fraud**

149.    The transfers of the Management Fees to Douglas Enterprises, the Douglas Transfer

to Douglas and the diversion of the sale proceeds justly due the Debtor from the sale of its assets

to GruenePointe 1 Kemp were made with the actual intent to hinder, delay or defraud the legitimate

creditors of the estate.

150.    The "badges" of fraud (as discussed earlier) indicate the Debtor intended to hinder,

delay and defraud its creditors. Personal injury/wrongful death claims are to be anticipated in a

skilled nursing home; however, the Debtor and Defendants worked in concert to frustrate the

ability of such claimants to be compensated for their damages. The Brae Insurance Policy secured

from the captive insurance company provided the appearance of coverage, but failed to tender

coverage in the Shepherd Case and the Peele Case. Further, the Debtor engaged counsel to defend

the pending personal injury/wrongful death claims; however, because the Debtor was without

sufficient resources to defend the litigation to conclusion, the defense continued until available

Debtor resources were virtually exhausted. It was only then that Debtor took the final action of

commencing the underlying bankruptcy case.

151.    The Debtor employed a scheme of transferring cash resources, which would

otherwise have been available to respond to a judgment, to insiders. Douglas Enterprises received

the Management Fee, Douglas received the Douglas Transfer in preference to other creditors and

Douglas, Douglas Enterprises and/or the Fee Owners received the proceeds of sale of the Debtor's

In re Dual D Health Care Operations, Inc. d/b/a Kemp Care Center, LLC - Debtor
Findings of Fact and Conclusions of Law                                                                              Page 28
470422

assets to GruenePointe 1 Kemp. All with the effect of hindering, delaying and defrauding creditors of the Debtor.

**Constructive Fraud**

152.    Grace Shepherd, as Wrongful Death Beneficiary of John Shepherd, Deceased serves as the triggering creditor.

153.    The Debtor received less than equivalent value for the transfer of its assets to GruenePointe 1 Kemp on or about July 29, 2015. In fact, the Debtor received absolutely no monetary consideration for the assets transferred to GruenePointe 1 Kemp.

154.    The Debtor became insolvent as a result of the GruenePointe 1 Kemp transfer. The sale of substantially all of the Debtor's assets to GrunePointe Kemp left the Debtor with limited assets and ability to satisfy any claims, including the attorney fees for defense of the personal injury claims.

155.    Certain of the Defendants were initial transferees of avoidable transfers within the meaning of the Bankruptcy Code.

156.    Certain of the Defendants were subsequent transferees of avoidable transfers within the meaning of the Bankruptcy Code and were not transferees in good faith and had or should have had ample knowledge and awareness of the avoidability of the initial transfers at the time they were received

157.    The conduct of the Defendants resulted in damages to the Debtor in the amount of $_____.

### 4.    Avoidance of Preferential Transfers Pursuant to 11 U.S.C. §§ 547 and 550

158.    A preference claim requires a plaintiff to establish that:

(b)    Except as provided in subsections (c) and (i) of this section, the trustee may, based on reasonable due diligence in the circumstances of the case and taking into account a

In re Dual D Health Care Operations, Inc. d/b/a Kemp Care Center, LLC - Debtor
Findings of Fact and Conclusions of Law                                    Page 29
470422

party's known or reasonably knowable affirmative defenses under subsection (c), avoid any transfer of an interest of the debtor in property—

    (1) to or for the benefit of a creditor;

    (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

    (3) made while the debtor was insolvent;

    (4) made—

        (A) on or within 90 days before the date of the filing of the petition; or

        (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

    (5) that enables such creditor to receive more than such creditor would receive if—

        (A) the case were a case under chapter 7 of this title;

        (B) the transfer had not been made; and

        (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547

159.    Douglas is an insider of the Debtor and received check number 9680 drawn on the Debtor's account no. xxxx0659 at Wells Fargo Bank dated January 5, 2017 in the amount of $78,560.66 (the "**Check**"). The Check was honored January 24, 2017

160.    The Check was in reimbursement for expenses, primarily attorney fees incurred defending the Shepherd Case and the Peele Case, which were satisfied by Douglas. These individual invoices had been collected over time, bundled for payment, and actually paid on January 5, 2017.

161.    The transfer the subject of the Check occurred within the year prior to the Petition Date, while the Debtor was insolvent.

162.    Such an amount is more than Douglas would receive were this case a chapter 7 liquidation.

163.    The transfer of the Check is avoided in the amount of $_____.

In re Dual D Health Care Operations, Inc. d/b/a Kemp Care Center, LLC - Debtor
Findings of Fact and Conclusions of Law                                                                                    Page 30
470422

## 5. Breach of Fiduciary Duty.

164.    Douglas breached his fiduciary duty to the Debtor by taking or otherwise diverting assets of the Debtor.

165.    Corporate officers have the fiduciary duties of due care, loyalty and obedience.

166.    At all relevant times, Douglas was the sole shareholder and was a director and the president of the Debtor.

167.    In connection with the sale of the skilled nursing home chain to GruenePointe, Douglas negotiated and executed the Purchase and Sale Agreement as well as amendments thereto for Douglas Enterprises, the Fee Owners, the Debtor as well as the other operating companies.

168.    At closing of the sale of the skilled nursing home chain to GruenePointe, Douglas negotiated and executed all closing documents including the Operations Transfer Agreements, Bills of Sale, Assignment and Assumption Agreements, Termination of Management Agreements, Sublease Agreements, Lease Termination Agreements and Closing Statements (the "Sale Documents").

169.    In executing the GruenePointe Sale Documents, Douglas negotiated, approved and closed on a $130 million transaction which transferred substantially all of Debtor's assets to the purchaser, GruenePointe 1 Kemp, without the Debtor receiving any monetary return in exchange. Instead, the net proceeds of sale were distributed to Douglas, Douglas Enterprises and the Fee Owners leaving the Debtor without sufficient cash reserves to satisfy claims of creditors. The entirety of the sale proceeds were diverted in whole with the damages suffered by the Debtor as a result of the breach of fiduciary duty no less than $2,410,000.

170.    After the Trustee discovered the gain on sale reported in the Debtor's 2015 Form 1120S U.S. Income Tax Return for an S Corporation, Douglas attempted to cover up the diversion

In re Dual D Health Care Operations, Inc. d/b/a Kemp Care Center, LLC - Debtor
Findings of Fact and Conclusions of Law                                                                        Page 31
470422

of funds from the Debtor by filing an amended 2015 Form 1120S U.S. Income Tax Return for an S Corporation removing all references to the asset sale.

171.    Douglas put his own interests above the best interests of the Debtor by negotiating a management agreement between the Debtor and Douglas Enterprises of $150,000 per month which was well above the industry 5% of gross receipts standard. The excessive management fees reduced Debtor's income as well as cash reserves available to respond to creditor claims.

172.    Douglas was well aware of the risk of personal injury and/or wrongful death at the Debtor-operated skilled nursing home and negotiated the Debtor's management agreement on terms which were weighted in favor of Douglas Enterprises so as to shift cash reserves from the Debtor to Douglas Enterprises.

173.    Douglas also caused the Debtor to pay the excessive management fees to Douglas Enterprises and Douglas Enterprises to accept the excessive management fees paid by the Debtor.

174.    Douglas formed Brae Insurance Company Limited as a captive insurance company to provide liability insurance coverage the Debtor. Douglas understood, at the time the captive insurance companies were formed, and at the time the Brae Insurance Policy was secured, that the contracted for insurance coverage was wholly inadequate thereby leaving the Debtor without insurance coverage for potential risks including wrongful death claims, such as those the subject of the Shepherd Case and Peele Case.

175.    The Brea Insurance Policy reflects limits of $250,000 per incident with a general aggregate limit of $750,000 (inclusive of defense expenses). The Brea Insurance Policy is a reimbursement policy.

176.    In contracting with his captive insurance company for the subject policy, Douglas essentially created a $250,000 fund to defend three covered incidents per year. The defense costs

In re Dual D Health Care Operations, Inc. d/b/a Kemp Care Center, LLC - Debtor
Findings of Fact and Conclusions of Law                                                  Page 32
470422

cannibalize the policy limits such that if defense costs run $100,000, there would only be $150,000 of remaining available coverage.

177.    If there are four or more claims on the Brea Insurance Policy in a single year of coverage, the first three claims may be covered, but after that, claims made on the Brea Insurance Policy would automatically be denied as outside policy limits.

178.    In each instance, Douglas caused the injury to the Debtor by decisions he made in his fiduciary capacity as president of the Debtor.

179.    Debtor has been injured by diversion of the proceeds of the GruenePointe 1 Kemp asset sale to Douglas, Douglas Enterprises and the Fee Owners. Debtor has been further injured the decision Douglas made to purchase the Brea Insurance Policy with the stated limits which are unreasonably inadequate under the circumstances. Debtor has sustained damages of $_____.

Respectfully submitted,

By: */s/ Jerry C. Alexander*                      */s/ Joseph F. Postnikoff*
    Jerry C. Alexander                            Joseph F. Postnikoff
    Texas Bar No. 00993500                        Texas Bar No. 16168320
    **PASSMAN & JONES, P.C.**                      **ROCHELLE MCCULLOUGH, LLP**
    1201 Elm Street, Suite 2500                   300 Throckmorton Street, Suite 520
    Dallas, Texas 75270-2599                      Fort Worth, Texas  76102
    Tel: (214) 742-2121                           Tel: (817) 347-5260
    alexanderj@passmanjones.com                   jpostnikoff@romclaw.com

*Special Litigation Counsel for Shawn K. Brown, Chapter 7 Trustee*

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on this 15th day of March 2024, a true and correct copy of the foregoing was served on counsel of record via e-mail.

                              */s/ Jerry C. Alexander*
                              Jerry C. Alexander

In re Dual D Health Care Operations, Inc. d/b/a Kemp Care Center, LLC - Debtor
Findings of Fact and Conclusions of Law                                      Page 33
470422