IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| DUAL D HEALTH CARE OPERATIONS, | § | Case No. 17-41320-elm-7 |
| INC. d/b/a KEMP CARE CENTER, LLC, | § | |
| | § | |
| Debtor. | § | |

---

| | | |
|---|---|---|
| SHAWN K. BROWN, Chapter 7 | § | |
| Trustee, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | ADVERSARY NO.  20-04059-elm |
| | § | |
| LLOYD DOUGLAS, Individually, *et al.*, | § | |
| | § | |
| Defendants. | § | |

## JOINT PRETRIAL ORDER

Pursuant to Local Bankruptcy Rule 7016(a) and the Court's Scheduling Order, Shawn K. Brown (the "Trustee"), the Chapter 7 trustee of Dual D Health Care Operations, Inc. (the "Debtor"), and Lloyd Douglas, Lloyd Douglas Enterprises, L.C., Brownwood Care Center I, Ltd., D-5 Development, LLC, Sunflower Park Holdings, LP, Whispering Pines Healthcare, L.C., Mt. Pleasant Operators, LLC, Specialty Select Care Center, LLC, Graham Investors Group, LLC, Kemp Investor Holdings, LLC, Kerens Care Center, Inc., and River City Life Care, Inc. (collectively, the "Defendants," with the Trustee, each a "Party" and collectively the "Parties") submit this Joint Pretrial Order.

# I.

## SUMMARY OF CLAIMS AND DEFENSES

### A.    Plaintiff's Claims.

There is no doubt Lloyd Douglas is a shrewd businessman. Douglas assembled a chain of ten (10) skilled nursing homes for which he owned and controlled the fee owners, the operating companies, master tenant, management company, and even a "captive" insurance company (Brae Insurance Company, Ltd.) that supposedly insured the Debtor against liability claims.

On May 1, 2015, Lloyd Douglas Enterprises, L.C. ("Douglas Enterprises"), joined by the Defendants and others, entered into a Purchase and Sale Agreement with GruenePointe Acquisition I, LLC, a Texas limited liability company, or its permitted assignee ("GruenePointe"), pursuant to which GruenePointe agreed to purchase the assets of the skilled nursing home chain for the sum of $130 million.

Closing of the sale of assets of nine (9) of the skilled nursing homes occurred on or about July 29, 2015, and in that sale the Debtor transferred substantially all of its assets to GruenePointe's assignee, GruenePointe 1 Kemp. Debtor retained only its cash on hand and accounts receivable.

The net distributed to Douglas Enterprises on account of the sale, after satisfaction of closing costs, professional fees, and claim of secured creditors, totaled $66,838,802.02.

Despite the fact the Debtor's original 2015 Form 1120S U.S. Income Tax Return for an S Corporation filed by the Debtor reflected, at Form 8949, proceeds of sale from the sale of business

of $2,462,745 and a net gain of $2,358,411 on the sale, the Debtor received no cash or other consideration from the sale[1].

The Trustee does not now, nor has he ever challenged the adequacy of the consideration paid by GruenePointe for the nursing home chain, which included Debtor's assets. Instead, the Trustee's complaint is lodged in the transfer of proceeds from the sale which were properly payable to the Debtor by the Buyer but were diverted by Debtor to Douglas or one or more of the other Defendants (the "Dual D Transfer").

The Trustee's valuation and insolvency expert, Jerry Chang, has placed a business enterprise and equity value of the assets of the Debtor, at the time of the sale to GruenePointe, at $2,410,000 with a range of value of between $2,300,000 and $2,500,000. Douglas's own accountant, David Liptz, testified he allocated $2,462,745 to Debtor's assets on its 2015 tax return using generally accepted accounting principles (GAP).

Insofar as Douglas owned and controlled all the seller entities, diversion of the sale proceeds properly payable to the Debtor to Douglas or one or more of the other Defendants would not have been problematic. However, there were two personal injury and wrongful death claims pending against the Debtor on the date of closing which Debtor had no plans to satisfy. The cases are as follows: (1) Cause No. 048-276330-15 commenced January 9, 2015 in the 48th Judicial District Court in and for Tarrant County, Texas styled *Grace Shepherd, as Wrongful Death Beneficiary of John Shepherd, Deceased, Plaintiff vs. Dual D Healthcare Operations Inc. d/b/a Kemp Care Centers, Dual D Life Care, Inc., and Kemp Care Center Operators, LLC Defendants*

---

[1] After lengthy discussions by the Trustee with Douglas prior to commencement of this adversary proceeding, Douglas caused to be filed by the Debtor, on or about July 17, 2020, without the knowledge, much less authorization of the Trustee an amended 2015 Form 1120S U.S. Income Tax Return for an S Corporation removing all references to the asset sale.

(the "Shepherd Case") seeking redress for errors and omissions which caused the death of Mr.

Shepherd on January 20, 2014; and (2) Cause No. DC-16-02641 commenced March 7, 2016 in the

160th Judicial District Court in and for Dallas County, Texas styled *Charles Harley on Behalf of*

*the Estate of Nellie Peele and on Behalf of All Wrongful Death Beneficiaries vs. East Texas*

*Medical Center Athens, GruenePointe 1 Kemp, LLC d/b/a Kemp Care Center, Karah L. Coker,*

*M.D. and Warren Cave, R.N. N.P.* (the "Peele Case").

Until commencement of the Debtor's chapter 7 bankruptcy case, Debtor defended the

Shepherd Case and Peele Case and, following the commencement of the bankruptcy case, estate

representatives of the decedent plaintiffs filed proofs of claim with the Bankruptcy Court and this

Court has approved compromise and settlement agreements with both estate representatives

resulting in allowed tardily filed unsecured claims of $190,000 on account of the Shepherd Case

and $190,000 on account of the Peele Case.

In addition to diverting to Douglas, or one or more of the other Defendants, $2,410,000 of

sale proceeds justly due to the Debtor, Debtor engaged in other practices which guaranteed there

would be insufficient funds available to the Debtor to satisfy the claims of Shepherd and Peele.

The Debtor paid monthly management fees in the amount of $150,000 to Douglas

Enterprises, with $325,000 in management fees paid by the Debtor to Douglas Enterprises

following closing of the asset sale (the "Douglas Enterprises Transfer"). The industry standard for

management fees in the skilled nursing home industry is 5% of gross revenues. Applying the 5%

industry standard to the Debtor's gross revenues of $5,979,481 in 2013, $8,338,808 in 2014 and

$5,347,418 for the first seven months of 2015, Douglas Enterprises would have been entitled to a

management fee in 2013 of $298,974, in 2014 of $416,940 and in 2015 of $267,371. The $150,000

monthly management fee actually collected by Douglas Enterprises calculates out to be $1,800,000 on an annualized basis and $1,050,000 for seven (7) months.

Additionally, Douglas owned and maintained a captive insurance company, Brae Insurance Company Limited, which was contracted by Debtor to provide Long Term Care Facility Liability insurance policy No. NBIC2010-03R15 with a limit of $250,000 per each medical incident and with a general aggregate limit of $750,000 (the "Brae Insurance Policy"). The Brae Insurance Policy was purchased in 2010 and was therefore in effect at the time of the incidents which gave rise to the Shepherd Case and Peele Case; however, coverage for the medical incidents was denied in each instance, after consultation with Brae's owner, Lloyd Douglas.

Next, approximately three months before commencement of the Debtor's chapter 7 bankruptcy case, the Debtor issued an expense reimbursement of $78,560.66 to Douglas for accumulated litigation defense costs satisfied by Douglas (the "Douglas Transfer").

In these proceedings, the Trustee seeks to avoid the Dual D Transfer and Douglas Enterprises Transfer as actual and constructive fraudulent convenances under Bankruptcy Code sections 548(a)(1)(A), 548(a)(1)(B) and pursuant to the Texas Uniform Fraudulent Transfer Act and Bankruptcy Code section 544(b). Additionally, the Trustee seeks to avoid the Douglas Transfer pursuant to Bankruptcy Code section 547. Finally, the Trustee asserts a claim for breach of fiduciary duty against Douglas, for obviously taking the Debtor's consideration and favoring his own interests over those of the Debtor.

The Trustee's valuation and insolvency expert, Jerry Chang, found that although the Debtor was solvent up until the time of the GruenePointe asset sale, the sale of substantially all of the Debtor's assets rendered the Debtor insolvent. Jerry Chang has further articulated that, all other

things being equal, the Debtor remained insolvent at all times thereafter and during which the Douglas Enterprises and the Douglas Transfers occurred.

**B.    <u>Defendants' Defenses.</u>**

The Defendants deny all of the Trustee's claims and deny any liability.  They do not believe that the Trustee will have any evidence on at least one element of each of his claims, as the Trustee's whole theory of his case—that Douglas transferred the going concern value of the Debtor to a buyer and pocketed for himself what should have been return cash consideration—is belied by the clear facts and unambiguous contracts and documents.  That is the real problem with the Trustee's case for, as two ships passing in the night, he simply does not understand—or want to understand—what the real, underlying transaction was.

At the center of the Trustee's claims is his allegation that Douglas sold his nursing homes and pocketed the proceeds in order to keep those proceeds from the disputed, personal injury and wrongful death creditors of the Debtor.  This is not true and, even after the sale, Douglas insured that the Debtor had sufficient assets left, of more than $1 million, to pay all legitimate debt, which it in fact did.  That Douglas did not pay the tort claims was not because he wanted to hinder, delay, or defraud them or their recovery, but simply because they were unproven, baseless, and worthless litigation claims.  What in the world can be wrong with that?

By early 2015, Douglas had been in the nursing home business for decades, working tirelessly and sacrificing every day to build up a network of ten successful nursing homes.  At that time, and upon the pressuring of a broker who had pressed him to sell for years and to retire and to enjoy life, he decided to sell his portfolio because it was a crazy, seller's market where publicly traded entities, flush wish cash, were on a spending spree for nursing homes.  Thus, Douglas sold his nursing homes on July 30, 2015, paid all secured debt, and netted a fortune to compensate him

for his hard work, risks, and investments; *i.e.* the American Dream.  The Trustee simply seeks to force him to pay a portion of his reward to disputed, unliquidated, contingent and bogus tort creditors.

In reality, the Debtor owned very little by way of assets.  It leased the real property and improvements from its landlord.  Importantly, it also leased from the landlord all furniture, fixtures, and equipment.  It did have its cash and its receivables, as well as a provided number, certain vendor contracts (of no value), certain supplies (of no value), and certain intangible assets, such as goodwill (also of no value).  The sale of the nursing homes, however, was a *real estate* transaction.  The buyer, a REIT, was buying the dirt, not the operations, because it would lease the dirt to new operators.  As with any reasonably prudent buyer, the buyer wanted the land free of lease encumbrances in order to lease to its own operator.  The operations, therefore, had to cease.  Thus, at the requirement of the buyer—and having nothing to do with the tort claims—the landlord and Debtor terminated the lease.  At that moment—for which the Trustee has not sued and cannot sue—the Debtor ceased all operations and lost all going concern or enterprise value, as it no longer had real property, facilities, or FF&E.  That, and not any fraudulent transfer or diversion of assets, is what happened to the Debtor.  But ceasing operations is not a fraudulent transfer, as there is no "transfer," and it is not a breach of fiduciary duty, without imposing involuntary servitude, even aside from the fact that the Trustee has not and cannot sue over that decision.

Minimal assets were transferred to the buyer, of no value to the Debtor or its creditors.  The vendor contracts (like with the cell phone provider) had no value; the supplies on-site had a negative value if they had to be removed (who wants to buy used nursing home bed sheets); the intangibles and goodwill had no value (especially in light of the tort claims); and permitting the buyer the use of the Debtor's provider number for a period of time was standard in the industry

and of no value to the Debtor, even if of some value to the buyer. True, the Debtor did not receive any monetary consideration for these worthless assets—not because any consideration was diverted to Douglas, but because no consideration was paid or payable for the same by the buyer. As the buyer was the initial transferee, the Trustee could have sued it, instead of chasing phantom dollars that allegedly made it to Douglas' pockets.

Again, the Trustee's theory of the case is simply wrong. There was no going concern that was sold. There were minimal assets that were transferred, that the Trustee has not valued, as is his burden to do. Even if the Trustee's claims have any merit, it would be only the value of those worthless assets that would be at play, as opposed to the millions of dollars sought by the Trustee for the non-existing and non-transferred going concern. But again, the Trustee has not valued those assets and, seemingly, does not even know what they were.

None of this had anything to do with not paying the disputed tort creditors; indeed, the transaction was ordinary and customary in the industry and was structured the same with respect to all ten properties. Nothing was different about the Debtor to suggest any trick. And, critically, the Debtor did not transfer its true assets, consisting of more than $1 million of cash and receivables, which Douglas left with the Debtor precisely to enable it to pay its legitimate debt. Had he wanted to avoid paying creditors, he could have taken those assets. But he did not. Instead, he paid his employees (losing money on it) to collect and recover the receivables for almost one year, which enabled the Debtor to pay all of its legitimate, undisputed debt and to wind down its affairs. That the tort claimants were not paid was not because of some master scheme, but because they were disputed claims not reduced to judgment that the Debtor was contesting in court, exactly as it should have. And, when the Debtor could no longer pay the costs to defend the tort claims,

it sought bankruptcy *protection*, never believing that the Trustee would casually focus the microscope on Douglas without focusing any scrutiny on the disputed tort claims.

Therefore, there was no actual fraudulent transfer, because the Debtor did not intend to hinder, delay, or defraud any creditor: it *paid* its legitimate creditors even after the sale. There was no constructive fraudulent transfer because the Debtor was solvent before and after the sale and because the reasonable equivalent of zero is . . . zero. The Trustee's theory that one takes disputed tort claims at face value is simply wrong, and not supported by the law. Nor was there any breach of fiduciary duty, even if the Trustee preserved that claim (which he did not), as Douglas always acted in the interests of the Debtor, enabling it to pay legitimate debts and acting prudently and appropriately to wind down its affairs. That the Trustee thinks that the Debtor does not have sufficient assets to pay its debts (based on the worthless tort claims, that is) is not the result of any fraudulent transfer or breach of fiduciary, if for no other reason than that the assets that were transferred, which of course is what the law of fraudulent transfer looks at, had no value. Nothing was taken from anyone; no *res* was depleted.

The Trustee's claims to avoid what he deems management fees, as excessive and as fraudulent transfers, also fail, to the extent even preserved. These fees go way back and predate the tort creditors by years, and were simply business as usual as opposed to a secret device to suck value out of a sinking debtor. The Debtor received perfect value for them, and the Debtor was never insolvent, either before or after them. Finally, with respect to the Trustee's lone preference claim, the Debtor was solvent when it made the payment to Douglas, and the payment cannot therefore be avoided.

In the end, Douglas operated this business exactly as he should have, consistent with business ethics, morality, and the law: he paid all creditors in full. That the Trustee apparently

thinks that the disputed and unliquidated tort claims have some value, which they do not, begs the question of what Douglas should have done. Should he have paid creditors he believed were bogus? Might that be a breach of fiduciary duty? Should he have subjected himself to involuntary servitude by keeping the Debtor going in order to pay these worthless claims and subjecting other creditors to a risk of recovery? Hindsight matters for certain things, but not for fraudulent transfer or breach of fiduciary duty, where one's present *mens rea* is considered. The Trustee's hindsight is absurd unless the Court concludes that Texas law imposes upon a businessman a duty to pay a disputed and unliquidated tort claim, that he in good faith believes to be baseless. That is not a proposition for which this case should be remembered.

## II.

## STATEMENT OF STIPULATED FACTS

The Parties hereby agree to the following facts. For the avoidance of doubt, in agreeing to these facts, the Parties are not implicitly or otherwise agreeing that these facts are exhaustive with respect to any given issue, and they reserve any and all arguments and rights with respect to any fact not expressly agreed to below, meaning, in addition to all other things, that an expressly agreed fact shall not be construed as an implicit admission as to any fact, argument, or allegation not expressly agreed to.

A.    **THE DEBTOR**

1.    At all times material hereto, the Debtor was a Texas entity.

2.    Prior to July 30, 2015, the Debtor operated a 124 bed skilled nursing home known as Kemp Center and located at 1351 S. Elm Street, Kemp Texas (the "Nursing Home"). The Debtor had its own provider number and generated, owned, and collected its own receivables, including from private insurance, private pay, Medicaid, and Medicare.

3.      At all times material hereto, the Debtor was directly owned and solely controlled by Lloyd Douglas ("Douglas").

4.      At all times material hereto, Douglas owed fiduciary duties to the Debtor, as and to the extent provided by Texas law.

5.      Douglas' intentions are imputed to the Debtor with respect to the subject matter of this Adversary Proceeding.

6.      At all times material hereto, Douglas was an insider of the Debtor.

7.      The Debtor leased the Nursing Home from Kemp Investor Holdings, LLC (the "Landlord"), pursuant to that certain *Lease* which commenced on November 1, 2010 (the "Lease").

8.      At all times material hereto, the Landlord was directly owned by Douglas and solely controlled by Douglas.

9.      At all times material hereto, the Debtor and the Landlord were insiders.

10.     The Debtor and its Nursing Home were managed by Lloyd Douglas Enterprises, L.C. ("Douglas Enterprises") in exchange for certain management fees and expense reimbursements.

11.     Douglas Enterprises provided, among other things, various services to the Debtor, including officers, upper management, accounting, regulatory, legal, and collection services.

12.     At all times material hereto, Douglas Enterprises was directly owned by Douglas and solely controlled by Douglas.

13.     At all times material hereto, the Debtor and Douglas Enterprises were insiders.

14.     In 2015 and before, the Debtor held liability insurance from Brae Insurance Company Limited ("Brae"), with a per claim limit of $250,000.00 and an annual limit of $750,000.00.

15.     The Debtor filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code on March 31, 2017 (the "Petition Date"), thereby initiating Bankruptcy Case No. 17-41320-elm-7 (the "Bankruptcy Case") and creating its bankruptcy estate (the "Estate").

16.     The Trustee is the duly appointed Chapter 7 trustee of the Estate.

17.     On the Petition Date, the Debtor had cash on hand of $2,622.84 which was received by the Trustee.

**B.      THE SALE AND THE TRANSFER**

18.     In addition to his direct ownership of the Debtor, Douglas directly owned and controlled various entities that owned real estate and improvements, and operated, nine (9) other nursing homes.

19.     On May 1, 2015, Douglas Enterprises and various affiliated entities, including the Defendants, entered into that certain *Purchase and Sale Agreement* (the "PSA"), as the sellers, with GruenePointe Acquisition I, LLC (the "Buyer"), as the buyer, pursuant to which the sellers were to sell and transfer various property to the Buyer, while retaining certain property.

20.     After certain extensions, the PSA closed on July 30, 2015, and the Buyer paid total gross consideration of $130,000,000.00 (the "Sale").

21.     On July 31, 2015, Texas American Title Company, the closing agent for the Sale, wired to Douglas Enterprises the net seller proceeds from the Sale in the amount of $66,838,802.02.

22.     None of the proceeds of the Sale were paid to the Debtor.

23.     The broker for the Sale was Michael Craig Kelly.

24.     In conjunction with the Sale, the Landlord and the Debtor terminated the Lease by agreement, as required by the Buyer and the PSA.

25.     As part of the Sale and the PSA, the Debtor transferred various of its assets to the Buyer and/or the Buyer's assignee (the "Transfer").

26.     The Transfer included the execution by the Debtor of that certain *Operations Transfers Agreement* to MRT of Kemp TX – SNF, LLC.

27.     The Transfer included bills of sale from the Debtor to the Buyer.

28.     The Debtor was not paid any cash consideration for the Transfer.

29.     At the time of the Transfer, the Debtor had various undisputed trade debt.

30.     On January 9, 2015 and March 7, 2016, two lawsuits were filed against the Debtor in Texas state court, alleging personal injury and wrongful death claims (the "Tort Claims").

31.     The first of the Tort Claims was commenced January 9, 2015 in the 48th Judicial District Court in and for Tarrant County, Texas under Cause No. 048-276330-15 styled *Grace Shepherd, as Wrongful Death Beneficiary of John Shepherd, Deceased, Plaintiff vs. Dual D Healthcare Operations Inc. d/b/a Kemp Care Centers, Dual D Life Care, Inc., and Kemp Care Center Operators, LLC Defendants* seeking redress for errors and omissions which caused the death of Mr. Shepherd on January 20, 2014.

32.     The Debtor disputed the Tort Claims and defended against them up to the Petition Date.

33.     Brae denied coverage of the Tort Claims after consultation with Lloyd Douglas.

34.     At no time prior to or after the Petition Date were the Tort Claims reduced to judgment.

35.     No claim objections were filed with respect to the Tort Claims by the Trustee or any other creditor or party in interest.

36.     No portion of the Tort Claims has been paid.

37.    In the Bankruptcy Case, and pursuant to Court order, the Trustee compromised and settled the Tort Claims by allowing each as a subordinated, unsecured claim in the amount of $190,000.00.

38.    The only proofs of claim filed in the Bankruptcy Case were: (i) the claim of Sullivan & Cook, LLC, a law firm defending the Debtor against the Tort Claims, which claim arose in March, 2017 and is in the amount of $14,327.06 (the "Sullivan Claim"); and (ii) the two Tort Claims.

39.    Additional creditors were listed on the schedules filed by the Debtor in the Bankruptcy Case; however, none elected to file claims in the Bankruptcy Case and they were all marked as "disputed" or "notice only."

**C.    TRANSFERS**

40.    The Debtor made the following transfers to Douglas Enterprises (the "Douglas Enterprises Transfers):

| Date of Transfer | Method of Transfer | Amount of Transfer |
|---|---|---|
| 03/26/14 | Wire Transfer | $ 150,000.00 |
| 05/22/14 | Wire Transfer | 250,000.00 |
| 07/09/14 | Wire Transfer | 300,000.00 |
| 10/15/14 | Wire Transfer | 400,000.00 |
| 12/11/14 | Wire Transfer | 300,000.00 |
| 12/23/14 | Wire Transfer | 200,000.00 |
| 02/03/15 | Wire Transfer | 100,000.00 |
| 03/12/15 | Wire Transfer | 100,000.00 |
| 05/04/15 | Wire Transfer | 250,000.00 |
| 06/22/15 | Wire Transfer | 200,000.00 |
| 09/24/15 | Wire Transfer | 100,000.00 |
| 09/25/15 | Wire Transfer | 150,000.00 |
| 11/12/15 | Wire Transfer | $75,000.00 |

41.    With respect to the Douglas Enterprises Transfers, the sum of $325,000 was transferred to Douglas Enterprises following the Sale.

42.     On January 5, 2017, the Debtor paid $78,560.66 to Douglas by check for the repayment of loans and advances made by him to the Debtor (the "Douglas Transfer").

43.     The Douglas Transfer was a payment to an insider creditor of the Debtor on account of antecedent debt owed to Douglas by the Debtor.

## III.

## CONTESTED ISSUES OF FACT[2]

The Parties agree that the following facts are contested (which list may not be exhaustive and is not intended to limit the Parties' right to offer and argue such other facts as may be relevant):

1.     Whether, at all relevant times, Brae was owned and controlled by Douglas.

2.     Whether the Debtor had any going concern value or enterprise value immediately prior to the Transfer.

3.     Whether the Debtor had any going concern value or enterprise value immediately prior to the Dual D Transfer.

4.     What assets of the Debtor were transferred in the Transfer.

5.     What assets of the Debtor were transferred in the Dual D Transfer.

6.     What the value of the assets of the Debtor transferred in the Transfer was.

7.     What the value of the assets of the Debtor transferred in the Dual D Transfer was.

8.     Whether the Debtor was insolvent prior to the Transfer or rendered insolvent as a result of the Transfer.

9.     Whether the Debtor was insolvent prior to the Dual D Transfer or rendered insolvent as a result of the Dual D Transfer.

---

[2] The Parties reserve all rights to object to the admissibility of any evidence.

10.     What portion of the Debtor's trade debt was paid following the Sale from cash on hand and the collection of its receivables.

11.     Whether any proceeds for the Transfer were properly payable to the Debtor by the Buyer and were diverted by Douglas to himself or one or more of the other Defendants.

12.     Whether the Debtor, through Douglas, intended to hinder, delay, or defraud a creditor by the Transfer.

13.     Whether the Debtor, through Douglas, intended to hinder, delay, or defraud a creditor by the Dual D Transfer.

14.     Whether the Debtor received reasonably equivalent value for the Transfer.

15.     Whether the Debtor received reasonably equivalent value for the Dual D Transfer.

16.     Whether, under TUFTA, there was a "golden creditor" of the Debtor at the time of the Transfer or within a reasonable period of time after the Transfer.

17.     Whether, under TUFTA, there was a "golden creditor" of the Debtor at the time of the Dual D Transfer or within a reasonable period of time after the Dual D Transfer.

18.     Whether the assets left with the Debtor after the Transfer were sufficient to enable the Debtor to wind down its operations and pay all undisputed debt in full.

19.     Whether the assets left with the Debtor after the Dual D Transfer were sufficient to enable the Debtor to wind down its operations and pay all undisputed debt in full.

20.     Whether the Debtor had any undisputed creditor at the time of the Transfer that was not paid prior to the Petition Date.

21.     Whether the Debtor had any undisputed creditor at the time of the Transfer that was not paid prior to the Petition Date.

22.     What the nature of the Douglas Enterprises Transfers was, including whether they were for management fees or other obligations.

23.     Whether the Douglas Enterprises Transfers, to the extent for management fees, was above market.

24.     Whether the Debtor made the Douglas Enterprises Transfers with the intention of hindering, delaying, or defrauding a creditor.

25.     Whether the Debtor was insolvent when it made any of the Douglas Enterprises Transfers, or was rendered insolvent as a result of any of the same.

26.     Whether the Debtor received reasonably equivalent value for making each of the Douglas Enterprises Transfers.

27.     Whether, and to what extent, Douglas Enterprises provided value to the Debtor for the Douglas Enterprises Transfers, which value it should not have to return or should have a preferential lien against.

28.     Whether, under TUFTA, the Debtor has a "golden creditor" at the time of each of the Douglas Enterprises Transfers, or within a reasonable period of time thereafter.

29.     Whether the Debtor was insolvent at the time it made the Douglas Transfer.

30.     Whether the Douglas Transfer enabled Douglas to receive more on account of his debt than he would have had the Douglas Transfer not been made and had the Debtor then filed Chapter 7 and Douglas have been repaid in such Chapter 7 case.

31.     Whether Douglas breached his fiduciary duties to the Debtor with respect to the Sale and Transfer, the Dual D Transfer, the Douglas Enterprise Transfers, the Douglas Transfer, and with respect to the Brea insurance policy.

32.     Whether Douglas paid the Sullivan Claim in full after the Petition Date as a jointly and severally liable party such that no amount is owing on the same.

## IV.

## CONTESTED ISSUES OF LAW

The Parties agree that the following issues of law are contested (which list may not be exhaustive and is not intended to limit the Parties' right to offer and argue such other issues of law as may be relevant):

1.      How unliquidated and disputed personal injury and wrongful death claims are valued for insolvency purposes with respect to a fraudulent transfer o preference.

2.      Whether the Transfer or any transfer of property of the Debtor in the Sale or Transfer can be avoided and recovered as an actual fraudulent transfer under the Bankruptcy Code or under the Texas Uniform Fraudulent Transfer Act ("TUFTA").

3.      Whether the Dual D Transfer or any transfer of property of the Debtor in the Dual D Transfer can be avoided and recovered as an actual fraudulent transfer under the Bankruptcy Code or under the Texas Uniform Fraudulent Transfer Act ("TUFTA").

4.      Whether the Transfer or any transfer of property of the Debtor in the sale or Transfer can be avoided and recovered as a constructive fraudulent transfer under the Bankruptcy Code or under TUFTA.

5.      Whether the Dual D Transfer or any transfer of property of the Debtor can be avoided and recovered as a constructive fraudulent transfer under the Bankruptcy Code or under TUFTA.

6.      Whether the Trustee has standing under TUFTA and section 544 of the Bankruptcy Code with respect to there being a "golden creditor" with respect to the Sale or Transfer.

7.      Whether the Trustee has standing under TUFTA and section 544 of the Bankruptcy Code with respect to there being a "golden creditor" with respect to the Dual D Transfer.

8.      Whether the Trustee is prevented from presenting any evidence of the insolvency of the Debtor prior to or as a result of the Sale and Transfer because he failed to properly answer or supplement the Defendants' interrogatories on that point.

9.      Whether the Trustee may avoid and recover any of the Douglas Enterprises Transfers as an actual fraudulent transfer under the Bankruptcy Code and under TUFTA.

10.     Whether the Trustee may avoid and recover any of the Douglas Enterprises Transfers as a constructively fraudulent transfer under the Bankruptcy Code and under TUFTA.

11.     Whether the Trustee may avoid the Douglas Management Transfers without first avoiding the underlying management agreements.

12.     Whether the Trustee is barred by limitations and repose, and the lookback periods under the Bankruptcy Code and TUFTA, from avoiding any underlying agreement under which the Douglas Management Transfers were made.

13.     Whether the Trustee has standing under TUFTA and section 544 of the Bankruptcy Code with respect to there being a "golden creditor" with respect to the Douglas Enterprises Transfers.

14.     Whether certain of the Douglas Management Transfers are outside the two year lookback under section 548 of the Bankruptcy Code and cannot therefore be avoided.

15.     Whether any of the Defendants would have had standing to object to the Tort Claims in the Bankruptcy Case.

16.    Who Douglas owed fiduciary duties to at the time of the Sale and Transfer, the Dual

D Transfer, and at the time of the Douglas Enterprises Transfers, or who would have had standing

to assert claims for breaches of the same.

17.    Whether Douglas breached his fiduciary duties to the Debtor with respect to the

Sale or Transfer.

18.    Whether Douglas breached his fiduciary duties to the Debtor with respect to the

Dual D Transfer.

19.    Whether Douglas breached his fiduciary duties to the Debtor with respect to the

Douglas Enterprises Transfers.

20.    Whether Douglas breached his fiduciary duties to the Debtor with respect to

causing the Debtor to purchase the Brae insurance.

21.    Whether limitations applies to the Trustee's claims against Douglas for breach of

fiduciary duty with respect to Brae insurance.

22.    Whether the Trustee is prevented from presenting any evidence as to the alleged

damages for Douglas' alleged breach of fiduciary duty arising from the Trustee's responses to the

Defendants' interrogatories.

23.    Whether the Trustee may avoid and recover the Douglas Transfer as an insider

preference under the Bankruptcy Code.

24.    Whether the Trustee has pled and/or preserved a cause of action to avoid the

Douglas Enterprises Transfer(s) under TUFTA and section 544 of the Bankruptcy Code.

### V.

### <u>ESTIMATED LENGTH OF TRIAL</u>

The Parties estimate two days for the trial.

# VI.

## <u>ADDITIONAL MATTERS THAT MIGHT AID IN DISPOSITION</u>

The Parties have agreed to this Court's entry of final judgment on all claims in this Adversary Proceeding, even if any such claim is not a core claim under 28 U.S.C. § 157(b)(2).

The Parties agree that Texas law governs this Adversary Proceeding, except where the Bankruptcy Code governs.

The Parties have agreed that the quantification of any attorney's fees and costs award that the Court may issue will be determined through post-trial procedures under Rule 54(d).

### # # #  END OF ORDER # # #

**AGREED:**

**MUNSCH HARDT KOPF & HARR, P.C.**
500 N. Akard Street, Suite 4000
Dallas, Texas 75202-2790
Telephone: (214) 855-7500
Facsimile: (214) 978-4375


By:    /s/ Davor Rukavina
Davor Rukavina, Esq.
Texas Bar No. 24030781
Email: drukavina@munsch.com

**COUNSEL FOR LLOYD DOUGLAS,** *ET AL*
**DEFENDANTS**

**ROCHELLE MCCULLOUGH, LLP**
300 Throckmorton Street, Suite 520
Fort Worth, Texas 76102
Telephone: 817.347.5261
Facsimile: 817.347.5269
http://www.romclaw.com


By:    /s/ Joseph F. Postnikoff (*w/ permission*)
        Joseph F. Postnikoff
        State Bar No. 16168320
Email: jpostnikoff@romclaw.com

**COUNSEL FOR SHAWN K. BROWN, PLAINTIFF**

**and**

**PASSMAN & JONES**
1201 Elm Street, Suite 2500
Dallas, Texas 75270-2599
Telephone: 214.742.2121
Facsimile: 214.748.7949

**SPECIAL COUNSEL FOR SHAWN K. BROWN,**
**CHAPTER 7 TRUSTEE AND PLANITIFF**